## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Adam Potter<br>57 Willomere Circle<br>Riverside, CT 06878,<br>   and<br>Moxie HC, LLC<br>4343 Old Grand Avenue, Suite 110<br>Gurnee, IL 60031<br><br>     Plaintiffs,<br><br>       v.<br><br>Cozen O'Connor<br>One Liberty Place<br>1650 Market Street<br>Philadelphia, Pennsylvania 19103,<br><br>Anne Blume, Esquire<br>2015 West School<br>Chicago, IL 60618,<br><br>Anne M. Madonia, Esquire<br>One Liberty Place<br>1650 Market Street<br>Philadelphia, Pennsylvania 19103,<br>   and<br>The Institutes<br>720 Province Rd.<br>Malvern, Pennsylvania,<br><br>     Defendants. | Civil Action No. 2:20-cv-01825-NIQA |

**[PROPOSED]**

**ORDER**

Upon consideration of Defendant Anne Blume's Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction, and any opposition and reply thereto, and for good cause appearing, it is hereby **ORDERED** that:

1.      Defendant Anne Blume's Motion to Dismiss is **GRANTED**.

2.      All Counts of the Complaint are **DISMISSED** as to Anne Blume for lack of

personal jurisdiction.


Dated: _____                      _____
                                            The Honorable Nitza I. Quiñones Alejandro
                                            United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Adam Potter | : | |
| 57 Willomere Circle | : | |
| Riverside, CT 06878, | : | Civil Action No. 2:20-cv-01825-NIQA |
|    and | : | |
| Moxie HC, LLC | : | |
| 4343 Old Grand Avenue, Suite 110 | : | |
| Gurnee, IL 60031 | : | |
| | : | |
|    Plaintiffs, | : | |
| | : | |
|      v. | : | |
| | : | |
| Cozen O'Connor | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| | : | |
| Anne Blume, Esquire | : | |
| 2015 West School | : | |
| Chicago, IL 60618, | : | |
| | : | |
| Anne M. Madonia, Esquire | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| | : | |
|    and | : | |
| | : | |
| The Institutes | : | |
| 720 Province Rd. | : | |
| Malvern, Pennsylvania, | : | |
| | : | |
|    Defendants. | | |

## DEFENDANT ANNE BLUME'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR LACK OF PERSONAL JURISDICTION

Pursuant to Federal Rule of Civil Procedure 12(b)(2) Defendant Anne Blume moves to dismiss the Complaint filed by Plaintiffs Adam Potter and Moxie HC, LLC, because the Court does not have personal jurisdiction over Anne Blume.  For this reason and as set forth in

Defendant's Memorandum of Law (herein incorporated by reference), the Court should grant

this Motion and dismiss the Complaint in its entirety as to Defendant Anne Blume.

Respectfully submitted,

COZEN O'CONNOR

_/s/ Brian P. Flaherty_
Brian P. Flaherty
Michael J. Melusky
1650 Market Street, Suite 2800
Philadelphia, PA 19103
_Attorneys for Defendant Anne Blume_

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Adam Potter | : | |
| 57 Willomere Circle | : | |
| Riverside, CT 06878, | : | Civil Action No. 2:20-cv-01825-NIQA |
| and | : | |
| Moxie HC, LLC | : | |
| 4343 Old Grand Avenue, Suite 110 | : | |
| Gurnee, IL 60031 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| Cozen O'Connor | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| | : | |
| Anne Blume, Esquire | : | |
| 2015 West School | : | |
| Chicago, IL 60618, | : | |
| | : | |
| Anne M. Madonia, Esquire | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| | : | |
| and | : | |
| | : | |
| The Institutes | : | |
| 720 Province Rd. | : | |
| Malvern, Pennsylvania, | : | |
| | | |
| Defendants. | | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT ANNE BLUME'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

COZEN O'CONNOR
Brian P. Flaherty
Michael J. Melusky
1650 Market Street, Suite 2800
Philadelphia, PA 19103

*Attorneys for Defendant Anne Blume*

## TABLE OF CONTENTS

I.     FACTUAL BACKGROUND ........................................................................................ 1

       A.     Introduction ................................................................................................ 1

       B.     The Parties to the Suit ................................................................................ 2

II.    LEGAL STANDARD .............................................................................................. 3

III.   ARGUMENT ........................................................................................................... 4

       A.     Pennsylvania Courts may not Exercise Personal Jurisdiction over Anne
              Blume. .......................................................................................................... 4

              1.     Anne Blume Does Not Have Sufficient Minimum Contacts with
                     Pennsylvania to Subject Her to Jurisdiction in Pennsylvania. ......... 5

              2.     Anne Blume's prior employment as an attorney with Cozen
                     O'Connor is insufficient to establish jurisdiction in Pennsylvania. ... 6

              3.     Anne Blume's former status as a shareholder and current position as
                     the Chief Executive Officer for The Institutes, LLC, d/b/a CLM
                     Group, Inc. does not create jurisdiction in Pennsylvania. ............... 7

IV.    CONCLUSION ........................................................................................................ 8

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brotherhood of Locomotive Eng's & Trainmen v. United Transp. Union*,
  413 F.Supp.2d 410 (E.D. Pa. 2005) ...................................................................7

*Colkitt v. Price*,
  No. 729-S-95, 1996 WL 34557463 (Pa. Com. Pl. Mar. 24, 1996) ..........................7

*Efford v. Jockey Club*,
  796 A.2d 370 (Pa. Super. 2002)........................................................................5

*Fid. Leasing, Inc. v. Limestone Cnty. Bd. of Educ.*,
  758 A.2d 1207 (Pa. Super. 2000).....................................................................3, 4

*GMAC v. Keller*,
  737 A.2d 279 (Pa.Super.1999)..........................................................................4, 5

*J. McIntyre Machinery, Ltd. v. Nicastro*,
  564 U.S. 873 (2011)........................................................................................3

*J.C. Snavely & Sons, Inc. v. Springland Assocs., Inc.*,
  600 A.2d 972 (Pa. Super. 1991)........................................................................7

*Lautman v. Loewen Grp., Inc.*,
  No. Civ. A. 99-75, 2000 WL 772818 (E.D. Pa. June 15, 2000) ............................7

*Nutrition Mgmt. Servs. Co. v. Hinchcliff*,
  926 A.2d 531 (Pa. Super. 2007)........................................................................5

*Wilmington Finance, Inc. v. Moonis*,
  No. 08-2365, 2008 WL 4661033 (E.D. Pa. Oct. 21, 2008) ..................................5

**Statutes**

42 Pa. C.S.A. §§ 5301 *et seq*..................................................................................4

**Rules**

Federal Rule of Civil Procedure 12(b)(2) ...................................................................3

ii

Defendant Anne Blume has moved to dismiss the Complaint against her because the Court lacks personal jurisdiction over her.[1]

## I.   **FACTUAL BACKGROUND**

### A.   **Introduction**

This motion to dismiss the Complaint against Anne Blume for lack of personal jurisdiction is filed on a standalone basis because Ms. Blume is the only Defendant to raise a matter of personal jurisdiction and believes this should be presented separately as an initial matter to the court.

The factual background presented in support of this motion will be confined to that necessary to address the matter of personal jurisdiction.  A far more extensive recitation of the facts underlying the case, and describing the complaint is in Defendants Cozen O'Connor, Anne Blume, and Anne M. Madonia's Motion to Dismiss Plaintiffs' Complaint.

Plaintiffs' claims all arise out of a transaction in which the assets of three businesses, Claims Pages, LLC, a Florida limited liability company; C&E MGMT and Planning, Inc., a Florida corporation; and CLM Group, Inc., a Florida Corporation (the "Sellers"), were sold to The Institutes, LLC, a subsidiary of the American Institute for Chartered Property Casualty Underwriters ("The Institutes").  *See* Compl. at 1-2.[2]

The Complaint asserts three counts against Anne Blume.  Count I asserts a claim for breach of fiduciary duty; Count II asserts a claim for legal malpractice based upon a tort theory of liability; and Count III asserts a legal malpractice claim based upon a contract theory of liability.  *See* Compl. at ¶¶ 64-98.

---

[1] Defendants Cozen O'Connor, Anne Blume, and Anne Madonia have concurrently filed a Motion to Dismiss Plaintiffs' Complaint.
[2] A copy of the Complaint is attached as Exhibit "A."

**B.     The Parties to the Suit**

There are two Plaintiffs: Adam Potter is a Connecticut resident and the sole member of Plaintiff Moxie.  Plaintiff Moxie was a Florida limited liability company with a registered address in Illinois.  There are four defendants.  Three of them, The Institutes, Cozen O'Connor and Anne Madonia, do not challenge personal jurisdiction.

Anne Blume does.

According to the Complaint, the alleged wrongdoing underlying the claims made against Ms. Blume occurred in connection with her allegedly serving as counsel for Potter, Moxie or one of the entities owned by them when she was employed with Cozen O'Connor in its Chicago office.   Compl. at ¶ 23.  The Complaint alleges that in early 2018, while Managing Partner of Cozen O'Connor's Chicago office, Ms. Blume gave certain advice to Mr. Potter regarding the sale price at which he should agree to have certain corporations in which he had interests sell certain assets to The Institutes.  Compl. at ¶¶ 33, 38-40. The Complaint alleges that was wrongful because, at the time that advice was allegedly given by Ms. Blume, she and Cozen O'Connor had a conflict of interest because Cozen O'Connor represented the Institutes.

The Complaint also alleges that certain entities in which Mr. Potter had an interest in fact sold certain assets to The Institutes, and that, after that, Mr. Potter recommended to the buyer of those assets that it hire Ms. Blume as the CEO of The Institutes, LLC d/b/a CLM Group, LLC. *See* Compl. at ¶ 50.  After Potter made those recommendations, that is exactly what happened. *See* Compl. at ¶ 49.

Since Ms. Blume is making a motion to dismiss for lack of personal jurisdiction, certain additional facts may be supplied by way of affidavit, and for that purpose an affidavit of Ms. Blume is appended hereto as Exhibit "B."

As explained in her affidavit, Ms. Blume was, indeed, a shareholder in the Chicago office of Cozen O'Connor in early 2018, when the allegedly improper conduct took place.  *See* Ex. B at ¶ 4; Compl. at ¶ 8.  At that time, not surprisingly, she lived in Chicago, Illinois.  *See* Ex. B at ¶ 3.

Further, consistent with the allegations of the Complaint, in late 2018 she accepted a position with The Institutes where she serves as the Chief Executive Officer for The Institutes, LLC d/b/a CLM Group, LLC,[3] which has its only office in Florida.  *See* Compl. at ¶ 6; Ex. B at ¶ 5.  Ms. Blume then moved from Illinois to Florida.  *See* Ex. B at ¶¶ 5-7.

As for Pennsylvania, Ms. Blume has never resided or worked in Pennsylvania.  Ex. B at ¶ 8.  Further Anne Blume does not own any real property, personal property, or other assets located in Pennsylvania.  Ex. B at ¶ 9.

## II.    LEGAL STANDARD

"A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (internal quotations and citations omitted).  A defendant may raise a court's lack of personal jurisdiction in a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), and a complaint may be dismissed where the court lacks personal jurisdiction over the defendant.  Fed. R. Civ. P. 12(b)(2).  "When reviewing a challenge to the trial court's exercise of jurisdiction, [] the burden rests upon the party challenging the trial court's jurisdiction," and the court "must consider the evidence in the light most favorable to the non-moving party." *Fid. Leasing, Inc. v. Limestone Cnty. Bd. of Educ.*, 758 A.2d 1207, 1210 (Pa. Super. 2000) (citing *King v. Detroit Tool Co.*, 682 A.2d 313, 314 (Pa. Super. 1996)).  "Once the movant has

---

[3]  The CLM Group, LLC of which Ms. Blume is alleged to be the Chief Executive Officer is not, nor is it alleged to be, the same entity as CLM Group Inc., one of the nonparty Sellers.

supported its jurisdictional objection, the burden shifts to the party asserting jurisdiction to prove that there is statutory and constitutional support for the trial court's exercise of *in personam* jurisdiction." *Id.* (citing *GMAC v. Keller*, 737 A.2d 279, 281 (Pa.Super.1999)).

## III.   ARGUMENT[4]

### A.   Pennsylvania Courts may not Exercise Personal Jurisdiction over Anne Blume.

This Court does not have personal jurisdiction over Anne Blume.  A Pennsylvania court may exercise *in personam* jurisdiction over a non-resident based on either that individual's "continuous and systematic contacts" with the state – general jurisdiction – or based on the particular acts of the defendant giving rise to the underlying cause of action – specific jurisdiction.  *GMAC*, 737 A.2d at 281; 42 Pa. C.S.A. §§ 5301 *et seq*.  Regardless of the grounds for *in personam* jurisdiction, the Defendant's conduct must be substantial enough that he could "reasonably anticipate being called to defend [himself] in the forum." *GMAC*, 737 A.2d at 281 (citing *Hall–Woolford Tank Co. v. R.F. Kilns*, 698 A.2d 80, 82–83 (Pa. Super. 1997)).  Further, "[r]andom, fortuitous and attenuated contacts cannot reasonably notify a party that it may be called to defend itself in a foreign forum and, thus, cannot support the exercise of personal jurisdiction.  *Id.*  That is, the defendant must have purposefully directed its activities to the forum and conducted itself in a manner indicating that it has availed itself to the forum's privileges and benefits such that it should also be subjected to the forum state's laws and regulations." *Efford v.*

---

[4] The Institutes is filing a motion to transfer this matter to the United States District Court for the District of Delaware based upon a forum selection clause in the APA and the pendency of other litigation between The Institutes and Mr. Potter in that court.  Defendants Cozen and Madonia are joining in that motion and specifically state that they would not object to the exercise of personal jurisdiction over them in the court in Delaware and consent to venue there. As to Defendant Blume, she does not believe that either this court or the Delaware court have personal jurisdiction over her.  But, in the event this Court determines that it does possess personal jurisdiction over her, then, and only then, does Ms. Blume state that she also would consent to the exercise of personal jurisdiction and venue in in the court in Delaware.

*Jockey Club*, 796 A.2d 370, 373 (Pa. Super. 2002) (citing *GMAC v. Keller*, 737 A.2d 279, 281 (Pa. Super. 1999)).

Moreover, Plaintiffs may not "overemphasize[] the legal significance of [The Institutes'] presence in Pennsylvania. '[I]t is the defendant's [] contacts with the forum that must be evaluated.'" *Wilmington Finance, Inc. v. Moonis*, No. 08-2365, 2008 WL 4661033, *4 (E.D. Pa. Oct. 21, 2008). Similarly, "that the consequences of [a defendant's] alleged acts may be felt by [a plaintiff] in Pennsylvania is not sufficient for personal jurisdiction if the activities causing such consequences are not forum-related." *Id.* at *5; *Nutrition Mgmt. Servs. Co. v. Hinchcliff*, 926 A.2d 531, 539 (Pa. Super. 2007) ("Merely alleging that a non-resident committed an act or omission in another jurisdiction that caused harm to a Pennsylvania resident is insufficient [for personal jurisdiction]; even if the parties had a contractual relationship, the defendant will not be subjected to litigation in this Commonwealth unless his forum-related activities are sufficient to support the exercise of personal jurisdiction by Pennsylvania courts.").

      1.      Anne Blume Does Not Have Sufficient Minimum Contacts with Pennsylvania to Subject Her to Jurisdiction in Pennsylvania.

Anne Blume does not have any contacts with Pennsylvania, let alone contacts relating to the allegations in Plaintiffs' Complaint sufficient to show that she somehow purposefully directed her activities to Pennsylvania.

Consistent with Plaintiffs' Complaint, at the time of the alleged wrongdoing, Anne Blume was a shareholder in Cozen O'Connor's Chicago office and was living and working in Illinois. *See* Ex. B at ¶¶ 3-4; Compl. at ¶ 8. Also consistent with Plaintiffs' Complaint, following the transaction in the asset purchase agreement at issue, Anne Blume accepted a position as CEO of The Institutes, LLC d/b/a CLM Group, LLC, and moved from Illinois to Florida, where she has lived and worked ever since. *See* Ex. B at ¶¶ 5-7; Compl. at ¶ 6. Anne

Blume has never lived or worked in Pennsylvania.  *See* Ex. B. at ¶ 8.  During the time period at issue as alleged in the Complaint pre-dating the Sale, Anne Blume did not have any contact with anyone at Cozen or with anyone at The Institutes regarding the Sale or Sale price.  In that regard, she never had any relevant contact with a Pennsylvania entity.  The Institutes, a Pennsylvania company, approached Potter regarding the potential sale.  Though the Complaint lacks detail, Potter, a Connecticut resident, presumably then approached Anne Blume about the potential sale. *See* Compl.

Ms. Blume did not travel to Pennsylvania in connection with the Sale, and did not have any contacts whatsoever with The Institutes or any other Pennsylvania entity relating to the Sale during the time period relevant to the Complaint.  Blume did not have *any* contacts with Pennsylvania and did not purposefully direct her activities to Pennsylvania or conduct herself in a manner indicating that she had availed herself of the forum's privileges and benefits such that she should also be subjected to jurisdiction in any court in Pennsylvania.  In fact, Anne Blume's actions were not even felt in Pennsylvania.  As Plaintiff Potter is a resident of Connecticut, and Plaintiff Moxie is a Florida corporation with a principal place of business in Illinois, if anywhere, the alleged harms of which Plaintiffs complain were felt in Connecticut, Florida, and Illinois.

This Court should find that Anne Blume is not subject to jurisdiction in Pennsylvania and dismiss Plaintiffs' claims against her.

2.    <u>Anne Blume's prior employment as an attorney with Cozen O'Connor is insufficient to establish jurisdiction in Pennsylvania.</u>

Anne Blume cannot be subject to general or specific jurisdiction in Pennsylvania merely because she was previously employed by Cozen O'Connor, a Philadelphia based law firm.  "The fact that [an attorney] works for a Philadelphia based firm does not make jurisdiction over her automatic. A firm's contacts with the forum state cannot be attributed to an employee to assert

6

jurisdiction over that employee." *Colkitt v. Price*, No. 729-S-95, 1996 WL 34557463, (Pa. Com. Pl. Mar. 24, 1996).  An employee's "contacts as an agent of [his employer] are not attributable to him for purposes of establishing specific jurisdiction." *J.C. Snavely & Sons, Inc. v. Springland Assocs., Inc.*, 600 A.2d 972, 974 (Pa. Super. 1991) (holding that where employee visited a factory in Pennsylvania two or three times to evaluate a product for his employer, such contacts were not attributable to the employee in his individual capacity).  "Participation as an agent for a Pennsylvania company, absent other contacts, is generally not sufficient to support the exercise of general jurisdiction." *Brotherhood of Locomotive Eng's & Trainmen v. United Transp. Union*, 413 F.Supp.2d 410, 414 (E.D. Pa. 2005).  Thus, Pennsylvania law is clear that the mere fact that Blume was previously employed as an attorney with Cozen O'Connor is insufficient to give rise to jurisdiction in Pennsylvania.

   3. Anne Blume's former status as a shareholder and current position as the Chief Executive Officer for The Institutes, LLC, d/b/a CLM Group, Inc. does not create jurisdiction in Pennsylvania.

  Anne Blume cannot be subject to general or specific jurisdiction in Pennsylvania solely due to her former status as a shareholder in Cozen O'Connor and current position as the Chief Executive Officer for The Institutes, LLC d/b/a CLM Group, Inc., a member of The Institutes. Pennsylvania law "protects officers and directors by limiting the extent to which their actions performed in the corporate capacity may be used to exercise jurisdiction over them individually." *Lautman v. Loewen Grp., Inc.*, No. Civ. A. 99-75, 2000 WL 772818, *5 (E.D. Pa. June 15, 2000) (citations omitted).  Courts sometimes find an exception where the officer was involved in tortious conduct in the officer's corporate capacity.  *Id.* (same).  Anne Blume's alleged acts at issue here do not relate to her capacity as a shareholder in Cozen O'Connor or as the Chief Executive Officer for The Institutes, LLC d/b/a CLM Group, Inc.  As a result, she cannot be

subject to jurisdiction in Pennsylvania merely because Cozen O'Connor and The Institutes have connections to Pennsylvania.

Thus, it is clear on the face of Plaintiffs' Complaint that this Court does not have jurisdiction over Anne Blume, and the Court should dismiss all claims against her.

## IV.    **CONCLUSION**

For the foregoing reasons, the Court should grant Defendant Anne Blume's motion and dismiss the Complaint.

                                                  Respectfully submitted,

                                                  COZEN O'CONNOR
                                                  */s/ Brian P. Flaherty*
                                                  Brian P. Flaherty
                                                  Michael J. Melusky
                                                  1650 Market Street, Suite 2800
                                                  Philadelphia, PA 19103
                                                  *Attorneys for Defendant Anne Blume*

Dated: July 1, 2020

# Exhibit A

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Adam Potter and Moxie HC, LLC

**(b)** County of Residence of First Listed Plaintiff    Fairfiled, CT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Clifford E. Haines, Esquire, Haines & Associates, The Widener Building, 5th Floor, 1339 Chestnut Street, Philadelphia, PA 19107 (215) 246-2200

## DEFENDANTS
Cozen O'Connor, Anne Blume, Esquire  and Anne Madonia, Esquire

County of Residence of First Listed Defendant    Philadelphia, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☒ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332 (diversity jurisdiction)
Brief description of cause:
This is a breach of fiduciary duty and legal malpractice and unjust enrichment action

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
10,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes   ☐No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE  Nitza I. Quinones Alejandro

DOCKET NUMBER  2:19-cv-05396

DATE
04/07/2020

SIGNATURE OF ATTORNEY OF RECORD
*Clifford E. Haines*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

```
Adam Potter and                          :
Moxie HC, LLC                            :        CIVIL ACTION
                                         :
                v.                       :
Cozen O'Connor, Anne Blume, Esquire      :
Anne M. Madonia, Esquire and             :        NO.
The Institutes                           :
```

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (✓)

```
 April 7, 2020            Clifford E. Haines              Plaintiffs
----------------------    ----------------------    ----------------------
Date                      Attorney-at-law           Attorney for
 215-246-2200              215-246-2211             chaines@haines-law.com
----------------------    ----------------------    ----------------------
Telephone                 FAX Number                E-Mail Address
```

(Civ. 660) 10/02

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: ___57 Willowmere Circle, Riverside, CT 06978; 4848 Old Grand Avenue, Ste. 110, Gurnee, IL 60031___

Address of Defendant: ___One Liberty Pl., 1650 Market Street, Philadelphia, PA 19103; 2015 West School, Chicago, IL 60618; 720 Providence Rd,, Malvern, PA___

Place of Accident, Incident or Transaction: ___Philadelphia, Pennsylvania___

---

**RELATED CASE, IF ANY:**

Case Number: __2:19-cv-05396__     Judge: __Nitza I. Quinones Alejandr0__     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☑   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☑   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __04/07/2020__     _____     __PA 09882__
                          *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*
                          Must sign here

---

**CIVIL: (Place a √ in one category only)**

**A.     *Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
   *(Please specify):* _____

**B.     *Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☑ 6. Other Personal Injury *(Please specify):* __Legal Malpractice__
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
   *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___Clifford E. Haines___, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __04/07/2020__     _____     __PA 09882__
                          *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Adam Potter | : | |
| 57 Willowmere Circle | : | |
| Riverside, CT 06878, | : | |
| | : | Civil Action No.: |
| and | : | |
| Moxie HC, LLC | : | |
| 4343 Old Grand Avenue, Suite 110 | : | |
| Gurnee, IL 60031 | : | |
| | : | |
| *Plaintiffs,* | : | |
| v. | : | <u>JURY TRIAL DEMANDED</u> |
| Cozen O'Connor | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| and | : | |
| Anne Blume, Esquire | : | |
| 2015 West School | : | |
| Chicago, IL 60618, | : | |
| and | : | |
| Anne M. Madonia, Esquire | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| and | : | |
| The Institutes | : | |
| 720 Providence Rd. | : | |
| Malvern, Pennsylvania, | : | |
| *Defendants.* | : | |

## <u>COMPLAINT</u>

## <u>BACKGROUND SUMMARY</u>

On June 1, 2018, Plaintiff Adam Potter, individually and as the sole member of Moxie

HC, LLC, a Florida Limited Liability Company, discontinued in December 2019, sold three

businesses, C&E MGMT and Planning, Inc., CLM Group, Inc. and Claims Pages, LLC to The

Institutes, LLC a wholly-owned subsidiary of The American Institute for Chartered Property

Casualty Underwriters on terms set forth in an Asset Purchase Agreement. When the terms of the deal were negotiated, most especially when the purchase price was set, all parties to the deal were represented by attorneys at Cozen O'Connor. After the deal closed, a year post-closing, when a dispute arose between the parties over the value of certain installment payments, Potter learned that he had not received fair value for the sale of the businesses, although he had been advised by his then-attorney, Anne Blume of Cozen O'Connor that the deal was so rich, that it was "more money than [Potter] would ever see." Blume never recommended to Potter that he have the businesses formally appraised or valued by an independent expert as part of setting the fair purchase price. The buyer, The Institutes, was also represented by Cozen O'Connor and shortly after closing, The Institutes installed Blume as Chief Executive Officer of the three businesses purchased in the deal. Blume was in this executive position when a dispute arose over the value of certain installment payments to be made to Potter and Moxie HC, LLC as part of the deal.

The conflict of interest is plain. In a complex deal such as this, the buyer and seller cannot be represented by the same law firm. Yet, no conflict waiver was obtained. The conduct of Defendants was a breach of fiduciary duties and legal malpractice, as more fully described below.

**PARTIES**

1.      Adam Potter ("Potter" or "Plaintiff") is an individual and citizen of the state of Connecticut with a residence located at 57 Willowmere Circle, Riverside, CT 06878. Adam Potter was also the sole member of Moxie HC, LLC.

2.      Plaintiff Moxie HC, LLC ("Moxie") was until December 2019, when it was discontinued, a Florida limited liability company with a registered address in Illinois at 4343 Old Grand Avenue, Suite 110, Gurnee, IL, 60031.

3.      At the time of the sale giving rise to this Complaint, Moxie owned 100% of the membership interest in Claims Pages, LLC and 100% of the outstanding and issued capital stock in CLM Group, Inc.  Potter owned 100% of the outstanding and issued capital stock in C&E MGMT and Planning, Inc.  Moxie was a named party to the transaction at issue.

4.      Defendant The Institutes, LLC is a Pennsylvania Limited liability company with a principal place of business located at 720 Providence Road, Malvern, Pennsylvania.  It is a wholly-owned subsidiary of The American Institute for Chartered Property Casualty Underwriters, a Pennsylvania non-profit corporation.

5.      Cozen O'Connor is a professional corporation created for the purpose of providing legal services with a principal place of business at One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania.

6.      Anne Blume is an individual and citizen of the State of Illinois and presently serves as the Chief Executive Officer for CLM Group, LLC., a member of The Institutes.

7.      Anne M. Madonia is an individual and citizen of the Commonwealth of Pennsylvania and presently serves as a Member of Cozen O'Connor.

8.      Up to and including October of 2018 when she became CEO of CLM Group, LLC (the businesses formerly owned by Potter and Moxie), Anne Blume was a partner in the law firm of Cozen O'Connor.

9.      C & E MGMT and Planning, Inc. is one of three companies sold by Plaintiffs to the Defendant The Institutes

10. CLM Group, Inc, is the second of three companies sold by Plaintiffs to The Institutes.

11. Claims Pages LLC is the third company sold by Plaintiffs to The Institutes.

## JURISDICTION & VENUE

12. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332 based upon diversity of citizenship between the parties. The amount in controversy, exclusive of cost and interest, exceeds the sum of $75,000. Furthermore, the amount in controversy exceeds the compulsory arbitration limits of $150,000 within the United States District Court for the Eastern District of Pennsylvania.

13. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the activities giving rise to these causes of action occurred in this district and Plaintiffs suffered injury within this District.


## FACTS

14. In or about 2007, Adam Potter created a business association now known as CLM Group, Inc for the purpose of serving property and casualty insurance claims professions.

15. CLM Group, Inc. provides education, training and information to Insurance Claims Representatives through publications, meetings and conferences. CLM Group grew to have over 45,000 members.

16. Subsequently, Plaintiff created C&E MGMT and Planning, Inc.("C&E"). C&E supported CLM Group, Inc. by organizing conferencing events at hotels, resorts and other facilities for the members of CLM Group, Inc.

17.     These services were to be billed through C & E, but the revenues earned would pass through to CLM Group, Inc.

18.     Shortly before the sale, which is at issue in this matter, Plaintiff also purchased Claims Pages, Inc.

19.     The entities, C & E., CLM Group, Inc., and Claims Pages Inc. are hereinafter collectively referred to as "CLM Group" or "CLM."

20.     Early in the development of CLM Group, Inc., Potter created an Advisory Board of Directors to assist him in making various decisions necessary for the operations of CLM Group, Inc.

21.     In 2011, Defendant Anne Blume was nominated to the Board as the "only outside lawyer member."

22.     Within a relatively brief period, Defendant Blume was titled "outside General Counsel" for CLM Group.

23.     At that time, Defendant Blume was a partner at Meckler Bulger Tilson Marick & Pearson LLP, subsequently Cozen O'Connor ("Cozen").  Blume became the Managing Partner of Cozen's Chicago office.

24.     As a practicing attorney, Blume offered her legal skills to Potter, Moxie, and CLM Group, drafting contracts, advising the companies on employment, antitrust, and other business-related matters.

25.     Blume met with, talked to and otherwise interacted with Potter on a daily basis.

26.     Blume, as designated "outside General Counsel," opened a billing file at Cozen reflecting her time and work.  Blume did not charge for her work, but used the representation as

a vehicle to grow her practice and as a marketing tool to raise awareness of and grow Cozen's Chicago office.

27.     Defendants Cozen and Blume, in addition to servicing CLM Group, also provided legal advice and counsel to Potter in his individual capacity, including but not limited to providing estate planning services and real estate transaction advice.

28.     Blume became a confidante to Potter and was regularly consulted by him on various matters related to his personal interests, CLM Group, as well as his other business interests.

29.     Defendant Blume became an integral source of advice and counsel to Potter during the purchase of CLM by The Institutes.

30.     In or about February 2018, Plaintiff Potter was approached by The Institutes with an offer to purchase CLM Group.

31.     The Institutes is a wholly-owned subsidiary of The American Institute for Chartered Property Casualty Underwriters, which services Insurance companies and brokers with educational support and certifications.  Prior to the deal to purchase CLM Group, The Institutes had a limited number of services to offer claims handling professionals and The Institutes had an interest in growing out that business line through the acquisition of CLM.

32.     The Institutes also created and administered several certification programs for Brokers and dealers of insurance products.

33.     Despite the fact that presumably Blume knew that The Institutes were long-standing clients of Cozen, Blume never suggested to Potter that:  (1) she could no longer provide him with legal advice concerning the transaction; (2) there was a significant conflict of interest;

and/or (3) she immediately needed to step out of her role as outside General Counsel to CLM Group.

34.      The Institutes was, upon information and belief, interested in acquiring the CLM Groups' business lines, *i.e.,* providing networked membership services to claims professionals throughout the United States.

35.      The Institutes recognized that Potter was in control of a large source of business revenues through a segment of the industry that had not previously been within its purview.

36.      Initially the Institutes offered Potter seventeen million dollars ($17,000,000) to purchase CLM Group.

37.      Potter was inexperienced in selling a business and immediately turned to Blume for advice and counsel and relied on it.

38.      Despite the fact that Cozen was representing The Institutes, Blume continued to provide legal advice and recommendations to Potter (and Moxie) concerning the proposed transaction.

39.      After conferring with Blume, Potter decided not to accept the initial offer and asked for more money to purchase CLM.  The Institutes then came back with a revised $20M offer, which was thoroughly discussed with Blume.

40.      Defendant Blume advised Potter that the offer was "more money than he ever imagined" and that he should not risk losing the deal.

41.      At no time did Blume recommend or advise Potter (and Moxie) to have CLM Group valued or appraised to be certain that the offer from The Institutes was fair.

42.     Potter relied on Blume, who he considered to be his trusted advisor and who had the knowledge and vast business resources within Cozen.  Potter accepted Blume's advice to "take the offer."

**The Conflict of Interest**

43.     When The Institutes delivered the purchase offer, it was represented by counsel, Cozen.

44.     Potter asked Blume whether the fact that he was selling his business to another business also represented by Cozen created a conflict of interest.

45.     Defendant Blume responded: "What's a conflict?" and advised there was no conflict, nor did she obtain a waiver of the obvious conflict.

46.     After consultation with Blume, Potter (and Moxie) decided to accept the $20,000,000 offer.  When it was decided that the transaction would be structured as an asset purchase and not a stock purchase, the purchase price was upwardly adjusted to account for taxes. Ultimately, the parties ultimately agreed to an asset purchase at a sale price of $20,329,098.

47.     The Asset Purchase Agreement was drafted by Cozen lawyers.  Potter retained separate outside counsel to negotiate and review the transaction documents on his and Moxie's behalf, and Potter continuously consulted with Blume.  The purchase price was set before Potter obtained additional counsel outside of Cozen.

48.     After the deal closed, Potter learned that he sold CLM Group for an amount substantially below the true value of the company and for a value far lower than what should have been the fair selling price.

49.     Almost immediately after the sale of CLM Group to The Institutes, Blume was appointed Chief Executive Officer of CLM Group and resigned her position at Cozen.

50.     Upon information and belief, Blume benefitted from Cozen's conflict and her dual role because Potter, not recognizing the import of the conflict and the harm that it caused him and not having been given any type of informed consent, recommended Blume for CLM Group's CEO position.

51.     The relationship between Plaintiff Potter and Defendants Blume and Cozen continued after the sale for a brief period, including that Defendants provided Potter with certain advice and counsel related to the purchase of his home.

52.     At some point, once Blume had departed Cozen and was secure in her role as CEO of the CLM Group, she turned on Potter and violated her duties of loyalty and confidentiality to him.

**The Dispute Over the Purchase Price**

53.     Under the terms of the Asset Purchase Agreement, attached as Exhibit "A," the purchase price was to be paid by delivery of an initial payment with three installment payments after that initial payment.

54.     For example, a portion of the sale price was to be paid at the end of a year post-closing, and was to be based on a formula more fully described on pages 7-9 of the Asset Purchase Agreement.

55.     The third and final payment for CLM Group was based on 12 months of post-sale net revenue.

56.     Section 2.4 of the Asset Purchase Agreement provides for an alternative dispute resolution mechanism to resolve any disputes over the amount of the installment payments.  This Section of the Agreement was drafted by Anne Madonia.

57.     A dispute over the amount of the installment payments arose, which triggered the need to use the process described in Section 2.4 of the Asset Purchase Agreement.

58.     The Institutes and Madonia failed to adhere to the mandates of Section 2.4 and contrary to the mandates of the agreed upon term of the Asset Purchase Agreement, twice provided *ex parte* information on December 5 and December 12 to the person tasked with resolving the dispute.

59.     Madonia and Cozen manipulated the process and took advantage of Potter and his confidential information gained through the firm's representation of Potter and CLM to deprive Potter of the benefit of his bargain.  Cozen's other client, The Institutes, was the third-party beneficiary of that duplicity.

60.     The *ex parte* communications were false, misleading and inaccurate, but the person tasked with resolving the dispute had no way to know that.

61.     As a result of the false, inaccurate and misleading information provided by the Institutes and Madonia in connection with the dispute resolution process, Potter and Moxie were not paid the true amount due and owing to them.

62.     The false and inaccurate information resulted in a loss of $344,951 to Plaintiffs when a dispute over the value of the installment payments was decided.  Absent the conflict of interest and legal malpractice, this miscalculation of the value of the installment payments would not have occurred.

10

63.     As a result of the negligent conduct and breaches of fiduciary duty of Cozen, Madonia, and Blume, described above, plaintiffs have suffered millions of dollars in damages, representing the difference in the true value of CLM Group and the purchase price in the Asset Purchase Agreement.


### COUNT I
### BREACH OF FIDUCIARY DUTY
### Potter and Moxie v. Blume, Madonia, and Cozen

64.     Plaintiffs incorporate by reference each of the foregoing paragraphs as though more fully set forth below

65.     Despite the absence of a formal engagement agreement, Blume and Cozen, including through Blume and Madonia and all other attorneys of the firm, had a fiduciary duty to act in accordance with good practice and render services to plaintiff commensurate with the standard of care for lawyers representing a client in connection with his business ventures.

66.     Defendants Blume and Cozen also owed Potter and Moxie a fiduciary duty of loyalty to act free from any conflict of interest in the representation.

67.     Defendants breached their duties of loyalty and of good faith and fair dealing to Potter and Moxie by giving them legal advice regarding the sale of their businesses when Cozen O'Connor also represented the buyer of the businesses and when Blume had a personal interest in the sale.

68.     Defendants breached their fiduciary duty to Potter and Moxie when they advised them to accept an offer to purchase the businesses made by another Cozen client, without advising Potter and Moxie to obtain an independent valuation of their businesses, or of the existence of a conflict of interest.

69. Defendants also breached their fiduciary duty to Potter and Moxie in representing The Institutes in the dispute regarding the final installment payment as provided for in the agreement of sale that arose when the third payment came due. Cozen had access to confidential information obtained in representing Potter and Moxie that it used against them for the benefit of the Institutes.

70. As a result of these breaches of fiduciary duty, Potter and Moxie have suffered monetary losses in the millions of dollars represented by the deficit in the set purchase price and the true value of CLM on the date of sale, plus $344,951 in losses associated with resolution of the dispute over the value of the installment payments, exclusive of litigation fees and expenses for that dispute resolution process, and non-economic losses, including humiliation, stress, and mental anguish.

71. Engaging in this egregious conflict of interest is so shocking to the conscience and is so outrageous that it warrants imposition of punitive damages.

WHEREFORE, Plaintiffs Adam Potter and Moxie HC, LLC demand judgment in their favor and against the Defendants, Cozen, Madonia, and Blume in excess of $150,000, including compensatory damages, punitive damages, and any further relief as the Court deems just and appropriate.

### COUNT II: PROFESSIONAL NEGLIGENCE
### LEGAL MALPRACTICE (TORT)
### Plaintiffs v. Blume and Cozen

72. Plaintiffs incorporate by reference each of the foregoing paragraphs as though more fully set forth below.

73.     Upon joining the board of CLM Group. defendant Blume became *de facto* and *de jure* counsel, representing Plaintiffs as the owners of the businesses.

74.     Cozen, in addition, provided legal services to Potter in his individual capacity.

75.     Although Cozen never provided Potter (or Moxie) with an engagement agreement, Cozen nonetheless represented Potter, Moxie and CLM Group in the transaction, at least up through, and including, the negotiation of the purchase price.

76.     Defendant Blume held herself out publicly on various platforms as outside General Counsel to CLM Group.

77.     Plaintiff Potter specifically sought advice from Blume concerning the sale of CLM to The Institutes.

78.     Defendant Blume failed to provide full and complete advice regarding the conflict of interest that presented itself when Cozen represented both Potter, Moxie and CLM Group and The Institutes, *i.e.,* both Sellers and Buyer in a complex transaction.

79.     When Potter questioned Defendant Blume about the potential for a conflict, Blume scoffed at the question and stated, "What's a conflict?"

80.     Defendant Blume failed to give Plaintiffs proper or adequate advice concerning the necessity of obtaining an independent valuation of CLM before setting a sale price for CLM.

81.     Potter relied on the advice given by Blume to agree on a sale price for CLM that was grossly below what the fair selling price should have been for the assets of CLM Group.

82.     Had Blume and Cozen properly advised Potter and Moxie to seek an independent appraisal or valuation of CLM Group, Potter and Moxie would have sold CLM Group for its true value, which was well in excess of the sale price.  Instead, they agreed to a sale price well below this sum, not knowing the true value of his businesses.  Potter was not advised that it is

customary to have a valuation or appraisal performed on a business to be sold and did not have independent knowledge of this.

83.     Even if the Institutes were unwilling to pay an additional sum, Plaintiffs could have negotiated for terms that would have provided them with greater value for CLM Group following the sale.

84.     Upon the sale of CLM Cozen continued to represent Potter in other personal matters.

85.     During the period up to and including June 2019, Potter was a client of Cozen.

86.     When a dispute arose between Potter (and Moxie) and the Institutes, Cozen represented The Institutes in utter disregard of the conflict of interest between Potter and The Institutes and without regard for the long term attorney client relationship that existed between Potter (and Moxie) and Cozen.

87.     Defendant Cozen actively represented The Institutes in alternative dispute resolution proceedings adverse to Potter and Moxie and used information gained confidentially from Potter and Moxie against them in the proceedings.

88.     At best, the failure to recognize this conflict of interest was merely negligent. At most, Cozen's actions were intended to harm these concurrent clients.

89.     Absent this negligence, Potter and Moxie would have sold CLM on terms and conditions far more advantageous to them and would have had a better outcome when a dispute arose over the value of the installment payments.

90.     As a result of Blume's and Cozen's negligence, Potter and Moxie lost the opportunity to sell CLM Group for full value.

91.     Cozen's and Blume's failure to appreciate the conflict of interest and/or the firm's use of confidential information obtained when representing Potter against him in the dispute that arose between him and the Institutes, as well as their failure to advise him to have his businesses professionally valued before agreeing on a sale price are errors and omissions so egregious as to be shocking to the conscience and requiring imposition of punitive damages.

WHEREFORE, Plaintiffs Adam Potter and Moxie HC, LLC demand judgment in their favor and against the Defendants Blume and Cozen in excess of $150,000 plus punitive damages and any further relief as the Court deems just and appropriate.

## COUNT III:  LEGAL MALPRACTICE (CONTRACT)
### Plaintiffs v. Blume and Cozen

92.     Plaintiffs incorporate by reference each of the foregoing paragraphs as though more full set for the herein.

93.     Plaintiffs engaged Defendants Blume and Cozen to perform legal services to include representation of CLM Group as outside counsel and to represent Plaintiffs' interests in a transaction for the sale of CLM Group to The Institutes.

94.     Although there was not a written agreement, Defendant Blume opened a client file for Potter and CLM Group at Cozen, reflecting her and the firm's representation of CLM.

95.     Defendants Blume and Cozen agreed to provide legal services to Plaintiffs, but did not perform the services in accordance with industry standards as is required by implication in all legal services contracts.

96.     The services were lacking as follows:

a.   Defendants provided advice to plaintiffs regarding the sale of CLM to The Institutes, while at the same time representing The Institutes.  This is otherwise known as engaging in a conflict of interest;

b.   Defendants failed to provide proper advice regarding the necessity to obtain an appropriate valuation of the assets to be sold in the deal for which they were providing representation to the sellers;

c.   Defendants failed to properly document the work done on behalf of Plaintiffs;

d.   Defendants improperly represented The Institutes against their clients Potter and Moxie in a dispute over the final payment under the terms of the agreement of sale Cozen drafted, ostensibly for Plaintiffs' benefit as the sellers of CLM Group.

97.   Potter (and Moxie) relied on the improper legal advice to his own detriment.

98.   The breach of contract for legal services to Plaintiffs resulted in significant losses to include selling CLM for fair value.  At the time of the sale, the fair value of CLM was significantly in excess of $20,000,000.

WHEREFORE, Plaintiffs Adam Potter and Moxie HC, LLC demand judgment in their favor and against the Defendants Blume and Cozen in excess of $150,000 and any further relief as the Court deems just and appropriate.


## COUNT: IV UNJUST ENRICHMENT
### Potter and Moxie v. The Institutes

99.   Plaintiffs incorporate by reference each of the foregoing paragraphs as though more fully set forth below.

16

100.  The Institutes was aware that it was represented by Cozen, the same firm that represented Potter, Moxie and CLM, and of which Blume was a Member.

101.  The Institutes used that relationship between Potter, Moxie, and CLM and their long-term relationship with Blume to obtain confidential information about Potter, Moxie, and CLM to its benefit and to Potter's and Moxie's detriment in the dispute that arose between Potter and Moxie as Sellers and The Institutes over the value of at least one installment payment.

102.  The Institutes used that information in order to derive something of value, CLM at a lower purchase price, without paying for it.

103.  Allowing The Institutes to retain this benefit without paying fair value constitutes an unjust enrichment.

104.  In other words, The Institutes was a third-party beneficiary of the conflict of interest between Cozen and Potter (and Moxie).

105.  The value of that benefit equals the difference between the purchase price actually paid and the true value of CLM, which is to be determined in this litigation.

106.  Upon information and belief, The Institutes has been unjustly enriched by at least $344,951 and as much as that plus the difference between the sale price paid and the true value of CLM.

WHEREFORE, Plaintiffs Adam Potter and Moxie HC, LLC demand judgment in their favor and against the Institutes in an amount exceeding $150,0000 together with any further relief the Court deems just and appropriate.

> Respectfully submitted:
>
> **HAINES & ASSOCIATES**
>
> _/s/ Clifford E. Haines_
> CLIFFORD E. HAINES (09882)
> The Widener Building, 5th Floor
> 1339 Chestnut Street
> Philadelphia, PA 19107
> (215) 246-2200 (t.)
> (215) 246-2211 (f.)
> _Attorneys for Plaintiffs Adam Potter and Moxie HC, LLC_

Dated: April 7, 2020

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all issues so triable.

> Respectfully submitted:
>
> **HAINES & ASSOCIATES**
>
> _/s/ Clifford E. Haines_
> CLIFFORD E. HAINES (09882)
> The Widener Building, 5th Floor
> 1339 Chestnut Street
> Philadelphia, PA 19107
> (215) 246-2200 (t.)
> (215) 246-2211 (f.)
> _Attorneys for Plaintiffs Adam Potter and Moxie HC, LLC_

Dated: April 7, 2020

# EXHIBIT A

=================================================================

ASSET PURCHASE AGREEMENT

By and Among

THE INSTITUTES, LLC

as Buyer,

THE AMERICAN INSTITUTE FOR CHARTERED
PROPERTY CASUALTY UNDERWRITERS
Parent,

CLAIMS PAGES, LLC,
C&E MGMT AND PLANNING, INC. and
CLM GROUP, INC.

as Sellers,

And

ADAM POTTER

and

MOXIE HC, LLC

DATED June 1, 2018

=================================================================

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ...................................................................................... 1
    Section 1.1    Definitions ........................................................................................ 1
**ARTICLE II PURCHASE AND SALE OF ACQUIRED ASSETS** ......................... 1
    Section 2.1    Purchase and Sale of Acquired Assets; Assumed Liabilities ................ 1
    Section 2.2    Consideration .................................................................................. 6
    Section 2.3    Closing Date Payments .................................................................... 6
    Section 2.4    Subsequent Payments ....................................................................... 7
    Section 2.5    Allocation of Purchase Price ............................................................ 9
**ARTICLE III CLOSING** ........................................................................................... 9
    Section 3.1    Closing; Closing Date ...................................................................... 9
    Section 3.2    Items to be Delivered at the Closing by the Selling Parties ................. 9
    Section 3.3    Items to be Delivered at the Closing by Buyer ................................. 10
**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE SELLING
PARTIES** .............................................................................................. 11
    Section 4.1    Organization, Authority, Binding Obligation of Selling Parties ......... 11
    Section 4.2    No Conflicts; Consents ................................................................... 11
    Section 4.3    Capitalization; Other Interests ........................................................ 12
    Section 4.4    Books and Records ........................................................................ 12
    Section 4.5    Authority; Compliance ................................................................... 12
    Section 4.6    Title to Acquired Assets; Condition and Sufficiency of Acquired Assets; Real
Property and Leases .......................................................................................... 12
    Section 4.7    Intellectual Property ...................................................................... 14
    Section 4.8    Contracts ..................................................................................... 16
    Section 4.9    Financial Statements; Undisclosed Liabilities; Absence of Certain Changes or
Events ............................................................................................................. 16
    Section 4.10   Receivables .................................................................................. 19
    Section 4.11   Employee and Related Matters ........................................................ 19
    Section 4.12   Litigation ..................................................................................... 20
    Section 4.13   Transactions with Related Parties .................................................... 20
    Section 4.14   Insurance ..................................................................................... 21
    Section 4.15   Tax Matters .................................................................................. 21
    Section 4.16   Certain Payments .......................................................................... 21
    Section 4.17   Privacy and Security ...................................................................... 22
    Section 4.18   Broker Fees .................................................................................. 22
    Section 4.19   Disclosure .................................................................................... 22
**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER AND PARENT** ... 22
    Section 5.1    Organization, Authority, Binding Obligation of Buyer ..................... 22
    Section 5.2    No Conflicts ................................................................................. 23
    Section 5.3    Buyer's Knowledge ....................................................................... 23
    Section 5.4    Due Diligence ............................................................................... 23
    Section 5.5    Financial Ability ........................................................................... 23
    Section 5.6    Broker Fees .................................................................................. 23
**ARTICLE VI CERTAIN COVENANTS AND UNDERSTANDINGS** ................ 24
    Section 6.1    Hotel Commissions; IATA Number ................................................ 24

i

Section 6.2    Prepaid Items ........................................................................... 24
Section 6.3    Transition Period .................................................................... 25
Section 6.4    Tax Matters ............................................................................ 25
Section 6.5    Notice to Third Parties .......................................................... 26
Section 6.6    Public Announcements ........................................................... 26
Section 6.7    Employee Matters ................................................................... 26
Section 6.8    Release of Liens ..................................................................... 27
Section 6.9    Name Change .......................................................................... 27
Section 6.10   Transition and Cooperation; Further Assurances ................. 28
Section 6.11   Confidentiality ....................................................................... 28
Section 6.12   Non-Compete .......................................................................... 28
Section 6.13   Conduct of Business Post-Closing ........................................ 29
**ARTICLE VII CONDITIONS TO OBLIGATIONS TO CLOSE** ........................30
Section 7.1    Conditions to Obligation of Buyer ........................................ 30
Section 7.2    Conditions to Obligation of the Selling Parties .................... 30
**ARTICLE VIII LEFT BLANK** .................................................................................31
**ARTICLE IX INDEMNIFICATION** .......................................................................31
Section 9.1    Indemnification of the Selling Parties ................................... 31
Section 9.2    Indemnification of Buyer ....................................................... 32
Section 9.3    Procedure ................................................................................ 32
Section 9.4    Settlement of Third Party Claims .......................................... 32
Section 9.5    Limitations on Indemnification ............................................. 33
Section 9.6    Survival of Representations, Warranties and Agreements ..... 33
Section 9.7    Definition of Losses ............................................................... 34
**ARTICLE X MISCELLANEOUS** ............................................................................34
Section 10.1   Fees and Expenses .................................................................. 34
Section 10.2   Notices .................................................................................... 34
Section 10.3   Governing Law; Disputes ...................................................... 35
Section 10.4   Waiver of Jury Trial ............................................................... 35
Section 10.5   Entire Agreement ................................................................... 35
Section 10.6   Assignability; Binding Effect ................................................ 35
Section 10.7   Amendments ........................................................................... 35
Section 10.8   Severability ............................................................................ 35
Section 10.9   Third-Party Rights .................................................................. 36
Section 10.10  Certain Interpretative Matters ............................................... 36
Section 10.11  Incorporation of Exhibits and Schedules .............................. 36
Section 10.12  Execution in Counterparts ..................................................... 36

LEGAL\36402379\4

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated June 1, 2018, by and among The Institutes, LLC ("Buyer"), a Pennsylvania limited liability company and wholly-owned subsidiary of The American Institute For Chartered Property Casualty Underwriters ("Parent"), a Pennsylvania non-profit corporation, Claims Pages, LLC, a Florida limited liability company ("CP"), C&E MGMT and Planning, Inc., a Florida corporation ("C&E"), CLM Group, Inc., a Florida corporation ("CLM" and, together with CP and C&E, collectively, "Sellers" or the "Companies" and each individually, a "Seller" or a "Company"), ADAM POTTER, an adult individual residing in Naples, Florida ("Adam Potter"), and MOXIE HC, LLC, a Florida limited liability company ("Moxie").  Buyer, Parent, each Seller, Adam Potter and Moxie are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

### W I T N E S S E T H:

A.      Moxie owns 100% of the membership interests in CP and 100% of the issued and outstanding capital stock of CLM, and Adam Potter owns 100% of the issued and outstanding capital stock of C&E.

B.      CP is engaged in the business of providing reference information for insurance claims adjusters, as more specifically set forth in Schedule A (the "CP Business"), C&E is engaged in the business of identifying and securing conference and event locations, hotel contracts and outside locations, as more specifically set forth in Schedule A (the "C&E Business"), and CLM is engaged in the business of operating as a national trade association for the claims and litigation management industries, as more specifically set forth in Schedule A (the "CLM Business" and, together with the CP Business and the C&E Business, the "Sellers' Businesses" and each individually, the "Seller's Business").

C.      Sellers desire to sell, and Buyer desires to purchase, substantially all of the assets of Sellers used in connection with the Sellers' Businesses, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties hereby, intending to be legally bound hereby, covenant and agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1      Definitions.  Defined terms used in this Agreement have the meanings ascribed to them by definition or in Appendix A.

### ARTICLE II
### PURCHASE AND SALE OF ACQUIRED ASSETS

Section 2.1      Purchase and Sale of Acquired Assets; Assumed Liabilities.

(a)    Purchase and Sale of Acquired Assets.  Subject to the terms and conditions of this Agreement, at the Closing referred to in Section 3.1 below, each Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from each Seller, all of such Seller's right, title and interest in and to all the property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, of each Seller, excluding only the Excluded Assets (the "Acquired Assets"), free and clear of any and all Liens other than Permitted Liens.  The Acquired Assets shall include all of the assets of Sellers on the Interim Financials and all assets acquired by Sellers since April 30, 2018, except to the extent disposed of in the ordinary course of business since such date or except to the extent specifically identified herein as an Excluded Asset, and shall include all of the following:

(i)    all of Sellers' rights under contracts, agreements and purchase and sale orders, including all of Sellers' rights under any customer contracts and any contract renewal rights, including, without limitation, the Contracts listed on Schedule 4.8(a);

(ii)    all of Sellers' rights under leases for real or personal property, and all security deposits associated therewith;

(iii)    all of Sellers' vehicles, parts and supplies, and all other items of machinery and equipment, owned, leased or used by Sellers as of the Closing Date, wherever located, in each case with any transferable warranty and service rights of each Seller with respect to such Acquired Assets, that are used in the ordinary course of the Sellers' Businesses, including, without limitation, such items as set forth on Schedule 2.1(a)(iii) attached hereto;

(iv)    all of Sellers' furniture, fixtures, office equipment and supplies, computers, servers, laptops and other computer hardware, computer software, stored data, communication equipment, leasehold improvements, and other fixed assets and personal property, owned, leased or used by Sellers as of the Closing Date, wherever located, in each case with any transferable warranty and service rights of each Seller with respect to such Acquired Assets, including, without limitation, such items as set forth on Schedule 2.1(a)(iv) attached hereto;

(v)    all of Sellers' inventory of raw materials, works in process, parts and finished goods, owned, leased or used by Sellers as of the Closing Date, wherever located and whether or not obsolete or carried on Seller's books of account, in each case with any transferable warranty and service rights of each Seller with respect to such Acquired Assets;

(vi)    all of Sellers' trade and other notes and accounts receivable, advance payments, deposits, prepaid items and expenses, deferred charges, rights of offset and credits and claims for refund, including, without limitation, any prepaid amounts received by any Company prior to the Closing Date, including, but not limited to, payments for conferences, sponsorships, registrations, membership dues and magazine advertising;

(vii)    all of Sellers' books, records, manuals, documents, books of account, correspondence, sales and credit reports, invoices, customer lists and records, personnel records of Hired Employees, Contract files and related correspondence; mailing lists, information manuals and similar items, literature, brochures, advertising, marketing, sales or promotional material and the like, whether maintained on paper or in any other form of media (but excluding

any general ledgers, accounting books, corporate and tax records of Sellers, or other personal records of Sellers or the equityholders of Sellers) (collectively, the "<u>Books and Records</u>");

        (viii)    all of Sellers' claims, choses in action, causes of action and judgments;

        (ix)    all of the Company Intellectual Property, including, but not limited to, all Intellectual Property and rights therein to the names "CLM", "Claims Pages," "C&E," and "Claims and Litigation Management Alliance," and any other Trademark, fictitious name, service mark, Domains, and corporate name that uses such names that the Company has rights in;

        (x)    all the Company IP Agreements, but excluding any Agreement that is unassignable as set forth in <u>Section 2.1(e)</u>;

        (xi)    to the extent transferable or assignable, any governmental licenses, authorizations, certifications, registrations, permits and approvals issued to each Seller, and all warranties and guaranties issued to any Seller, that were issued in connection with the Acquired Assets; and

        (xii)    any commissions payable with respect to the International Air Transport Association (IATA) Number 33564440 ("<u>IATA Number</u>"), for the contracts listed on <u>Schedule 2.1(a)(xii)</u> ("<u>Hotel Commissions</u>"), in accordance with <u>Section 6.1(a)</u>.

        (b)    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, from and after the Closing, each Seller shall retain all of its right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "<u>Excluded Assets</u>"):

        (i)    all cash and cash equivalents on hand on the Closing Date (including but not limited to short-term cash investments, rights or obligations under 401(k) plans and notes receivable from equityholders of Sellers);

        (ii)    all refunds of Taxes to the extent that the Taxes being refunded were attributable to any Tax period prior to the Closing Date;

        (iii)    all Tax Returns of Sellers;

        (iv)    all rights of the Selling Parties under this Agreement;

        (v)    Sellers' minute books, share registers or surplus stock certificates;

        (vi)    all Employee Benefit Plans of Sellers;

        (vii)    the IATA Number;

        (viii)    all of Sellers' vehicles, parts and supplies, and all other items of machinery and equipment, owned, leased or used by Sellers as of the Closing Date, wherever

located, in each case with any transferable warranty and service rights of each Seller with respect to such Acquired Assets, that are not used in the ordinary course of the Sellers' Businesses and are set forth on <u>Schedule 2.1(b)(viii)</u> attached hereto; and (ix) the items set forth on <u>Schedule 2.1(b)(ix)</u> attached hereto.

       (c)    <u>Assumed Liabilities</u>.  Subject to the terms and conditions of this Agreement, from and after the Closing Date, Buyer agrees that, on the Closing Date, Buyer shall assume, and from and after the Closing Date Buyer, shall pay and perform, the following debts, liabilities or obligations of Sellers unless expressly identified as Excluded Liabilities in <u>Section 2.1(d)</u> hereof (the "<u>Assumed Liabilities</u>"):

       (i)    all of the current liabilities and obligations of Sellers reflected on the Interim Financials that remain unpaid at and are not delinquent as of the Closing Date, and any current liabilities and obligations of Sellers incurred by Sellers in the ordinary course of business consistent with past practice between April 30, 2018 and the Closing Date that remain unpaid at and are not delinquent as of the Closing Date, in each case, as determined on a cash basis in accordance with GAAP (other than the Credit Card Debt);

       (ii)    all of the debts, liabilities and obligations of Sellers arising under or relating to any contract, lease or agreement included in the Acquired Assets (including, without limitation, the Contracts listed on <u>Schedule 4.8(a)</u>) which by their terms are required to be performed, paid or otherwise discharged following the Closing Date (other than to the extent such debts, liabilities and obligations are a result of any Seller's default, prior to Closing, of the provisions of any such contract, lease or agreement); and

       (iii)    such liabilities for real and personal property Taxes imposed in respect of the Acquired Assets that are due and payable subsequent to the Closing Date, to the extent such Taxes are allocable on a per diem basis to the periods commencing subsequent to the Closing Date, and Buyer's share of the Transfer Taxes as set forth in <u>Section 6.4(c)</u>.

       (d)    <u>Excluded Liabilities</u>.  Notwithstanding anything contained herein to the contrary, and except as set forth in <u>Section 2.1(c)</u> above, the purchase by Buyer of the Acquired Assets shall be free and clear of all Liens, other than Permitted Liens, and without any assumption by Buyer of any Excluded Liabilities, all of which shall be retained, performed, paid and discharged by Sellers.  The term "<u>Excluded Liabilities</u>" as used herein means any and all liabilities or obligations of Sellers or any of their respective affiliates of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, existing on the Closing Date, or arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any of the Sellers' Businesses prior to the Closing Date, excepting only the Assumed Liabilities.  Without limiting the foregoing, the Excluded Liabilities shall include, excepting the Assumed Liabilities, the following:

       (i)    any Liability for Taxes incurred by any Selling Parties for any period (or portion thereof) prior to the Closing Date, including Sellers' share of the Transfer Taxes as set forth in in <u>Section 6.4(c)</u> and Sellers' portion, allocated on a per diem basis as of the Closing Date, of any real or personal property Taxes imposed in respect of the Acquired Assets prior to the

Closing Date, and any Liability of any Selling Parties for the Taxes of another Person under a contractual indemnity or covenant, as a transferee or otherwise under applicable Laws;

(ii)     any claim or Liability in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(iii)    any Debt of Sellers as of the Closing Date, including, without, limitation, all of the outstanding credit card debt of each Company as of the Closing Date that accrued prior to the Closing Date, for the accounts listed in <u>Schedule 2.1(d)</u> (the "<u>Credit Card Debt</u>"), and such credit cards shall be closed by Sellers after the Credit Card Debt is paid in full;

(iv)    any Liability of Sellers to their respective stockholders, members or other equity security holders respecting dividends, distributions in liquidation, redemptions of shares, option payments or otherwise;

(v)     any Liability of Sellers, Adam Potter and/or Moxie arising out of this Agreement;

(vi)    any Liability for Sellers' business practices and conduct of business on or prior to the Closing Date;

(vii)   any Liability arising out of or relating to any business formerly owned or operated by Sellers, any affiliate or predecessor thereof, but not presently owned and operated by any Seller;

(viii)  any Liabilities under Employee Benefit Plans whether arising before or after the Closing Date;

(ix)    any Liability of Sellers or their respective predecessors arising out of any contract, agreement, permit, franchise or claim that is not transferred to Buyer as part of the Assumed Liabilities or otherwise included in the Acquired Assets or, subject to <u>Section 2.1(e)</u> hereof, is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer; and

(x)     any Liability of any of the Selling Parties to Nationwide Publishing Company, Incorporated ("<u>Nationwide</u>"), Scott Plakon or any Affiliate of Nationwide or of Scott Plakon, including, without limitation, any Liability arising out of or relating to that certain Asset Purchase Agreement, dated as of January 5, 2018, by and among CP and Nationwide, and any amendments thereto, that certain Consulting Agreement, dated January 5, 2018, by and between CP and Scott Plakon and that certain Promissory Note, dated January 5, 2018, in the principal amount of $200,000, issued by CP to Nationwide.

(e)     <u>Non-Transferability</u>.

(i)     To the extent that any of the Acquired Assets is not capable of being sold, assigned, transferred, delivered or subleased without the consent or waiver of any third Person (including a Governmental Entity), or if such sale, assignment, transfer, delivery or sublease or attempted sale, assignment, transfer, delivery or sublease would constitute a breach

thereof or a violation of any Law, this Agreement shall not constitute a sale, assignment, transfer, delivery or sublease thereof, or an attempted sale, assignment, transfer, delivery or sublease thereof (each, a "Non-Transferred Business Asset").

(ii)     Notwithstanding anything in this Agreement to the contrary, with respect to any Non-Transferred Business Asset, Sellers shall not be obligated to sell, assign, transfer, deliver or sublease to Buyer or any of its Affiliates (and neither Buyer nor any of its Affiliates shall be required to accept) such Non-Transferred Business Asset without first having obtained all necessary consents and waivers with respect to such Non-Transferred Business Asset. Sellers shall use all reasonable commercial efforts, and Buyer shall cooperate with Sellers, to obtain said consents and waivers and to resolve the impediments to the sale, assignment, transfer, delivery or subleases required by this Agreement and to obtain any other consents and waivers as necessary to convey to Buyer or any of its Affiliates any of the Non-Transferred Business Assets.

(iii)    To the extent that such consents and waivers are not obtained by Sellers, or until the impediments to the sale, assignment, transfer, delivery or sublease referred to therein are resolved, Sellers shall use all reasonable commercial efforts to (A) provide, at the request of Buyer, to Buyer the benefits of any Non-Transferred Business Asset, to the extent related to any of Sellers' Businesses, (B) cooperate in any reasonable and lawful arrangement designated to provide such benefits to Buyer, and (C) enforce, at the reasonable request of and for the account of Buyer, any rights of Sellers arising from any Non-Transferred Business Asset against any third Person (including a Governmental Entity), including the right to elect to terminate in accordance with the terms thereof upon the advice of Buyer. Buyer shall not be required by this Section 2.1(e) to enter into any arrangement that would impose any additional cost, expense or liability or that would deprive Buyer of any benefits or profits arising out of the Non-Transferred Business Asset in question.

(iv)    To the extent that Buyer is provided the benefits of any Non-Transferred Business Asset (whether from Sellers or otherwise), Buyer shall perform for the benefit of any third Person (including a Governmental Entity), the obligations of Sellers thereunder or in connection therewith.

(v)     Unless otherwise expressly agreed to in a separate writing by the Parties, the provisions of this Section 2.1(e) shall not be applicable to any Acquired Assets or Contracts the transfer of which is subject to a Required Consent.

Section 2.2     Consideration.  In consideration of Sellers' sale and transfer to Buyer of the Acquired Assets and assumption of the Assumed Liabilities, Parent shall cause Buyer, subject to the terms and conditions of this Agreement, to pay Sellers initially an amount equal to Seventeen Million Three Hundred Twenty Nine Thousand and Ninety Eight Dollars (US$17,329,098) (the "Initial Purchase Price").

Section 2.3     Closing Date Payments.  On the Closing Date, Parent shall cause Buyer to pay, and Buyer shall pay to, Sellers the Initial Purchase Price (the "Closing Payment"), to be allocated to Sellers in the manner set forth on Schedule 2.3, and payable by wire transfer of immediately available funds in United States dollars to the account of Sellers specified in wire instructions, delivered to Buyer no later than two (2) Business Days prior to the Closing Date.

6

Section 2.4    Subsequent Payments .  Parent shall cause Buyer to pay, and Buyer shall pay to, Sellers, in accordance with the terms and conditions set forth in this Section 2.4, subject to the right of offset as set forth in Section 6.1, the following subsequent payment amounts:

(a)    PLRB Documentation.  Buyer shall pay to the Sellers an amount equal to Two Hundred and Fifty Thousand Dollars (US$250,000) (the "PLRB Subsequent Payment"), to be allocated among Sellers in the manner set forth on Schedule 2.4(a) and payable by wire transfer of immediately available funds in United States dollars to the account of Sellers specified in the wire instructions delivered to Buyer in connection with the Closing Payment, or as otherwise instructed in writing by Sellers' Representative, within five (5) Business Days from the occurrence of the following events:(i)    no later than three (3) Business Days after the Closing Date, Sellers shall provide to Buyer all documentation in the possession of Sellers, including all documentation in Adam Potter's possession, that were previously exchanged between PLRB and the Sellers and Adam Potter with respect to all prior negotiations relating to the possible acquisition of PLRB or its assets by Sellers or any of their Affiliates (collectively, the "PLRB Documents").  Sellers' Representative shall provide written notice to Buyer that Sellers have timely provided all of the PLRB Documents to Buyer; and (ii)  for the period beginning on the Closing Date and continuing until the earlier of (A) the acquisition of PLRB or its assets by Buyer or the Companies ("PLRB Acquisition") and (B) the end of the Transition Period, Adam Potter will assist Buyer with respect to a potential PLRB Acquisition, and shall specifically undertake the efforts set forth on Schedule 2.4(a)-1; provided that the Parties understand and agree that the PLRB Subsequent Payment shall not be conditioned upon the consummation of a PLRB Acquisition.

(b)    Universal Claim Certification Product.  Buyer shall pay to the Sellers an amount equal to Five Hundred Thousand Dollars (US$500,000) (the "UCC Subsequent Payment"), to be allocated among Sellers in the manner set forth on Schedule 2.4(b) and payable by wire transfer of immediately available funds in United States dollars to the account of Sellers specified in the wire instructions delivered to Buyer in connection with the Closing Payment, or as otherwise instructed in writing by Sellers' Representative, within five (5) Business Days from the occurrence of the following events:

(i)    the UCC Product is available for distribution to third party customers and a third party customer purchases the UCC Product ("Product Launch"); provided, however, that the Product Launch must occur prior to the end of the Transition Period, unless Buyer determines, in its sole discretion, during the Transition Period, to cease the development or distribution of the UCC Product, in which case, Sellers shall receive the UCC Subsequent Payment within five (5) Business Days from date Buyer ceases such development or distribution; provided that Adam Potter is not in breach of his obligations in this Section 2.4(b), in which case, Buyer shall not be obligated to pay the UCC Subsequent Payment to the Sellers; and

(ii)    for the period beginning on the Closing Date and continuing until the earlier of (A) the Product Launch and (B) the six (6) month anniversary of the Closing Date, Adam Potter will assist Buyer to develop and distribute the UCC Product to third party customers prior to the end of the Transition Period, and shall specifically undertake the efforts set forth on Schedule 2.4(b)-1.

(c)    Revenue Target Subsequent Payment.

(i)     The "<u>Revenue Target Subsequent Payment</u>" shall mean, and shall be calculated, as follows: If, pursuant to the 12-Month Statement (as defined below), the Net Revenue for the twelve month period beginning on the first (1st) calendar day of the month immediately following the Closing Date ("<u>12-Month Post-Closing Period</u>") equals or is greater than Twelve Million Dollars (US$12,000,000) (the "<u>Required Net Revenue</u>"), then the Revenue Target Subsequent Payment shall be equal to Two Million Two Hundred Fifty Thousand Dollars (US$2,250,000). If, pursuant to the 12-Month Statement, the Net Revenue for the 12-Month Post-Closing Period is less than the Required Net Revenue, then the Revenue Target Subsequent Payment shall be an amount as set forth on <u>Schedule 2.4(c)(i)</u>.

(ii)     <u>Net Revenue Determination</u>.

(A)     Buyer will (or will cause its accountants), after the end of the 12-Month Post-Closing Period, to prepare and deliver to Sellers' Representative, no later than sixty (60) days after the end of such period, the 12-Month Statement, together with a certification from Buyer (x) stating that the 12-Month Statement was prepared in accordance with this Agreement, and (y) setting forth, for the 12-Month Post-Closing Period under examination, the applicable calculation of the Net Revenue and Revenue Target Subsequent Payment.

(B)     If Sellers disagree with Buyer's calculation of the Net Revenue and Revenue Target Subsequent Payment as set forth on the 12-Month Statement, Sellers' Representative shall provide written notice to Buyer disputing such calculations (a "<u>Dispute Notice</u>"), which Dispute Notice shall specify in reasonable detail the nature of the disagreement. Buyer shall thereupon give the Sellers' Representative reasonable access to the relevant books and records relating to the Sellers' Businesses and Buyer. If Sellers' Representative does not provide a Dispute Notice within thirty (30) Business Days after delivery of the 12-Month Statement, then such statements and payments shall be deemed accepted by Sellers, and Net Revenue and Revenue Target Subsequent Payment, for the 12-Month Post-Closing Period as reflected on the 12-Month Statement shall be deemed final.

(C)     If a Dispute Notice is delivered to Buyer by Sellers' Representative within thirty (30) Business Days after delivery of the 12-Month Statement, then, during the twenty (20) Business Day period following delivery of the Dispute Notice, Buyer and Sellers shall in good faith attempt to resolve all disagreements and to agree upon the calculation of Net Revenue and Revenue Target Subsequent Payment. In the event the parties are unable to agree upon the calculation of the Net Revenue and Revenue Target Subsequent Payment, within twenty (20) Business Days after delivery of the Dispute Notice, either Buyer or Sellers may thereafter refer the dispute to the Expert. As used herein, "<u>Expert</u>" means the New York City office of such independent firm of certified accountants of regional repute as Buyer and Sellers' Representative may mutually agree or, failing such agreement, such other independent firm of certified public accountants of international repute in New York City as the President of the New York State Society of Certified Public Accountants may, on application of either Buyer or Sellers, nominate. The Expert is to be instructed to make a decision on the dispute and notify Buyer and Sellers of its decision within twenty (20) Business Days of receiving the reference or such longer reasonable period as the Expert may reasonably determine. For purposes of this <u>Section 2.4(c)(ii)(C)</u>, (x) the Expert shall act as an expert and not an arbitrator, (y) Sellers and Sellers' accountants and Buyer and Buyer's accountants shall each promptly prepare a written statement

solely on the items in dispute which, together with all relevant documents, shall be submitted to the Expert and to the other Party, and provide to the Expert all such information as the Expert shall reasonably request, and (z) in rendering a decision, the Expert shall state what adjustments (if any) are necessary to be made to the 12-Month Post-Closing Period in respect of the items in dispute in order to comply with the requirements contained in this Agreement for the calculation of the Net Revenue and Revenue Target Subsequent Payment. The decision of the Expert shall, in the absence of fraud or manifest error, be final and binding on the Parties and the Net Revenue and Revenue Target Subsequent Payment, amended as necessary to reflect the decision of the Expert and signed by the Expert. Buyer and Sellers each shall pay one-half of the fees and expenses of the Expert.

(D)     Upon the final determination of the Net Revenue and Revenue Target Subsequent Payment, if any, in accordance with Section 2.4(c)(ii), any payment of the Revenue Target Subsequent Payment due to Sellers under this Section 2.4(c) shall be made by Buyer to Sellers not later than five (5) Business Days following such final determination, to be allocated to Sellers in the manner set forth on Schedule 2.4(c)(ii)(D), payable by wire transfer of immediately available funds in United States dollars to the account of Sellers specified in wire instructions delivered to Buyer in connection with the Closing Payment, or as otherwise instructed by Sellers' Representative.

Section 2.5     Allocation of Purchase Price.  The Purchase Price shall be allocated among the Acquired Assets as indicated on Schedule 2.5 (the "Allocation"). The Allocation shall, for Tax purposes, be binding on the Parties.  Each Party shall file their respective Tax Returns in accordance with the Allocation and shall not take any position inconsistent with such Allocation for any purpose. The Parties agree that, except as otherwise required by law, (a) the Allocation shall be binding on the Parties for all federal, state, local and foreign Tax purposes, (b) the Parties shall file, and cause to be filed by the Companies, the respective Tax Returns consistent with this Agreement and all of which shall reflect the allocation set forth in the Allocation pursuant to this Section 2.5.

## ARTICLE III
## CLOSING

Section 3.1     Closing; Closing Date.  The closing of the purchase and sale of the Acquired Assets (the "Closing") shall be held at the offices of Cozen O'Connor in Philadelphia, Pennsylvania at 9:00 a.m. (eastern standard time) on the date hereof, subject to the satisfaction or waiver of all conditions to the obligations of the Parties described in Article VII below, or at such other time and/or on such other date as may be agreed upon in writing by the Parties (the date on which the Closing actually occurs being referred to herein as the "Closing Date").  For financial accounting and tax purposes, to the extent permitted by Law, the Closing shall be deemed to have become effective as of the opening of business on the Closing Date.

Section 3.2     Items to be Delivered at the Closing by the Selling Parties.  On the Closing Date, the Selling Parties shall deliver or cause to be delivered to Buyer:

(a)     (i) a Bill of Sale (the "Bill of Sale"), in form and substance attached hereto as Exhibit A, (ii) an Assignment and Assumption Agreement (the "Assumption Agreement"), in

9

form and substance attached hereto as <u>Exhibit B,</u> (iii) an Assignment and Assumption of Lease Agreement for each Lease in form and substance acceptable to the applicable landlord (each an "<u>Assignment of Lease</u>"), and (iv) an Intellectual Property Assignment Agreement ("<u>IP Assignment</u>"), in form and substance attached hereto as <u>Exhibit C</u>.

        (b)     the Sellers' Closing Certificate;

        (c)     Ancillary Agreements to which a Selling Party is a party, duly executed by such Selling Party;

        (d)     a certificate of good standing of each Seller in the jurisdiction of formation or incorporation of each Seller, and a copy of shareholder or member resolutions of each Seller authorizing the execution, delivery and performance of this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby;

        (e)     evidence of receipt of all Required Consents;

        (f)     possession and control of all the Acquired Assets of a tangible nature; and

        (g)     such other instruments of assignment, transfer or conveyance as, in the reasonable opinion of Buyer and its counsel, shall be necessary to vest in Buyer, good and valid title to the Acquired Assets, free and clear of any Liens (other than Permitted Liens), and to put Buyer in actual possession or control of the Acquired Assets.

        Section 3.3    <u>Items to be Delivered at the Closing by Buyer</u>.  At the Closing, Buyer shall deliver or cause to be delivered to the Selling Parties:

        (a)     the Closing Payment;

        (b)     the Bill of Sale, the Assumption Agreement, each Assignment of Lease and IP Assignment, each duly executed by Buyer;

        (c)     the Buyer Closing Certificate;

        (d)     a guaranty of payment and performance (the "<u>Guaranty</u>") by Parent ("<u>Guarantor</u>") of this Agreement, in form and substance attached hereto as <u>Exhibit D</u>;

        (e)     Ancillary Agreements to which Buyer is a party, duly executed by Buyer;

        (f)     a certificate of the secretary of Parent with respect to certain corporate matters and attaching thereto a true, correct and complete copy of resolutions of the Board of Parent authorizing the execution, delivery and performance of this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby; and

        (g)     a certificate of the secretary of Buyer with respect to certain corporate matters and attaching thereto a true, correct and complete copy of resolutions of the sole member of Buyer authorizing the execution, delivery and performance of this Agreement, the Ancillary Agreements, and the transactions contemplated hereby and thereby.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE
## SELLING PARTIES

In connection with the sale of the Acquired Assets to Buyer, each of the Selling Parties, jointly and severally, represents, warrants and covenants as follows as of the Closing Date:

Section 4.1 <u>Organization, Authority, Binding Obligation of Selling Parties</u>. Each of C&E and CLM is duly incorporated and validly existing and in good standing under the laws of its jurisdiction of incorporation. Each of CP and Moxie is duly organized and validly existing and in good standing under the laws of its jurisdiction of organization. Each Selling Party has the full legal right, power, authority and capacity to execute and deliver this Agreement and the Ancillary Agreements to which such Selling Party is a party and to consummate the transactions contemplated hereby and thereby. The consummation by each of the Selling Parties of this Agreement and the Ancillary Agreements to which such Selling Party is a party and the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of each of the Selling Parties. This Agreement has been, and each Ancillary Agreement when executed will be, duly and validly executed and delivered by each Selling Party and constitutes (and will constitute) the valid and legally binding obligation of such Selling Party, enforceable in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies. Each Company has all requisite company (or corporate) power and authority to own, operate, lease and encumber its properties and carry on its business (including the Sellers' Businesses as applicable) as now conducted. Each of Company is duly qualified or registered to do business and is in good standing in each jurisdiction where such qualification or registration is required by Law, except for jurisdictions where the failure to be so qualified, either individually and in the aggregate, would not have a Material Adverse Effect.

Section 4.2 <u>No Conflicts; Consents</u>. No consent, approval, order or authorization (each a, "<u>Consent</u>") of, or registration, declaration or filing (each, a "<u>Filing</u>") with, any Governmental Entity by any of the Selling Parties is required for or in connection with the execution and delivery of this Agreement, or any Ancillary Agreement, by any of the Selling Parties or the consummation by any of the Selling Parties of the transactions contemplated hereby or thereby, other than the Required Consents. The execution, delivery and performance of this Agreement by any of the Selling Parties does not, and the consummation of the transactions contemplated hereby will not, (a) violate any provision of the organizational or governing documents of any of the entity Selling Parties, (b) conflict with or violate any applicable Law or order of any Governmental Entity currently in effect with respect to the Sellers' Businesses, except where such violation would not, individually or in the aggregate, have a Material Adverse Effect on Sellers, the Sellers' Businesses or the Acquired Assets, or (c) result in the imposition of any Lien (other than Permitted Liens) on the Acquired Assets pursuant to any mortgage, lease, Permit, agreement, instrument, Law, order, arbitration award, judgment or decree to which any Selling Party is bound. <u>Schedule 4.2(b)</u> sets forth all third party Consents and Filings required in connection with the consummation of the transactions contemplated by this Agreement (the "<u>Required Consents</u>").

Section 4.3    Capitalization; Other Interests.    The equity interests in each respective Company is as set forth on Schedule 4.3.  None of the Companies owns, directly or indirectly, any interest or investment (whether equity or debt) in any corporation, partnership, joint venture, business, trust or entity (other than investments in short-term investment securities).

Section 4.4    Books and Records. The Books and Records of each Company are in all material respects true, complete and correct and have been maintained in accordance with good business practices.

Section 4.5    Authority; Compliance.

(a)    Each Company is not in violation of, and has complied, with any order of any court, Government Entity or arbitration board or tribunal, or any Law, ordinance, governmental rule or regulation to which such Company or any of its properties or the Acquired Assets is subject, except where the failure to so comply would not, individually or in the aggregate, have a Material Adverse Effect on Sellers, the Sellers' Businesses or the Acquired Assets.  Since January 1, 2017, no Company has received any written communication from a Governmental Entity that alleges that such Company is not in compliance with any Law, ordinance, governmental rule or regulation of any Governmental Entity and which has not been resolved in all material respects.

(b)    Each Company has all necessary and material licenses, authorizations, certifications, registrations, permits and approvals and franchises required by any Governmental Entity to conduct the business of such Company as currently conducted (collectively, "Permits"), and no violations exist or have been reported in respect of such Permits since January 1, 2017, except in each case for any Permits, the absence or violation of which would not have, individually or in the aggregate, a Material Adverse Effect on the Sellers' Businesses, Sellers or the Acquired Assets.

Section 4.6    Title to Acquired Assets; Condition and Sufficiency of Acquired Assets; Real Property and Leases.

(a)    Except as described in Schedule 4.6(a), each Company has good title and marketable to, or in the case of leased personal property have a valid leasehold interests in, the tangible assets comprising the Acquired Assets, in each case free and clear of any Liens, other than Permitted Liens.  Except as described in Schedule 4.6(a), all of the Acquired Assets are owned or leased by Sellers.

(b)    Except as set forth on Schedule 4.6(b), the Acquired Assets are in good operating condition and repair (except for ordinary wear and tear and routine maintenance in the ordinary course of business), are adequate for the purposes for which they are presently used in the conduct of the Sellers' Businesses and are usable in a manner consistent with their current use. Except as set forth on Schedule 4.6(b) and other than the Excluded Assets, the Acquired Assets constitute all of the assets, properties and rights necessary for the operation of the Sellers' Businesses in the same manner as the Sellers' Businesses are currently conducted.

(c)    Sellers do not own any real property.  All real property used or held for use by Sellers in connection with the Sellers' Businesses is leased by a Seller as lessee or sublessee.

12

(d)      Schedule 4.6(d) sets forth a true, correct and complete list of all leases and subleases (the "Leases") of real property to which each Seller is a party (collectively, the "Leased Real Property").  None of the Sellers operate its business at any location other than those listed as Leased Real Properties on Schedule 4.6(d), excluding for such purposes employees and independent contractors who work for the Companies from their private residences or, in the case of independent contractors, at business locations not associated with the Companies, as set forth on Schedule 4.11(a).  True, correct and complete copies of all Leases and all amendments, modifications and supplemental agreements thereto have previously been delivered by the Selling Parties to Buyer.  The Leases are in full force and effect and are binding and enforceable against the applicable Seller and, to the Knowledge of the Sellers, each of the other parties thereto, in accordance with their respective terms and, except as set forth on Schedule 4.6(d), have not been modified or amended since the date of delivery to Buyer.  All rent and other charges currently due and payable under the Leases have been paid.  No party to any Lease has sent written notice to the other claiming that such party is in default thereunder and that such default remains uncured. Except as set forth on Schedule 4.6(d), and to the Knowledge of the Sellers there has not occurred any event which would constitute a breach of or default in the performance of any covenant, agreement or condition contained in any Lease, nor has there occurred any event which with the passage of time or the giving of notice or both would constitute such a breach or default.  To the Knowledge of the Sellers, there is no current or pending event or circumstance that would permit the termination of any of the Leases or the increase of any Liabilities or restrictions of any Seller under the Leases.  Except as set forth on Schedule 4.6(d), no construction, alteration or other leasehold improvement work with respect to any of the Leases remains to be paid for or to be performed by any Seller.  No Seller has any obligation to provide deposits (other than customary security deposits for any Lease, which have been provided by Sellers), letters of credit or other credit enhancements to retain its rights under the Leases or otherwise operate its business at the Leased Real Properties.

(e)      Sellers presently enjoy peaceful and undisturbed possession of each Leased Real Property.  To the Knowledge of the Sellers, no landlord under any Lease has received written notice of any eminent domain, condemnation or other similar proceedings pending or threatened against any Seller or any such landlords with respect to, or otherwise affecting any portion of, the Leased Real Property.  The current use of the Leased Real Property in the conduct of the Sellers' Businesses does not violate any Lease.  Except as set forth on Schedule 4.6(e), there is no violation of any covenant, condition, restriction, easement or to the Knowledge of the Sellers order of any Governmental Entity having jurisdiction over the Leased Real Property or the use or occupancy thereof.  Except as set forth on Schedule 4.6(e), no Seller has received any notice of any violation by any of them of any such Laws with respect to the Leased Real Property which have not been resolved or for which any material obligation of any Seller remains to be fulfilled, including, but not limited to, payments of monetary damages, fines or penalties or completion of any remedial or corrective measures, except in each case for any violation of which would not have, individually or in the aggregate, a material adverse effect on the Sellers' Businesses, Sellers or the Acquired Assets.

(f)      To the Knowledge of the Sellers, each Seller, and the operation of such Seller's Business, has been and are in material compliance with all applicable Environmental Laws and orders or directives of any Governmental Entity having jurisdiction under such Environmental Laws, including, without limitation, any Environmental Laws or orders or directives with respect

to any cleanup or remediation of any release or threat of release of Hazardous Substances, except in such instances where the failure to comply would not, individually or in the aggregate, have a Material Adverse Effect on the Leased Real Property. No Seller has received a written notice, demand, claim, or request for information in connection with the Seller's Business indicating that such Seller is in violation of, or is potentially liable under, any Environmental Law with respect to the conduct of any of Sellers' Businesses, the substance of which communication has not been resolved. For the purposes of this Agreement, the term "Environmental Laws" shall mean any foreign, federal, state or local law or ordinance or regulation pertaining to the protection of human health or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601, et. seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. Sections 11001, et. seq., and the Resource Conservation and Recovery Act, 42 U.S.C. Sections 6901, et. seq. For purposes of this Agreement, the term "Hazardous Substances" shall include oil and petroleum products, asbestos, polychlorinated biphenyls, urea formaldehyde and any other materials classified as hazardous or toxic under any Environmental Laws.

Section 4.7    Intellectual Property.

(a)    Schedule 4.7(a) contains an accurate and complete list of all (i) Intellectual Property Registrations owned by any of the Companies, specifying as to each as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; and the issue, registration, or filing date;; (ii) all Trademarks and all unregistered Intellectual Property that is owned by each Company and material to each Seller's Business; (iii) all Domains registered by the Companies or on behalf of the Companies; and (iv) social media accounts used by or on behalf of any of the Companies in the conduct of Sellers' Businesses, specifying the URL address associated with each account. All Intellectual Property Registrations owned by the Companies are valid and enforceable and none of Intellectual Property Registrations have lapsed or been abandoned or cancelled. Since January 1, 2018, all issuance, renewal, maintenance and other payments that are or have become due with respect said Intellectual Property Registrations have been timely paid by or on behalf of the Companies.

(b)    Schedule 4.7(b) contains a correct, current, and complete list of all Company IP Agreements, separately identifying the Company IP Agreements: (i) under which Company is a licensor or otherwise grants to any Person any right or interest relating to any Intellectual Property; (ii) that are Licensed Intellectual Property material to the Sellers' Businesses, as currently conducted; and (iii) which otherwise relate to each Company's ownership or use of any Intellectual Property in the conduct of the Sellers' Businesses as currently conducted. Each Company has provided Buyer with true and complete copies (or in the case of any oral agreements, a complete and accurate written description) of all Company IP Agreements, including all modifications, amendments, and supplements thereto and waivers thereunder.

(c)    The Companies own all right, title, and interest in or have the valid and enforceable right to use all Company Intellectual Property used in or necessary for the conduct of the Sellers' Businesses as currently conducted, in each case, free and clear of all encumbrances or Liens, other than Permitted Liens. The Company Intellectual Property constitute all material Intellectual Property necessary to conduct the Sellers' Businesses, taken as a whole, as currently

conducted. To the Knowledge of the Sellers, each Seller has taken commercially reasonable steps to preserve the confidentiality of all material Trade Secrets of Sellers

(d)   Each Company IP Agreement is valid and binding on the Companies in accordance with its terms and is in full force and effect. Neither the Company nor Sellers is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Company IP Agreement.

(e)   No current employee, former employee or independent contractor of any of the Companies who is or was involved in or has contributed to the invention, creation, or development of any Intellectual Property during the course of employment or engagement with any of the Companies, whether or not within the scope of his or her employment or engagement with any of the Companies: (i) has any ownership interests or rights to any of the Companies' Intellectual Property; (ii) needs or needed to execute an assignment of any ownership interest which such employee or independent contractor may have in or to such Intellectual Property whether or not such Intellectual Property constitutes "work made for hire" under applicable Law; and (iii) has any right or interest, including any moral rights, regarding any such Intellectual Property.

(f)   All assignments and other instruments necessary to establish the Companies' ownership interest in the Intellectual Property Registrations disclosed in <u>Schedule 4.7(a)</u> have been validly executed, delivered, and filed with the relevant Governmental Entity and authorized registrars.

(g)   To the Knowledge of the Sellers, no Person has infringed, misappropriated, made unlawful use of or otherwise violated, or is currently infringing, misappropriating, making unlawful use of, or otherwise violating, any Company Intellectual Property.

(h)   The conduct of Sellers' Businesses as currently conducted including the use of the Company Intellectual Property in connection therewith, and the products, processes, and services of the Sellers' Businesses have not infringed, misappropriated, or otherwise violated the Intellectual Property or other rights of any Person.

(i)   There are no opposition, cancellation, revocation, review, litigation, or other proceeding, whether settled, pending, or to the Knowledge of the Sellers, threatened (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by Sellers or the Companies in the conduct of the Sellers' Businesses, as currently conducted; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property owned by the Companies, including but not limited to the Intellectual Property Registrations disclosed in <u>Schedule 4.7(a)</u>, or the Companies' rights with respect to any Licensed Intellectual Property; or (iii) by the Sellers or Companies alleging any infringement, misappropriation, or other violation by any Person of any Company Intellectual Property.

(j)   To the Knowledge of the Sellers, each Company has complied with all terms of use of any social media platforms, sites or services in the conduct of the Sellers' Businesses as currently conducted.

15

(k)     Schedule 4.7(k) sets forth a complete and accurate list of all (i) Software owned, developed, or currently being developed, by any of the Companies (collectively, "Company Software"); and (ii) all Software material to the Sellers' Businesses, as currently conducted, licensed to any of the Companies under Company IP Agreements.

(l)     To the Knowledge of the Sellers, and except as listed on Schedule 4.7(l), no Open Source Software has been used in the creation or development of Company Software.

(m)     The Companies have maintained a privacy policy(ies) for their relevant websites and have been in compliance with such policy(ies).  To the Knowledge of the Sellers, there have been no data breaches involving loss, theft, or unauthorized access, use or disclosure of Personal Information in the possession, custody, or control of any of the Companies. The Companies have not received written notice of any claims or complaints, or been charged with the violation of any Laws concerning data privacy or security or, to the Knowledge of the Sellers, have not and currently are not under investigation with respect to any violation of any Laws concerning data privacy or security.

(n)     The consummation of the transactions contemplated by this Agreement shall not create any right of termination, cancellation or reversion with respect to any of the Company Intellectual Property. Each item of Company Intellectual Property will be owned or available for use by the Buyer immediately following the Closing on substantially identical terms and conditions as it was available to the Companies immediately prior to the Closing.

Section 4.8     Contracts. Schedule 4.8 contains a complete and accurate list of all Contracts of Sellers (classified (a) through (n), as applicable, based on the definition of Contracts set forth on Annex A), and true, correct and complete copies of each such Contract, including all exhibits and amendments thereto, have been delivered to Buyer.  Except as set forth in Schedule 4.8, each such Contract to which any Seller is a party is a valid and binding obligation of such Seller and, to the Knowledge of the Sellers, the other parties thereto, and each such Contract is in full force and effect in accordance with its terms.  Except as set forth in Schedule 4.8-1, each Seller and, to the Knowledge of the Sellers, each of the other parties thereto, have performed all obligations required to be performed by them under, and are not in default under, any of such Contracts and no event or circumstance has occurred which, with notice or lapse of time, or both, would constitute such a material default.  No Selling Party has received any written claim from any other party to any Contract that any Seller has breached any obligations to be performed by it thereunder or is otherwise in default or delinquent in performance thereunder, or that such party intends to terminate or has terminated such Contract.  Schedule 4.8 includes all Contracts of Sellers with hotels and other venues for upcoming CLM conferences (including any co-branded conferences), CLM events or other CLM off-site activities that will generate commissions under the IATA Number.  Adam Potter is the sole owner of the IATA Number, and Adam Potter has assigned the IATA Number to C&E as the registered agency associated with the IATA Number

Section 4.9     Financial Statements; Undisclosed Liabilities; Absence of Certain Changes or Events.

(a)     Attached hereto as Schedule 4.9(a) are (i) the unaudited balance sheets of Sellers as of December 31, 2016 and December 31, 2017, together with the related statements of

operations and retained earnings and cash flows for the years then ended ("2016-2017 Financials") and (ii) the unaudited balance sheet of Sellers as of April 30, 2018, together with the related statements of operations and retained earnings and cash flows for the four (4) months then ended ("Interim Financials" and, together with the 2016-2017 Financials, the "Financial Statements"). The Financial Statements (A) are true, complete and correct and (B) fairly present in all material respects the financial condition, results of operations and cash flows of each Seller as of such dates and for the periods then ended, except that there are no accounts receivable reflected on such Financial Statements given that the Financial Statements were prepared on a cash basis method. The income of Sellers as set forth on the 2016-2017 Financials was derived solely from Sellers' Businesses and the Acquired Assets, and not from any other businesses of Sellers. Sellers have no Liabilities, except (1) to the extent reflected as a liability on the Interim Financials, (2) Liabilities incurred in the ordinary course of business consistent with past practice after April 30, 2018, (3) Liabilities arising under any Contracts (other than those related to any breach by Sellers under such Contract prior to the Closing Date as set forth on Schedule 4.8-1) and (4) Liabilities disclosed on Schedule 4.9(a)-1, and, to the best of Sellers' Knowledge after due inquiry, there is no existing condition, situation or set of circumstances which could reasonably be expected to result in any other Liabilities. All payments paid to or received by Business Insurance Holdings, LLC for CLM conference sponsorships and for registration fees for any co-branded conferences with CLM have been paid to or received by the applicable Company on or prior to the Closing Date.

(b)     Except as set forth on Schedule 4.9(b), since April 30, 2018, no Seller has:

(i)     purchased or redeemed any capital stock or other equity interests, or granted or issued any option, warrant or other right to purchase or acquire any such capital stock or other equity interests;

(ii)     incurred or discharged any Liabilities exceeding $10,000 in the aggregate, except Liabilities incurred or discharged in the ordinary course of business consistent with past practice;

(iii)     encumbered any of the Acquired Assets, other than Permitted Liens;

(iv)     entered into of any employment, deferred compensation or other similar agreement (or any amendment to any such existing agreement) with any officer, director or employee of Seller other than in the ordinary course of business consistent with past practice;

(v)     granted (A) any increase in the salaries or other compensation payable or to become payable to, or any advance (excluding advances for ordinary business expenses consistent with past practice) or loan to, any officer, director or employee of such Seller(except for normal merit, or cost-of-living, or promotional increases to individual employees in the ordinary course of business and consistent with past practice of Sellers), (B) any increase in, or any addition to, other benefits (including any bonus, profit-sharing, pension or other plan) to which any of the officers, directors and employees may be entitled (except for normal merit, or cost-of-living, or promotional increases to individual employees in the ordinary course of business and consistent with past practice of Sellers), or (C) any payments to any pension, retirement, profit-sharing, bonus or similar plan except payments in the ordinary course of business and consistent

17

with past practice made pursuant to the Employee Benefit Plans, (D) any severance or termination pay, or any rights to receive such pay, to any officer, director or employee of such Seller or (E) any other payment of any kind to or on behalf of any officer or employee other than payment of base compensation and reimbursement for reasonable expenses in the ordinary course of business consistent with past practice;

        (vi)    suffered any labor dispute, other than routine individual grievances, or any activity or proceeding by a labor organization or representative thereof to organize any employees of such Seller;

        (vii)    caused any employee terminations (other than for poor performance or for cause) or layoffs;

        (viii)    suffered any material change or, to the Knowledge of the Sellers, received any threat of any change in any of its relations with, or any loss or, to the Knowledge of the Sellers, threat of loss of, any of the suppliers, vendors, clients, customers or employees of Seller, including any loss or change which may result from the transactions contemplated by this Agreement;

        (ix)    disposed of or to the Knowledge of the Sellers, has failed to keep in effect any rights in, to or for the use of any Permit material to the Sellers' Businesses;

        (x)    materially changed any method of keeping of its books of account or accounting practices, or Tax elections or methods;

        (xi)    disposed of or to the Knowledge of the Sellers, failed to keep in effect any rights in, to or for the use of any Intellectual Property of such Seller;

        (xii)    sold, transferred or otherwise disposed of any material assets, properties or rights of the Sellers' Businesses, except in the ordinary course of business consistent with past practice;

        (xiii)    entered into any transaction, agreement or event (other than inter-Company transactions) outside the ordinary course of the conduct of the business of such Seller or with any officer, director, manager or other affiliate of such Seller or any "associates" (as defined in the rules and regulations of the Securities and Exchange Commission) of any of the foregoing;

        (xiv)    made any single capital expenditure in excess of $50,000, or capital expenditures in excess of $100,000 in the aggregate, except for the acquisition of equipment for rental in the ordinary course of business;

        (xv)    amended or modified the terms of its existing credit, collection and payment policies, procedures and practices with respect to accounts receivable and accounts payable, respectively, including acceleration of collections of receivables, failure to make or delay in making collections of receivables (whether or not past due), acceleration of payment of payables or failure to pay or delay in payment of payables;

(xvi)    incurred any damage, destruction, theft, loss of any material Acquired Asset;

(xvii)    made (except as consistent with past practice) or revoked any Tax election or settled or compromised any material Tax Liability with any Governmental Entity;

(xviii)    waived or released any material right or claim of such Seller or incurred any modifications, amendments or terminations of any Contracts which, in the aggregate, would have a Material Adverse Effect on the Sellers' Businesses; or (xix) to the Knowledge of the Sellers, become aware of any event, occurrence, development or state of circumstances or facts which would have a Material Adverse Effect on the Sellers' Businesses.

Section 4.10    <u>Receivables</u>.    All of Companies' accounts receivable as of the relevant dates will be reflected on <u>Schedule 4.10</u>, and each will be the result of bona fide transactions in the ordinary course of the business of such Companies.  As of the date hereof, to the Knowledge of the Sellers and except as set forth on <u>Schedule 4.10</u>, all such receivables are fully collectible and are not subject to any dispute, offset, claim, refund, discount or unissued credit.

Section 4.11    <u>Employee and Related Matters</u>.

(a)    <u>Schedule 4.11(a)</u> sets forth, for each Company, a true and correct list of all Persons who are employees, independent contractors or consultants as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth, by Company, for each such individual the following: (i) name; (ii) title or position; (iii) hire date or engagement date; (iv) regular number of hours scheduled to work each week; (v) exempt/non-exempt status of each employee; (vi) current annual base compensation rate or, for independent contractors and consultants, fees paid in the last twelve (12) months; (vii) commission, bonus or other incentive-based compensation; and (viii) a description of the fringe benefits provided to each such individual as of the date hereof.

(b)    Except as set forth on <u>Schedule 4.11(b)</u>, (i) each Company is in material compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours; (ii) each Company has withheld and reported all amounts required by Law or Contract to be withheld and reported with respect to wages, salaries and other payments to its employees; (iii) there is no unfair labor practice complaint against any Company pending or, to the Knowledge of the Sellers, threatened before any Governmental Entity with respect to any Company; (iv) to the Knowledge of the Sellers, there have been no union organizing activities at any Company in the three (3) years prior to Closing; (v) no Company has Liability for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Entity with respect to wages, unemployment compensation, benefits, social security or other benefits or obligations for employees; (vi) there are no discrimination or other employment-related charges or complaints pending before any Governmental Entity against any Company or, to the Knowledge of the  Sellers, threatened against any Company; (vii) other than routine claims for benefits under the Employee Benefit Plans, no Company has any liabilities to any of Sellers' employees relating to workers' compensation benefits that are not fully insured against by third-party insurance carriers; (viii) each Company has been in material compliance

19

with and has not materially violated the terms and provisions of the Immigration Reform and Control Act of 1986, as amended, or any related regulations promulgated thereunder (the "Immigration Laws"); and (ix) each Company has complied with all Laws regarding classification of employees and has no direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any person as an independent contractor rather than as an employee, with respect to any employee leased from another employer, or with respect to any misclassification of any employee as exempt versus non-exempt.

(c)    Schedule 4.11(c) sets forth a list of all Employee Benefit Plans, if any, and Sellers have made available to Buyer copies of the written Employee Benefit Plans. Employee Benefit Plans are provided or contributed to through Moxie. Neither the Company nor any of its ERISA Affiliates has ever sponsored, maintained, contributed to or had an obligation to contribute to, or incurred any other obligation or liability (contingent or otherwise) or been secondarily liable for or with respect to a (i) plan subject to Title IV of ERISA or Sections 412 or 430 of the Code or Title I, Subtitle B, Part 3 of ERISA (including a Multiemployer Plan (as defined in Sections 3(37) and 4001(a)(3) of ERISA)), (ii) plan that has two or more contributing sponsors at least two of which are not under common control within the meaning of Section 4063 of ERISA, (iii) welfare benefit plan which is funded in whole or in part through a welfare benefit fund, as defined in Section 419 of the Code, or (iv) the Company has never maintained, established, sponsored, participated in or contributed to any self-insured plan that is governed by ERISA and that provides benefits to employees (including any such plan pursuant to which a stop-loss policy or contract applies).

(d)    Seller has not been fined or otherwise penalized by reason of its failure to comply with the Immigration Laws, nor is any such proceeding pending or, to Knowledge of the Sellers, threatened.

Section 4.12    Litigation. Except as set forth in Schedule 4.12, there is no claim, counterclaim, action, suit, order, proceeding or investigation (each a "Claim") pending or, to the Knowledge of the Sellers, threatened against any Company, any of the Acquired Assets or (to the extent any Seller may have an obligation to provide indemnification or may otherwise become liable) any of officer, manager, director or employee of any Company. To the Knowledge of the Sellers, no Company is subject to or in default under any order, judgment, decree or ruling of any Governmental Entity. Schedule 4.12 contains a complete and accurate list setting forth a general description of settlements occurring since January 1, 2016 regarding actual or threatened lawsuits (excluding worker's compensation claims) binding on any Seller.

Section 4.13    Transactions with Related Parties. Except as set forth on Schedule 4.13, no shareholder, member, director, officer or manager of any Company, nor any of their respective spouses or immediate family members (collectively, the "Related Parties"), directly or indirectly (a) owns, on an individual or joint basis, any material interest in, nor serves as an officer or director or in another similar capacity of, any distributor or supplier of any Company that has a contract or arrangement with any Company relating to the business of such Company, or (b) is engaged in any other transaction with any Company (other than employment relationships at the salaries disclosed on Schedule 4.11(a) and cash dividends and distributions in respect of any capital stock or other equity interests of any Seller).

Section 4.14    Insurance.    Schedule 4.14 sets forth a list of all insurance policies currently in effect that insure the business property and assets of each Company and a description of any material claims made thereunder (the "Insurance Policies"), and true and complete copies of, all Insurance Policies have been made available to Buyer.  The Insurance Policies are provided to the Companies by Moxie and will lapse on the Closing Date.  The Insurance Policies were adequate through the Closing Date to insure against all liabilities, claims and risks against which are customary for companies similarly situated as Sellers to insure.

Section 4.15    Tax Matters.  Except as set forth on Schedule 4.15:

(a)    each Company has timely filed all Tax Returns that it was required to file on or prior to the Closing Date (except if valid extensions have been filed for such Company) and all Taxes of the Companies, reflected on such Tax Returns, as well as Taxes of the Companies not reflected on such Tax Returns, have been paid;

(b)    there are no outstanding Liens for Taxes upon the assets of any Company, other than for Taxes not yet due and payable;

(c)    to the Knowledge of the Sellers, each Company has withheld and remitted all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder, or other third party, and has remitted all Taxes required from any amounts payable to each Company by any of its customers;

(d)    for the purpose of all Tax Returns, (i) CLM is a valid, qualified subchapter S subsidiary pursuant to the Code, and reports all Taxes on a consolidated basis with Moxie, (ii) C&E is treated as a C-Corporation, (iii) Moxie has at all times since its formation been treated as a subchapter S corporation, and (iv) CP is treated as a disregarded entity;

(e)    no waivers of the statute of limitations is currently in effect or has been requested by any Government Entity with respect to any Company's Tax Returns, no Tax Return of any of the Companies is currently under audit or, to the Knowledge of the Sellers, under examination, and none of the Companies has received any notice that its Tax Returns are to be examined or audited;

(f)    none of the Companies is or has ever been a United States real property holding corporation within the meaning of §897(c)(2) of the Code; and

(g)    to the Knowledge of the Sellers, no claim has ever been made by any Government Entity in a jurisdiction where any of the Companies does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

Section 4.16    Certain Payments.

(a)    To the Knowledge of the Sellers, none of the Companies, nor any member, shareholder officer, agent, employee or other person associated with or acting on behalf of any Company have (i) provided, or arranged for the provision of, any unlawful contribution, gift, entertainment or other unlawful expense relating to any political party or official thereof or any candidate for public office; (ii) made any bribe, rebate, payoff, influence payment, kickback or

other unlawful payment to any person (including any representative or employee of any Governmental Entity); or (iii) violated or operated in noncompliance with any export restrictions, anti-boycott regulations or embargo regulations.

(b)     None of the assets and properties of any Company (i) has been acquired by such Company pursuant to a transaction that has involved directly or indirectly an illegal payment to a representative or employee of any Governmental Entity or (ii) represents the proceeds of any illegal activity.

Section 4.17     <u>Privacy and Security</u>.  Sellers have consistently taken and currently takes all commercially reasonable actions consistent to protect the confidentiality, integrity and security of Sellers' computer systems (and all information and transactions and content stored or contained therein or transmitted thereby) against any unauthorized use, access, interruption, modification or corruption.  <u>Schedule 4.17</u> sets forth a description of the backup systems maintained by Sellers.  As of the Closing Date, no Seller has not collected, uploaded or in any way obtained identifiable medical information of any person in connection with its business.

Section 4.18     <u>Broker Fees</u>.  No broker or finder is entitled to any brokerage fees, commission or finders' fee in connection with the transactions contemplated by this Agreement or any other agreement contemplated hereby pursuant to any arrangement with any Company or Sellers.

Section 4.19     <u>Disclosure</u>. To the Knowledge of the Sellers, no representation or warranty by any Selling Party in this Agreement, and no Ancillary Agreement, exhibit, document, statement, certificate or schedule furnished or to be furnished to Buyer pursuant hereto, contains any untrue statement of a material fact, or fails to state a material fact necessary to make the statements made therein, in light of the circumstances in which they are made, not misleading.  To the Knowledge of the Sellers, there is no event or circumstance which the Selling Parties have not disclosed to Buyer which would have a Material Adverse Effect.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER AND PARENT

In connection with the purchase of the Acquired Assets from Sellers, each of Buyer and Parent, jointly and severally, represents and warrants to the Selling Parties as of the Closing Date as follows:

Section 5.1     <u>Organization, Authority, Binding Obligation of Buyer</u>.  Buyer is duly organized and validly existing and in good standing under the laws of its jurisdiction of organization.  Buyer has the full legal right, power, authority and capacity to execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party and to consummate the transactions contemplated hereby and thereby.  The consummation by Buyer of this Agreement and the Ancillary Agreements to which Buyer is a party and the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Buyer.  This Agreement has been, and each Ancillary Agreement when executed will be, duly and validly executed and delivered by Buyer and constitutes (and will constitute) the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, subject to laws of general application relating to

bankruptcy, insolvency, and the relief of debtors and other laws of general application affecting enforcement of creditors' rights generally, rules of law governing specific performance, injunctive relief and other equitable remedies. This Agreement and the Ancillary Agreements contemplated hereby and thereby have been approved by the Board.

Section 5.2    No Conflicts.    No consent of, or filing with, any Governmental Entity by Buyer is required for or in connection with the execution and delivery of this Agreement, or any Ancillary Agreement, by Buyer or the consummation by Buyer of the transactions contemplated hereby or thereby, other than the Required Consents. The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do and will not (with or without notice or lapse of time, or both) conflict with or result in any material violation of (a) the organizational documents, bylaws or similar governing documents of Buyer, or (b) any Law or order of any Governmental Entity applicable to Buyer or its properties or assets or violate or conflict with, or result in a breach under, or require any consent, other than the Required Consents, or approval to be obtained from any Governmental Entity or party to, any contract to which Buyer is subject or is bound.  No consent, approval, or authorization of, or other release from, any third party is required on the part of Buyer in connection with Buyer's valid execution, delivery and performance of this Agreement.

Section 5.3    Buyer's Knowledge. In making its decision to purchase the Acquired Assets, Buyer is not relying on any oral or written representations or assurances from the Selling Parties or any other Person other than as set forth in this Agreement. Buyer has sufficient knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risk of the transaction contemplated by this Agreement.

Section 5.4    Due Diligence. Buyer has conducted its own due diligence, searches, inspections, and investigations with respect to the Acquired Assets and the Sellers, including each Seller's Business, to the extent that it has so desired, and has been assisted and advised by its own legal, accounting and business advisers in connection with the acquisition of the Acquired Assets.  Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of the Selling Parties expressly set forth in this Agreement (including the related portions of the Schedules attached hereto); and (b) Buyer has not been induced to purchase the Acquired Assets by representations or warranties given by the Company's members, shareholders, directors, officers, or employees, or by the Sellers or Sellers' representatives, agents or attorneys, except as expressly set forth in this Agreement.

Section 5.5    Financial Ability. Buyer and Parent have the financial ability to close the transactions contemplated by this Agreement and the other documents contemplated herein and to make the payments required hereunder and thereunder.

Section 5.6    Broker Fees.  No broker or finder is entitled to any brokerage fees, commission or finders' fee in connection with the transactions contemplated by this Agreement or any other agreement contemplated hereby pursuant to any arrangement with Buyer.

## ARTICLE VI
## CERTAIN COVENANTS AND UNDERSTANDINGS

Section 6.1    Hotel Commissions; IATA Number.

(a)    The Selling Parties agree to promptly pay to Parent the amount of any Hotel Commissions earned (and paid) on or after the Closing Date, less an amount equal to ten percent (10%) of such Hotel Commission, to be paid within five (5) Business Days after payment of same by the applicable payor.

(b)    On and after the Closing Date, the Selling Parties agree to allow, or cause their respective affiliates to allow, Parent or Buyer to use the IATA Number to book hotels, conference centers or other venues that require the utilization of a registered travel agent for commission purposes, and the amount of all commissions payable as a result thereof shall be paid by the Selling Parties to Buyer, less an amount equal to ten percent (10%) of such commission, to be paid within five (5) Business Days after payment of same by the applicable payor.  In the event that the Selling Parties fail to timely pay to Buyer any amounts due hereunder, then Buyer has the right to offset, on a dollar-for-dollar basis, the amount of such payment against any Subsequent Purchase Price due to Sellers.

(c)    Notwithstanding anything herein to the contrary, Adam Potter shall have the absolute right to use the IATA Number with other Persons and other business relationships other than with Buyer, and Buyer shall have no rights, and shall not be entitled to any commissions, with respect to such business relationships with such other Persons or otherwise, it being understood that the IATA Number is the sole property of Adam Potter.  For the period commencing on the Closing Date and ending on the first year anniversary, each of C&E and Adam Potter agrees not to assign, transfer, cancel or allow to expire/lapse the IATA Number without the prior consent of Buyer, which consent shall be in Buyer's sole discretion; provided that the foregoing restrictions and consent requirement shall not apply to any assignment or transfer of the IATA Number to an entity that is owned and controlled by Adam Potter if such entity agrees in writing to abide by and comply with the obligations under this Section 6.1 on a joint and several with the Selling Parties.

Section 6.2    Prepaid Items.

(a)    Sellers have delivered to Buyer and attached hereto Schedule 6.2 setting forth certain prepaid items related to Sellers' Businesses, which have been taken into account in determining the Initial Purchase Price.

(b)    Buyer shall have thirty (30) days after the Closing Date to review and object in writing to Schedule 6.2, and the Parties shall use good faith efforts to agree upon any necessary adjustments to the Purchase Price in response to Buyer's written objections.  If the Parties are unable to resolve Buyer's written objections within fifteen (15) days after delivery of Buyer's written objections, then either Buyer or Sellers' Representative may thereafter refer the dispute to the Expert for resolution in the same manner as set forth in Section 2.4(c)(ii)(C).  Upon the final resolution of Buyer's written objections, if any payment is determined to be due to Buyer from Sellers, or due to Sellers from Buyer, such payment amount shall be made not later than five (5) Business Days following such final determination (and if to be paid to Sellers, to be allocated to

Sellers in the manner set forth on Schedule 6.2), payable by wire transfer of immediately available funds in United States dollars to the account(s) as specified in writing by the applicable payee(s). In the event that Sellers fail to timely pay to Buyer any amounts due hereunder, then Buyer has the right to offset, on a dollar-for-dollar basis, the amount of such payment against any Subsequent Purchase Price due to Sellers.

(c) In the event Buyer, after using its reasonable commercial efforts to do so, is unable to collect the accounts receivable set forth on Schedule 6.2 by December 31, 2018, Buyer shall deliver written notice of the uncollected amount to Sellers' Representative, and Sellers shall reimburse Buyer in an amount equal to such uncollected amount. Such payment amount shall be made not later than five (5) Business Days following delivery of such written notice from Buyer, payable by wire transfer of immediately available funds in United States dollars to the account as specified in writing by Buyer.

(d) In addition to the adjustments to the Purchase Price for the prepaid items on Schedule 6.2, Buyer shall also be entitled to receive complimentary advertisements (in digital and/or print formats) with Business Insurance Holdings, Inc. ("BI"), in an amount equal to up to $67,553 in 2018 and/or 2019, and the Selling Parties hereby agree to cause BI to provide such complimentary advertisements to Buyer.

Section 6.3  Transition Period. In addition to the obligations set forth in Section 2.4, commencing on the Closing Date and continuing for a period terminating on the earlier of: (a) the six (6) month anniversary of the Closing Date and (b) the date that Adam Potter provides four hundred (400) aggregate hours of Transition Services (the "Transition Period"), Adam Potter agrees to provide the services to Parent and Buyer as set forth on Schedule 6.3 (collectively referred to as, the "Transition Services"); provided, however, that in no event shall Adam Potter be required to perform such Transition Services in excess of thirty (30) hours on a weekly basis, unless Adam Potter in his sole discretion chooses to provide Transition Service in excess of such limitation. Parent shall pay Adam Potter an amount equal to $22,000 for the Transition Services, to be paid one-half on the Closing Date and the balance within two (2) Business Days after the end of the Transition Period. During the Transition Period, Adam Potter will report directly to Parent's Chief Administrative Officer. Adam Potter may provide the Transition Services from a remote location, at Adam Potter's sole discretion, except as specifically set forth on Schedule 6.3. Buyer and Parent shall jointly and severally indemnify Adam Potter and hold Adam Potter harmless with respect to any Losses arising out of or relating to the Transition Services, except to the extent such Losses were caused by an act or omission by Adam Potter.

Section 6.4  Tax Matters.

(a) Transfer Taxes. Sales taxes, transfer taxes, stamp taxes, conveyance taxes, intangible taxes, documentary recording taxes, license and registration fees, recording fees and any similar taxes or fees, if any, imposed by any Governmental Entity upon the transfer of the Acquired Assets hereunder and the filing of any instruments (the "Transfer Taxes") shall be shared equally by Buyer and Sellers (other than any Pennsylvania bulk sales Transfer Tax which shall be borne solely by Buyer). Buyer and Sellers shall cooperate with each other in any reasonable and lawful arrangement designed to minimize any applicable Transfer Taxes.

(b)    _Assistance and Cooperation_.  After the Closing Date, the Selling Parties and Buyer shall:

(i)    assist (and cause their respective Affiliates to assist) the other Party in preparing any Tax Returns or reports which such other Party is responsible for preparing and filing, which assistances shall include, for purposes of illustration and not of limitation, the provision to Sellers of reasonable access to the books and records of the Companies and the execution, at the request of the other Party of any document requisite to any Tax Return filing;

(ii)    furnish the other with copies of all correspondence received from any taxing authority in connection with any tax audit or information request with respect to any taxable period ending on or prior to the Closing Date; and (iii)    in the case of Buyer, maintain and cause each Company to maintain, any Tax Returns, tax records and similar items relating to taxable periods or portions thereof ending on or before the Closing Date for a reasonable period and not dispose of such items unless Sellers have been provided a reasonable opportunity to keep such items.

(c)    All Tax Returns of the Company for periods ending on or prior to the Closing Date which have not been filed as of the date hereof shall be timely filed (taking into account all valid extensions of time to file), shall be true and correct, and all Taxes for periods ending on or prior to the Closing Date shall be paid by the Selling Parties when due.

Section 6.5    _Notice to Third Parties_.  After the Closing, Sellers' Representative and Buyer shall send a jointly executed letter to those Persons as Sellers' Representative or Buyer may reasonably request notifying such Persons of the consummation of the transactions contemplated by this Agreement.

Section 6.6    _Public Announcements_.  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement or the transactions contemplated hereby without the prior written approval of Buyer and Sellers' Representative, provided that in no event shall the Parties issue any press release or make any public announcement relating to the Purchase Price.

Section 6.7    _Employee Matters_.

(a)    Parent shall make offers of employment to all employees engaged in each of Seller's respective businesses (the "Employees"), such offer to be made prior to the Closing Date for those Employees on Schedule 6.7(a) and on the Closing Date for all other Employees, with employment to commence effective as of the Closing Date.  Each such offer of employment shall be at the same salary or hourly wage rate as set forth on Schedule 4.11(a) or otherwise on substantially equivalent terms and conditions thereof, including, but not limited to, participation in all material employee benefit plans described on Schedule 4.11(c).  Any Employee who accepts such an offer of employment from Parent is hereinafter referred to as a "Hired Employee" and any Employee who does not accept such an offer of employment from Parent is hereinafter referred to as an "Excluded Employee" and shall not be an employee of Parent or Buyer.  Nothing in this Agreement is intended to confer any employee of Sellers any rights or remedies, including, without limitation, any rights of employment of any nature or kind whatsoever.

26

(b)     Sellers agree that neither Parent nor Buyer shall assume any responsibility for, and Sellers shall indemnify Parent and Buyer from and against, any Liability arising from any termination of employment of any Excluded Employees.  Neither Parent nor Buyer shall have any Liability with respect to any Excluded Employee, and Sellers shall retain all Liabilities with respect to all Excluded Employees.

(c)     Sellers shall be responsible for any required notices under the WARN, or any similar Law for any termination effected by Sellers prior to the Closing Date, and Sellers shall be responsible for payment of any severance, salary or benefits due in connection therewith. Subsequent to the Closing Date, Parent shall be responsible for providing any required notices under the WARN or any similar Law, and Parent shall be responsible for payment of any severance, salary or benefits due in connection therewith.

(d)     With respect to each Hired Employee, Buyer will provide, or cause to be provided, credit for all service with any Seller prior to the Closing Date for all purposes with respect to the benefits provided by Buyer (except for purposes of benefit accruals under a defined benefit pension plan, if any, maintained by Buyer).

(e)     Buyer agrees that on the Closing Date and at least for a 12-month period thereafter, to the extent permitted by Law, it will provide each Hired Employee with health insurance benefits which in the aggregate are substantially comparable to the health insurance benefits currently provided by each Company (or provided by Moxie to such Company).  For purposes of employee benefit plans, programs and arrangements provided by each Company to employees in accordance with this Section 6.7, Buyer shall treat service of each employee (determined in accordance with the employee benefit plans currently provided by each Company (or provided by Moxie to such Company)) as service rendered to Buyer for the purposes of eligibility to participate, seniority and vesting thereunder.

(f)     The Selling Parties covenant and agree that any unpaid compensation, including any bonuses, accrued for periods prior to the Closing Date will be paid to all Hired Employees no later than three (3) Business Days after the Closing Date, and all legally required withholdings will be made.

Section 6.8     Release of Liens.  Prior to the Closing, Sellers shall deliver to Buyer such Lien releases or other written evidence reasonably satisfactory to Buyer, evidencing the release of all Liens on the Acquired Assets that are not Permitted Liens, including, without limitation, pay-off letters from financial institutions in form and substance satisfactory to Buyer for any Debt.

Section 6.9     Name Change.  Within five (5) Business Days after Closing, each Seller will use commercial reasonable efforts to file with the appropriate Government Entity such documentation as necessary to change its legal name to a name that is not confusingly similar to "Claims Pages", "C&E", "C&E Mgmt" or "CLM" or any derivation thereof, and that does not include any initials in any of Sellers' names, except that the Selling Parties shall have ten (10) Business Days from the Closing Date to change the legal name of C&E.

27

Section 6.10    Transition and Cooperation; Further Assurances.  From and after the Closing, the Parties shall: (a) cooperate reasonably with each other to transfer to Buyer the control and enjoyment of the Sellers' Businesses and the Acquired Assets; and (b) not take any action, directly or indirectly, alone or together with others, which obstructs or impairs the assumption by Buyer of the Sellers' Businesses and the Acquired Assets.  After the Closing, the Selling Parties shall promptly deliver to Buyer all correspondence, papers, documents and other items and materials received by any of them or found to be in any of their possession which pertain to the Sellers' Businesses or the Acquired Assets (other than any Excluded Assets).  Each Party shall, from time to time on being reasonably requested to do so by the other Party, now or at any time in the future, take all commercially reasonable actions necessary to do or procure the doing of all such acts and/or execute or procure the execution of all such documents, at the sole cost and expense of the requesting Party, in a form reasonably satisfactory to the other Party as the other Party may reasonably consider necessary for giving full effect to this Agreement and securing to the other Party the full benefit of the rights, powers and remedies conferred upon the other Party in this Agreement.

Section 6.11    Confidentiality.    Each Selling Party shall, and shall cause its respective affiliates and representatives to, keep confidential and not disclose to any other Person or use for its own benefit or the benefit of any other Person any confidential proprietary information, technology, know-how, trade secrets (including all results of research and development), product formulas, industrial designs, franchises, inventions or other intellectual property regarding any Seller or Seller's Business ("Confidential Information") in its possession or control.  The obligations of the Selling Parties under this Section 6.11 shall not apply to Confidential Information which (a) is or becomes generally available to the public without breach of the commitment provided for in this Section or (b) is required to be disclosed by Laws of a court or tribunal or Governmental Entity; provided, however, that, in any such case, any Selling Party subject to such requirement shall notify Buyer as early as reasonably practicable prior to disclosure to allow Buyer to take appropriate measures to preserve the confidentiality of such Confidential Information.  Notwithstanding the foregoing, and subject to maintaining confidentiality of same as set forth in this Section 6.11, Moxie and Adam Potter are permitted to use, solely in connection the Permitted Activities, such know-how included in the Confidential Information that is currently used by the Selling Parties outside of the Sellers' Businesses.

Section 6.12    Non-Compete.

(a)    During the period beginning on the Closing Date and ending the fifth (5th) anniversary of the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the "Permitted Activities").

(b)    With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of

Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

(c)     During the Non-Compete Period, each Selling Party shall not, and shall cause its affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any employee or independent contractor to leave the employ of Buyer, or engagement by Buyer, for any reason whatsoever, nor shall any Selling Party or any of their affiliates offer or provide employment to (whether such employment is for Seller or any other business or enterprise), or engage, either on a full-time basis or part-time basis, any Person who then currently is, or who within six months immediately prior thereto was, an employee or independent contractor of Buyer or any of the Companies; provided, however, that this prohibition shall not apply to general solicitations not directed at any employees or independent contractors or in the event of any initial contact being made by any employee or independent contractor.  Buyer acknowledges that, on and after the Closing Date, there will be independent contractors engaged part-time with both Parent or Buyer and with a Selling Party or an affiliate of a Selling Party, and that such engagement does not violate this Section 6.12(c); provided, however, that each Selling Party hereby agrees not to, and shall cause its affiliates not to, directly or indirectly, solicit or induce, or attempt to solicit or induce, any such independent contractor to leave its engagement with Parent or Buyer during the Non-Compete Period.

(d)     Each Selling Party acknowledges and agrees that the provisions of this Section 6.12 are reasonable and necessary to protect the legitimate business interests of Buyer and its investment in the Acquired Assets.  Each Selling Party shall not contest that Buyer's remedies at law for any breach or threat of breach by any Selling Party or any of its affiliates of the provisions of this Section 6.12 will be inadequate, and that Buyer shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Section 6.12, without proving actual damages, and to enforce specifically such terms and provisions, in addition to any other remedy to which Buyer may be entitled at law or equity.  The restrictive covenants contained in this Section 6.12 are covenants independent of any other provision of this Agreement or any other agreement between the parties hereunder and the existence of any claim which any Selling Party may allege against Buyer under any other provision of the Agreement or any other agreement will not prevent the enforcement of these covenants.

(e)     If any of the provisions contained in this Section 6.12 shall for any reason be held to be excessively broad as to duration, scope, activity or subject, then such provision shall be construed by limiting and reducing it, so as to be valid and enforceable to the extent compatible with the applicable Laws or the determination by a court of competent jurisdiction.

(f)     In the event of a breach by any Selling Party of any covenant set forth in Sections 6.12(a), (b) or (c) of this Agreement, the term of such covenant will be extended by the period of the duration of such breach.

Section 6.13     Conduct of Business Post-Closing. From the Closing Date through the one (1) year anniversary thereof, Buyer shall not take any action (or omit to take any action) for the purpose or with the intent to eliminate or reduce the amount of the Subsequent Purchase Price.  If Buyer sells Sellers' Businesses to an unaffiliated third party (whether by means of asset

sale, sale of fifty (50%) percent or more of the stock ownership in one or a series of related transactions other than to an Affiliate or the Parent) ("Spin Off Sale") prior to the six (6) month anniversary of the Closing Date, then Buyer agrees to pay to Sellers the full amount of the UCC Subsequent Payment, PLRB Subsequent Payment and the Revenue Target Subsequent Payment, and such payments will be paid to Sellers within thirty (30) days of the consummation of the Spin Off Sale in accordance with the payment instructions set forth in Section 2.4; provided, however, that the acceleration of the Subsequent Purchase Price shall not be due to Sellers under this Section 6.13 in the event that the Selling Parties are in breach of Section 2.4.

# ARTICLE VII
## CONDITIONS TO OBLIGATIONS TO CLOSE

Section 7.1    Conditions to Obligation of Buyer.  The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to the satisfaction (or waiver in writing by Buyer as of the Closing) of the following conditions:

(a)    (i)  the representations and warranties set forth in Article IV above shall be true and correct in all material respects as of the Closing Date, and (ii) the Selling Parties shall have performed and complied with all of their covenants hereunder in all material respects through the Closing;

(b)    Buyer shall have been furnished with a certificate executed by the Selling Parties (the "Sellers' Closing Certificate"), dated the Closing Date, certifying that the conditions set forth in Section 7.1(a) have been fulfilled (or waived in writing by Buyer) at or prior to the Closing Date;

(c)    there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)    all of the Required Consents shall have been obtained;

(e)    the Selling Parties shall have executed and delivered to Buyer the agreements, instruments, documents and certificates provided for in Section 3.2;

(f)    all actions to be taken by the Selling Parties in connection with consummation of the transactions as specified by this Agreement and all instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Buyer.

Section 7.2    Conditions to Obligation of the Selling Parties.  The obligation of the Selling Parties to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction (or waived in writing by the Selling Parties) of the following conditions:

(a)    (i)  the representations and warranties set forth in Article V above shall be true and correct in all material respects as of the Closing Date, and (ii) Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(b)     the Selling Parties shall have been furnished with a certificate executed by an officer of Buyer (the "Buyer Closing Certificate"), dated the Closing Date, certifying that the conditions set forth in Section 7.2(a) have been fulfilled (or waived in writing by the Selling Parties) at or prior to the Closing Date;

(c)     all of the Required Consents shall have been obtained;

(d)     there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(e)     Buyer and Parent shall have executed and delivered to the Selling Parties the agreements, instruments, documents and certificates provided for in Section 3.3; and

(f)     all actions to be taken by Buyer and Parent in connection with consummation of the transactions as specified by this Agreement and all instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Sellers.

## ARTICLE VIII
## LEFT BLANK

## ARTICLE IX
## INDEMNIFICATION

Section 9.1     Indemnification of the Selling Parties.  Buyer and Parent shall, from and after the Closing, defend, indemnify and hold harmless the Selling Parties, and their respective heirs, officers, directors, stockholders, members, Affiliates, agents and representatives (collectively the "Seller Indemnified Parties"), from, against, for, and in respect of and pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:

(a)     any breach of any representation, warranty, covenant or agreement of Buyer or Parent contained in this Agreement or in any Ancillary Agreement;

(b)     the operations of the Sellers' Businesses, or the Acquired Assets, after the Closing, excluding any Losses arising from the Excluded Assets or the Excluded Liabilities, or the Assumed Liabilities after the Closing Date;

(c)     (i) any employment-related Liability (statutory or otherwise) with respect to employment or termination of employment on or after the Closing Date, (ii) any Liability relating to, arising under or in connection with any Employee Benefit Plan, including any Liability under COBRA, arising on or after the Closing Date and (iii) any liability under WARN;

(d)     any Liabilities arising from any claims made by any Marriott entity for Buyer's breach of any of its obligations under any of the Hotel Contracts (as defined on Schedule 4.8) on or after the Closing Date (excluding if such breach is based upon any event, circumstance, condition or other state of facts existing or arising prior to the Closing Date);

31

(e)      the enforcement by any Seller Indemnified Party of any of its rights under this <u>Section 9.1</u> or any other covenant contained in this Agreement.

Section 9.2      <u>Indemnification of Buyer</u>.  The Selling Parties shall, jointly and severally, from and after the Closing, defend, indemnify and hold harmless Buyer and its respective officers, directors, stockholders, Affiliates, agents and representatives (collectively the "<u>Buyer Indemnified Parties</u>") from, against, for and in respect of and pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:

(a)      any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement (other than any such breach in existence as of the Closing Date which was disclosed in writing by Sellers to Buyer at or prior to the Closing Date and was waived in writing by Buyer);

(b)      the operations of the Companies prior to the Closing Date (other than arising out or resulting from the Assumed Liabilities);

(c)      (i) any employment-related Liability (statutory or otherwise) with respect to employment or termination of employment of Sellers' employees prior to the Closing Date, and (ii) any liability relating to, arising under or in connection with any Employee Benefit Plan, including any liability under COBRA, arising prior to the Closing Date;

(d)      any failure by any Selling Party to pay, perform or discharge any Excluded Liabilities;

(e)      any Liabilities arising under any of the Hotel Contracts as a result of any claims made by any Marriott entity due to any event, circumstance, condition or other state of facts existing or arising prior to the Closing Date; or

(f)      the enforcement by any Buyer Indemnified Party of any of its rights under this <u>Section 9.2</u> or any other indemnification covenant contained in this Agreement.

Section 9.3      <u>Procedure</u>.  Any Party seeking indemnification pursuant to this Agreement (the "<u>Indemnified Party</u>") shall promptly give the Party from whom such indemnification is sought (the "<u>Indemnifying Party</u>") written notice of the matter with respect to which indemnification is being sought, which notice shall specify in reasonable detail, if known, the amount or an estimate of the amount of the Loss arising therefrom and the basis of the claim or indemnification obligation.  Such notice shall be a condition precedent to any liability of the Indemnifying Party for indemnification hereunder, but the failure of the Indemnified Party to give such prompt notice shall not adversely affect the Indemnified Party's right to indemnification hereunder except, and only to the extent that, in the case of a claim made by a third party, the defense of that claim is materially prejudiced by such failure.

Section 9.4      <u>Settlement of Third Party Claims</u>.  In connection with any indemnification claim arising out of a claim or legal proceeding (a "<u>Third Party Claim</u>") by a Person who is not a Party, the Indemnifying Party shall be entitled to control the defense of any such claim with counsel reasonably acceptable to the Indemnified Party at the Indemnifying

Party's own cost and expense, including the cost and expense of reasonable attorneys' fees and disbursements in connection with such defense. Subject to the preceding proviso, the Indemnifying Party shall be entitled to agree to a settlement of, or the stipulation of any judgment arising from, any such Third Party Claim, with the consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed; provided, however, that no such consent shall be required from the Indemnified Party if (A) the Indemnifying Party pays or causes to be paid all Losses arising out of such settlement or judgment concurrently with the effectiveness thereof (as well as all other Losses theretofore incurred by the Indemnified Party which then remain unpaid or unreimbursed), (B) in the case of a settlement, the settlement is conditioned upon a complete release by the claimant of the Indemnified Party, and (C) such settlement or judgment does not impose an injunction or other equitable relief upon the Indemnified Party, require the encumbrance of any asset of the Indemnified Party or impose any restriction upon its conduct of business or otherwise materially adversely affect its business, including, without limitation, use of any of the Intellectual Property.

Section 9.5     Limitations on Indemnification.

(a)     Notwithstanding anything in this Agreement to the contrary, no Party will be entitled to assert any claim for indemnification (for the Selling Parties, under Section 9.1, and for Buyer, under Section 9.2) unless the amount of such Loss exceeds US$50,000 (the "Basket") in the aggregate, in which event the Indemnified Party may assert its right to the full extent of its Loss in excess of the Basket; provided, however, that the maximum aggregate amount of Losses payable by the Selling Parties shall be limited to the Purchase Price (the "Cap"); and provided further, that the Basket and the Cap shall not apply in the event of fraud, or intentional misrepresentation relating to Sections 4.1, 4.3 4.5, 4.6, 4.7, 4.15, 4.18, 5.1, 5.4 and 5.5, or any indemnification claimed under Sections 9.1(b), 9.1(c), 9.2(b), 9.2(c) and 9.2(d), or for any breaches of covenants in Article VI. For purposes of this Article IX, the Selling Parties shall not be deemed to have breached any representation or warranty if Buyer had prior to the Closing Date, any actual knowledge of the breach of, or any facts or circumstances constituting or resulting in a breach of, such representation or warranty.

Section 9.6     Survival of Representations, Warranties and Agreements. All representations and warranties made by Buyer, Parent, and Selling Parties in this Agreement, or in any Ancillary Agreement delivered pursuant hereto or thereto shall survive the Closing Date for a period of twenty-four (24) months following the Closing Date (the "Survival Period") and no action or claim for Losses resulting from any misrepresentation or breach of warranty shall be brought or made after the Survival Period, except that such time limitation shall not apply to: (a) claims for misrepresentations and breach of warranties relating to Section 4.7 or claims relating to breaches of covenants, all of which may be asserted without limitation; (b) claims for misrepresentations and breach of warranties relating to Section 4.15, which may be asserted until sixty (60) days after the running of the applicable statute of limitations (giving effect to any waiver or extension thereof); and (c) any claims which have been asserted and which are the subject of a written notice from any Seller Indemnified Party to Buyer or from any Buyer Indemnified Party to the Selling Parties, as may be applicable, prior to the expiration of the Survival Period; and in each case shall be unaffected by any investigation made by or on behalf of any Party, by knowledge obtained as a result thereof or otherwise or by any notice of breach of, or failure to perform under, this Agreement which is not effectively waived in accordance herewith.

Section 9.7    Definition of Losses.  For purposes of this Article IX, "Losses" shall mean all Liabilities, losses, damages (other than consequential, special, incidental or punitive damages), awards, judgments, assessments, fines, penalties, charges, fees, costs, expenses and other payments however suffered or characterized, all interest thereon, all reasonable costs and expenses of investigating any claim, lawsuit or arbitration and any appeal therefrom, all reasonable attorneys', accountants', investment bankers', and expert witness' fees incurred in connection therewith, whether or not such claim, lawsuit or arbitration is ultimately defeated and, subject to this Article IX, all amounts paid incident to any compromise or settlement of any such claim, lawsuit or arbitration.

## ARTICLE X
## MISCELLANEOUS

Section 10.1    Fees and Expenses.    Except as otherwise provided in this Agreement, each Party will bear its own direct expenses incurred in connection with the negotiation and preparation of this Agreement and the consummation and performance of the transactions contemplated hereby.

Section 10.2    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been given if delivered personally, sent by facsimile transmission, overnight courier, or certified or express mail, postage prepaid.  Any such notice shall be deemed given: (a) when so delivered personally or sent by facsimile transmission or email (provided that a confirmation copy is sent by overnight courier), (b) one (1) Business Day after deposit with an overnight courier, or (c) if mailed as required above, three (3) Business Days after the date of deposit in the United States mails, and shall be addressed as follows:

| If to Parent or Buyer: | With a copy to: |
|---|---|
| The Institutes, LLC | Cozen O'Connor |
| c/o The American Institute for Chartered | 1650 Market Street |
| Property Casualty Underwriters | Suite 2800 |
| 720 Providence Road | Philadelphia, PA  19103 |
| Malvern, PA  19355 | Attn: Anne M. Madonia, Esq. |
| Attn: Linda C. Hohn, General Counsel | Facsimile: 215-665-2013 |
| Facsimile: N/A | |
| **If to the Selling Parties:** | **With a copy to:** |
| | |
| Adam Potter | Bashian & Papantoniou, P.C. |
| 7 Nawthorne Road | 500 Old Country Road, Suite 302 |
| Old Greenwich, CT  06870 | Garden City, New York 11530 |
| Facsimile:  N/A | Attn: Andreas Papantoniou, Esq. |
| | Facsimile: 516-213-0339 |

Any notice given hereunder may be given on behalf of any Party by its counsel or other authorized representatives.  The address of any Party may be changed on notice to the other Party duly served in accordance with the foregoing provisions.

34

Section 10.3   Governing Law; Disputes.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, and the Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts located in New Castle County, Delaware for resolution of any disputes hereunder; provided, however, that with respect to disagreements relating to Buyer's calculation of the Revenue Target Subsequent Payment under Section 2.4(c), such disagreements shall be finally settled as provided in Section 2.4(c).

Section 10.4   Waiver of Jury Trial.  Each Party to this Agreement hereby waives, to the fullest extent permitted by Law, any right to trial by jury of any claim, counterclaim, demand, action, or cause of action (a) arising under this Agreement, or (b) in any way connected with or related or incidental to the dealings of the Parties hereto in respect of this Agreement or any of the transactions related hereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise.  Each Party to this Agreement hereby agrees and consents that any such claim, counterclaim, demand, action, or cause of action shall be decided by court trial without a jury and that the parties to this Agreement may file an original counterpart of a copy of this Agreement with any court as written evidence of the consent of the Parties hereto to the waiver of their right to trial by jury.

Section 10.5   Entire Agreement.   This Agreement, including the Ancillary Agreements, the Schedules and Exhibits hereto, are intended to embody the complete, final and exclusive agreement among the Parties with respect to the purchase of the Acquired Assets and the related transactions and are intended to supersede all previous negotiations, commitments, writings, agreements and representations, written or oral, with respect thereto and may not be contradicted by evidence of any such prior or contemporaneous agreement, understanding or representations, whether written or oral.

Section 10.6   Assignability; Binding Effect.  This Agreement may not be assigned by any Party without the other Party's written consent.  This Agreement and the respective rights, covenants, conditions and obligations of the Parties and any instrument or agreement executed pursuant hereto and thereto shall be binding upon and enforceable by, and shall inure to the benefit of, the Parties and their respective heirs, successors and permitted assigns and legal representatives.

Section 10.7   Amendments.  This Agreement may not be amended or modified, nor may compliance with any condition or covenant set forth herein be waived, except by a writing duly and validly executed by each Party, or in the case of a waiver, the Party waiving compliance; provided, however, that no such waiver shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Whenever this Agreement requires or permits a waiver or consent by or on behalf of any Party, such waiver or consent shall be given in writing.

Section 10.8   Severability.  In the event that any one or more of the provisions contained in this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained in this Agreement shall not be in any way impaired thereby, it being intended that all of the rights and privileges of the Parties shall be enforceable to the fullest extent permitted by Law.

LEGAL\36402379\4

Section 10.9    Third-Party Rights.  Nothing in this Agreement, whether express or implied, is intended to confer rights or remedies under or by reason of this Agreement on any persons other than the Parties, each Indemnified Party and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any Party, nor shall any provisions give any third person any right of subrogations over or action against any Party.

Section 10.10    Certain Interpretative Matters.  The language in all parts of this Agreement shall in all cases be construed simply, accurately to its fair meaning, and not strictly for or against any of the Parties.  There shall be no presumption against any Party on the ground that such Party was responsible for drafting this Agreement or any part thereof, and any Law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.  The Section headings of this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.  Where the context or construction requires, all words applied in the plural shall be deemed to have been used in the singular, and vice versa; the masculine shall include the feminine and neuter, and vice versa; and the present tense shall include the past and future tense and vice versa.

Section 10.11    Incorporation of Exhibits and Schedules.    The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

Section 10.12    Execution in Counterparts.  For the convenience of the Parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall, taken together, constitute one and the same document.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart evidencing execution by each Party.  This Agreement may be executed and delivered by delivery of a facsimile copy of an executed signature page or by e-mailing a portable data format (PDF) version of a signed signature page, and each shall have the same force and effect as the delivery of an originally executed signature page.

**[Remainder of Page Intentionally Left Blank]**

36

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in their respective names by their respective officers duly authorized, as of the date first written above.

**BUYER:**

**THE INSTITUTES, LLC**

By: _____

    Name: PETER L. MILLER

    Title: PRESIDENT / CEO

**PARENT:**

**THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS**

By: _____

    Name: PETER L. MILLER

    Title: PRESIDENT / CEO

**SELLING PARTIES:**

_____
ADAM POTTER

MOXIE HC, LLC

_____
Name: Adam Potter
Title: Sole Member

CLAIMS PAGES, LLC
By: Moxie HC, LLC

_____
Name: Adam Potter
Title: Sole Member

C&E MGMT AND PLANNING, INC.

_____
Name: Adam Potter
Title: President

CLM GROUP, INC.

_____
Name: Adam Potter
Title: President

**[SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in their respective names by their respective officers duly authorized, as of the date first written above.

**BUYER:**

**THE INSTITUTES, LLC**

By: _____

    Name: _____

    Title: _____

**PARENT:**

**THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY CASUALTY UNDERWRITERS**

    By: _____

    Name: _____

    Title: _____

**SELLING PARTIES:**

_____
ADAM POTTER

**MOXIE HC, LLC**

_____
Name: Adam Potter
Title: Sole Member

**CLAIMS PAGES, LLC**
By: Moxie HC, LLC

_____
Name: Adam Potter
Title: Sole Member

**C&E MGMT AND PLANNING, INC.**

_____
Name: Adam Potter
Title: President

**CLM GROUP, INC.**

_____
Name: Adam Potter
Title: President

**[SIGNATURE PAGE TO THE ASSET PURCHASE AGREEMENT]**

## APPENDIX A

As used in the Agreement, the following terms shall have the following meanings:

"12-Month Post-Closing Period" has the meaning set forth in Section 2.4(c)(i).

"12-Month Statement" shall mean the unaudited statement of the Net Revenue for the 12-Month Post-Closing Period, together with the calculation of the Revenue Target Subsequent Payment, prepared by Buyer.

"Acquired Assets" has the meaning set forth in Section 2.1(a).

"Adam Potter" has the meaning set forth in the preamble hereto.

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"Agreement" has the meaning set forth in the preamble hereto.

"Allocation" has the meaning set forth in Section 2.5.

"Ancillary Agreement" means any agreement, exhibit, statement, document or certificate executed and delivered in accordance with or required by this Agreement and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

"Assignment of Lease" has the meaning set forth in Section 3.2(a).

"Assumed Liabilities" has the meaning set forth in Section 2.1(c).

"Assumption Agreement" has the meaning set forth in Section 3.2(a).

"Basket" has the meaning set forth in Section 9.5.

"Bill of Sale" has the meaning set forth in Section 3.2(a).

"Board" means the Board of Trustees of Parent.

"Books and Records" has the meaning set forth in Section 2.1(a)(vii).

"Business Day" means any day, other than a Saturday or a Sunday or any other day on which banks are required or authorized to close in the State of New York.

"Buyer" has the meaning set forth in the preamble hereto.

"Buyer Indemnified Parties" has the meaning set forth in Section 9.2.

"Buyer Closing Certificate" has the meaning set forth in Section 7.2(b).

"C&E" has the meaning set forth in the preamble hereto.

"C&E Business" has the meaning set forth in the preamble hereto.

"Cap" has the meaning set forth in Section 9.5.

"Claim" has the meaning set forth in Section 4.12.

"CLM Business" has the meaning set forth in the preamble hereto.

"CLM" has the meaning set forth in the preamble.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Payment" has the meaning set forth in Section 2.3.

"Closing" has the meaning set forth in Section 3.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company (ies)" has the meaning set forth in the preamble hereto.

"Company Intellectual Property" means all Intellectual Property that (a) in whole or in part, is owned or purported to be owned by any of the Companies or (b) is licensed by any of the Companies through a Company IP Agreement.

"Company IP Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions, and other Contracts, relating to Intellectual Property and to which any of the Companies is a party, beneficiary, or otherwise bound, other than licenses for shrinkwrap, clickwrap, or other similar commercially available off-the-shelf software that has not been modified or customized by a third party for the Companies.

"Company Software" has the meaning set forth in Section 4.7(k).

"Confidential Information" has the meaning set forth in Section 6.11.

"Consent" has the meaning set forth in Section 4.2.

"Contracts" means all written or oral agreements, contracts or commitments of the following types to which any Seller is a party or by which any Seller or any of its properties or assets is bound as of the date hereof and between the date hereof and the Closing Date:

(a)     real property leases;

(b)     labor, employment-related or consulting agreements;

39

(c)     joint venture, partnership or similar agreements;

(d)     mortgages, indentures, loan or credit agreements, security agreements and other agreements and instruments relating to the borrowing of money or extension of credit;

(e)     contracts for the purchase of materials, supplies, goods, services, equipment or other assets providing for annual payments by any Seller of, or pursuant to which in the last twelve (12) months any Seller has paid, $25,000 or more;

(f)     sales, distribution or other similar agreements providing for the sale by any Seller of materials, supplies, goods, services, equipment or other assets for an aggregate purchase price of $10,000 or more;

(g)     lease agreements for machinery and equipment, motor vehicles or furniture and office equipment or other personal property by or with any vendor (or any group of related vendors) that had annual aggregate payments exceeding $10,000 in any of the last three calendar years;

(h)     agreements restricting in any manner the right of any Seller to compete with any other person, or restricting the right of any Seller to sell to or purchase from any other Person;

(i)     agreements between any Seller and any of its affiliates;

(j)     guaranties, performance, bid or completion bonds, surety and appeal bonds, return of money bonds and surety or indemnification agreements;

(k)     custom bonds and standby letters of credit;

(l)     Company IP Agreements;

(m)     other agreements, contracts and commitments which cannot be terminated by any Seller on notice of thirty (30) days or less and without payment by any Seller of less than $10,000 upon such termination; and

(n)     powers of attorney.

"CP" has the meaning set forth in the preamble hereto.

"CP Business" has the meaning set forth in the preamble hereto.

"Credit Card Debt" has the meaning set forth in Section 2.1(d)(iii).

"Debt" means all principal, interest, premiums or other obligations related to (a) all indebtedness of any Seller for borrowed money, (b) all obligations of any Seller for the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and consistent with past practice, and other than the Excluded Assets), (c) all obligations of any Seller evidenced by notes, bonds, debentures or other similar instruments, (d)

all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by any Seller, (e) all obligations of any Seller as lessee or lessees under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of any Seller under acceptance, letter of credit or similar facilities, (g) all obligations owing pursuant to factoring agreements for accounts receivable, (h) all Debt of the type referred to in clauses (a) through (g) above guaranteed directly or indirectly in any manner by any Seller, or in effect guaranteed directly or indirectly by any Seller through an agreement (w) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (x) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (y) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (z) otherwise to assure a creditor against loss; provided, that such Debt referred under this clause (h) is of the type that would be reflected as debt on a balance sheet prepared in accordance with GAAP, (i) all Debt of the type referred to in clauses (a) through (h) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Liens on property (including accounts and contract rights) owned by any Seller, even though such person has not assumed, become liable for or guaranteed the payment of such Debt and(j) all accrued but unpaid interest (or interest equivalent) to the date of determination, and all prepayment premiums or penalties, related to any items of Debt of the type referred to in clauses (a) through (i) above.

"Dispute Notice" has the meaning set forth in Section 2.4(c)(ii)(B).

"Employee Benefit Plan" means each employee benefit plan as defined in Section 3(3) of ERISA, and each other compensation, bonus, deferred compensation, severance, change-in-control, or employment plan, arrangement program or agreement, and any and all pension, retirement, vacation, incentive, profit sharing, stock option, stock purchase and restricted stock plan, program or policy, maintained, contributed to, required to be contributed to, or sponsored by each Company for purposes of providing benefits to any current or former employee, officer or member of such Company.

"Environmental Laws" has the meaning set forth in Section 4.6(f).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person that together with the Company would be deemed a 'single employer' within the meaning of Section 414 of the Code or under "common control" within the meaning of Section 4001(a)(14) of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.1(b).

"Excluded Employee" has the meaning set forth in Section 6.7(a).

"Excluded Liabilities" has the meaning set forth in Section 2.1(d).

"Expert" has the meaning set forth in Section 2.4(c)(ii)(C).

41

"Filing" has the meaning set forth in Section 4.2.

"Financial Statements" has the meaning set forth in Section 4.9(a).

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Entity" means any governmental, regulatory or administrative department, commission, board, bureau, agency, court, authority or other instrumentality of the United States (federal, state or local) or any county, jurisdiction, municipality or other political subdivision thereof.

"Guarantor" has the meaning set forth in Section 3.3(d).

"Guaranty" has the meaning set forth in Section 3.3(d).

"Hazardous Substances" has the meaning set forth in Section 4.6(f).

"Hired Employee" has the meaning set forth in Section 6.7(a).

"Hotel Commissions" has the meaning set forth in Section 2.1(a)(xii).

"IATA Number" has the meaning set forth in Section 2.1(a)(xii).

"Immigration Laws" has the meaning set forth in Section 4.11(b).

"Indemnified Party" has the meaning set forth in Section 9.3.

"Indemnifying Party" has the meaning set forth in Section 9.3.

"Initial Purchase Price" has the meaning set forth in Section 2.2.

"Insurance Policies" has the meaning set forth in Section 4.14.

"Intellectual Property" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued foreign and domestic patents and patent applications (including reissuances, divisions, renewals, provisional applications, continuations, continuations in part, revisions, extensions and re-examinations, and other governmental authority-issued indicia of invention ownership), and all inventions (whether patentable or not), invention disclosures, and improvements thereof of any of the foregoing ("Patents"); (b) trademarks, service marks, trade names, designs, logos or other source identifiers, including as defined in 15 U.S.C. § 1127, whether registered or unregistered or at common law, including all foreign and domestic applications, registrations and renewals thereof or in connection therewith, and all goodwill of the business or otherwise associated with any of the foregoing ("Trademarks"); (c) copyrights, original works of authorship, and all databases and data collections, whether or not copyrightable or registered, and all registrations, applications for registration, and renewals of any of the foregoing, and all moral rights associated therewith ("Copyrights"); (d) internet domain names, other internet addresses, user names, accounts,

including social networking accounts, pages and online identities, all goodwill associated therewith whether or not Trademarks, and all content and data thereon or relating thereto, whether or not Copyrights ("Domains"); (e) know-how, trade secrets, source code, object code, inventions and invention disclosures (whether or not patentable), discoveries, improvements, concepts, ideas, methods, processes, designs, plans, schematics, drawings, formulae, customer and market lists, technical data, specifications, research and development information, technology and product roadmaps, data bases and other proprietary or confidential information, and all rights therein ("Trade Secrets"); (f) all computer programs, applications and computer code, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code or other readable code ("Software"); and (g) other proprietary rights relating to any of the foregoing (including but not limited to remedies against infringement thereof and rights of protection of interest therein under the laws of all jurisdictions and the right to sue for and collect damages arising out of the past, present, and/or future infringement, misappropriation, dilution or violation of any of the foregoing).

"Intellectual Property Registrations" means all Intellectual Property that is subject to any issuance, registration, or application by or with any Governmental Entity or authorized private registrar in any United States jurisdiction, including issued Patents, registered Trademarks, Domains, and Copyrights, and pending applications for any of the foregoing.

"Interim Financials" has the meaning set forth in Section 4.9(a).

"IP Assignment" has the meaning set forth in Section 3.2(a).

"Knowledge of the Sellers" means with regard to the Sellers, the actual knowledge of Adam Potter.

"Law" means any Government Entity's constitution, law, regulation, ordinance, rule, order, judgment, decree, citation, code, regulation, permit, requirement, or statute.

"Leased Real Property" has the meaning set forth in Section 4.6(d).

"Leases" has the meaning set forth in Section 4.6(d).

"Liability" or "Liabilities" means with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, or executory, and whether or not the same is required to be accrued on the financial statements of such Person.

"Licensed Intellectual Property" mean all Intellectual Property in which any of the Companies holds any rights or interests granted by any third party, including any of Sellers' Affiliates, which is used or held for use in the conduct of the Sellers' Businesses as currently conducted.

"Lien" means any option, pledge, security interest, lien, claim, charge, encumbrance or other restriction (whether on sale, transfer, disposition or otherwise, whether imposed by agreement, understanding, law or otherwise).

"<u>Losses</u>" has the meaning set forth in <u>Section 9.7</u>.

"<u>Material Adverse Effect</u>" means any effect, circumstance or event which, individually or in the aggregate with any other effect, circumstance or event, is or would be reasonably expected to be material and adverse to the business, operations, earnings, condition (financial or otherwise), assets, results of operations or liabilities of the Companies taken as a whole; <u>provided</u>, <u>however</u>, that any of the following shall not be deemed a Material Adverse Effect: any adverse change, event, development, or effect the direct and principal cause of which is related to (a) overall economy or economic conditions, (b) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the U.S., or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the U.S., (c) general disruption of the financial, banking, insurance, or securities markets, (d) changes in U.S. generally accepted accounting principles, or (e) any adverse change relating to the compliance with the terms of, or the taking of any action contemplated by, this Agreement and the other agreements contemplated hereby, or the taking of any action consented to by Buyer.

"<u>Moxie</u>" has the meaning set forth in the preamble hereto.

"<u>Net Revenue</u>" means the unaudited total revenue for Buyer during the 12-month Post-Closing Period net of returns, discounts, allowances, price adjustments and refunds; provided, that any revenue, returns, discounts, allowances, price adjustments or refunds shall be in the ordinary course of business and consistent with past practices of the Companies as reflected in the Financial Statements.

"<u>Non-Compete Period</u>" has the meaning set forth in <u>Section 6.12(a)</u>.

"<u>Non-Transferred Business Asset</u>" has the meaning set forth in <u>Section 2.1(e)(i)</u>.

"<u>Open Source Software</u>" means any Software that is distributed as "free software," "open source software," or pursuant to any license identified as an "open source license" by the Open Source Initiative (www.opensource.org/licenses) or other license that substantially conforms to the Open Source Definition (opensource.org/osd).

"<u>Parent</u>" has the meaning set forth in the preamble hereto.

"<u>Party</u>" or "<u>Parties</u>" has the meaning set forth in the preamble hereto.

"<u>Permits</u>" has the meaning set forth in <u>Section 4.5(b)</u>.

"<u>Permitted Activities</u>" has the meaning set forth in <u>Section 6.12(a)</u>.

"<u>Permitted Lien</u>" means, with respect to each Company, any (a) Liens in respect of Taxes, the validity of which are being contested in good faith by appropriate proceedings or Liens in respect of Taxes not yet due and payable; (b) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business; (c) Liens reflected on <u>Schedule 4.6(a)</u>; (d) such other imperfections of title and other Liens, if any, which,

44

individually or in the aggregate, would not reasonably be expected to materially impair the value of the Acquired Assets or the use of the Acquired Assets in the ordinary course of business; or (e) Liens arising under original purchase price conditional sales contracts and equipment leases with third parties which are contracts entered into in connection with the business of such Company and are set forth on Schedule 4.6(a).

"Person" shall mean a natural person, corporation, partnership, joint venture, trust, limited liability company, unincorporated organization or other entity, or a Governmental Entity.

"Personal Information" shall mean any information that identifies an individual, including name, physical address, telephone number, email address, financial account number or government-issued identifier (including Social Security number and driver's license number), medical, health or insurance information, gender, date of birth, educational or employment information, facial or biometric data, geolocation data, Internet Protocol addresses, unique device identifiers or other persistent identifiers, solely to the extent the foregoing is protected pursuant to data privacy or data security Laws applicable to any of the Companies. Personal Information may relate to any individual, including a current, prospective or former customer or employee of any of the Companies.

"PLRB Acquisition" has the meaning set forth in Section 2.4(a).

"PLRB Documents" has the meaning set forth in Section 2.4(a).

"PLRB Subsequent Payment" has the meaning set forth in Section 2.4(a).

"PLRB" means Property Loss Research Bureau, a not-for-profit corporation, organized under the laws of the State of Illinois.

"Product Launch" has the meaning set forth in Section 2.4(b).

"Purchase Price" shall mean the Initial Purchase Price, plus any PLRB Subsequent Payment, UCC Subsequent Payment and Revenue Target Subsequent Payment.

"Related Parties" has the meaning set forth in Section 4.13.

"Required Consents" has the meaning set forth in Section 4.2.

"Required Net Revenue" has the meaning set forth in Section 2.4(c)(i).

"Revenue Target Subsequent Payment" has the meaning set forth in Section 2.4(c)(i).

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" or "Sellers" has the meaning set forth in the preamble hereto.

"Seller Indemnified Parties" has the meaning set forth in Section 9.1.

"Sellers' Businesses" or "Seller's Business" has the meaning set forth in the preamble hereto.

45

"Sellers' Closing Certificate" has the meaning set forth in Section 7.1(b).

"Sellers' Representative" shall mean Adam Potter, or such Person who may be appointed by Adam Potter in a written notice delivered to Buyer to replace Adam Potter.

"Selling Parties" shall mean the Companies, Adam Potter and Moxie.

"Spin Off Sale" has the meaning set forth in Section 6.13.

"Subsequent Purchase Price" shall mean, if any, the PLRB Subsequent Payment, the UCC Subsequent Payment and the Revenue Target Subsequent Payment.

"Tax Returns" means any return, report or similar statement required to be filed with any taxing authority with respect to any Taxes (including any required schedules), including, without limitation, any information return, claim for refund, declaration of estimated Tax, and any amendment to any of the foregoing.

"Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority, including, but not limited to, income, excise, property, sales, value added, transfer, franchise, payroll, withholding, social security or other taxes, including any interest, penalties or additions attributable thereto.

"Third Party Claim" has the meaning set forth in Section 9.4.

"Transfer Taxes" has the meaning set forth in Section 6.4(b).

"Transition Period" has the meaning set forth in Section 6.3.

"Transition Services" has the meaning set forth in Section 6.3.

"UCC Product" means the Universal Claims Certification ("UCC") to be offered by Buyer (after the Closing).  It is intended that States that recognize the UCC will not require individuals to complete certain State pre-licensing or renewal requirements, such as pre-licensing courses, exams or continuing education requirements, to obtain or renew such State's adjuster license.

"UCC Subsequent Payment" has the meaning set forth in Section 2.4(b).

"WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Adam Potter
57 Willomere Circle
Riverside, CT 06878,                                    :    Civil Action No. 2:20-cv-01825-NIQA
   and
Moxie HC, LLC
4343 Old Grand Avenue, Suite 110
Gurnee, IL 60031

      Plaintiffs,

         v.

Cozen O'Connor
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103,

Anne Blume, Esquire
2015 West School
Chicago, IL 60618,

Anne M. Madonia, Esquire
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103,
   and
The Institutes
720 Province Rd.
Malvern, Pennsylvania,

      Defendants.

## AFFIDAVIT OF ANNE BLUME IN SUPPORT
## OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

I, Anne Blume, declare as follows:

1.    I am a resident of the State of Florida, am over the age of 18 years, and, if called to

testify in court, I could and would truthfully testify to the following information based upon my

own personal knowledge.

2.    I make this affidavit in support of Defendant Anne Blume's Motion to Dismiss

Plaintiffs' Complaint for Lack of Personal Jurisdiction (the "Motion").

3.      At the time of the conduct alleged in the Complaint, and until November 19, 2018, I lived and resided in Illinois.

4.      I was a shareholder of Cozen O'Connor at the time of the alleged conduct related to the Sale of the CLM Entities to The Institutes, LLC and until October of 2018.

5.      During my employment at Cozen O'Connor, I was offered a position as the Chief Executive Officer of The Institutes, LLC d/b/a CLM Group, LLC,[1] which has its only office in Florida.

6.      I accepted the offer and thereafter moved from Illinois to Florida.

7.      From November, 19, 2018 to the present I have lived and resided in Florida.

8.      At no time have I ever lived or worked in Pennsylvania.

9.      I do not own any real property, personal property, or other assets located in Pennsylvania.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

Anne Blume

EXECUTED ON: June ___, 2020.

---

[1] CLM Group, LLC is not the same entity as CLM Group Inc., a nonparty seller involved in the Complaint.

## CERTIFICATE OF SERVICE

I, <u>Brian P. Flaherty</u>, hereby certify that on this <u>1st</u> day of <u>July</u>, <u>2020</u>, I caused to be served a copy of the following: (1) Defendant Anne Blume's Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction; (2) Memorandum of Law In Support of Defendant Anne Blume's Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction, and (3) a proposed Order on Defendant Anne Blume's Motion to Dismiss Plaintiffs' Complaint for Lack of Personal Jurisdiction, through the Court's electronic filing system on:

Clifford E. Haines, Esq.
Haines & Associates
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107

*Attorneys for Plaintiffs*

/s/ *Brian P. Flaherty*
BRIAN P. FLAHERTY

LEGAL\47151693\2