**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Adam Potter | : | |
| 57 Willomere Circle | : | |
| Riverside, CT 06878, | : | Civil Action No. 2:20-cv-01825-NIQA |
|    and | : | |
| Moxie HC, LLC | : | |
| 4343 Old Grand Avenue, Suite 110 | : | |
| Gurnee, IL 60031 | : | |
| | : | |
|    Plaintiffs, | : | |
| | : | |
|    v. | : | |
| | : | |
| Cozen O'Connor | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| | : | |
| Anne Blume, Esquire | : | |
| 2015 West School | : | |
| Chicago, IL 60618, | : | |
| | : | |
| Anne M. Madonia, Esquire | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
|    and | : | |
| The Institutes | : | |
| 720 Province Rd. | : | |
| Malvern, Pennsylvania, | : | |
| | : | |
|    Defendants. | : | |

**[PROPOSED]**

**<u>ORDER</u>**

Upon consideration of Defendants Cozen O'Connor, Anne Blume, and Anne M.

Madonia's Motion to Dismiss Plaintiffs' Complaint, and any opposition and reply thereto, and

for good cause appearing, it is hereby **ORDERED** that:

1.      Defendants Anne Blume and Cozen O'Connor's Motion to Dismiss is

**GRANTED**.

2.      All Counts of the Complaint are **DISMISSED** because Plaintiffs lack standing to assert the claims.

3.      All Counts of the Complaint brought by Plaintiff Moxie HC, LLC are **DISMISSED** because Plaintiff Moxie HC, LLC, according to the Complaint, has been "discontinued" and therefore lacks the capacity to bring this Complaint.

4.      Counts I, II, and III of the Complaint are **DISMISSED** in their entirety for failure to state a claim upon which relief can be granted.


Dated: _____                        _____
                                               The Honorable Nitza I. Quiñones Alejandro
                                               United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Adam Potter | : | |
| 57 Willomere Circle | : | |
| Riverside, CT 06878, | : | Civil Action No. 2:20-cv-01825-NIQA |
| and | : | |
| Moxie HC, LLC | : | |
| 4343 Old Grand Avenue, Suite 110 | : | |
| Gurnee, IL 60031 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| Cozen O'Connor | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| | : | |
| Anne Blume, Esquire | : | |
| 2015 West School | : | |
| Chicago, IL 60618, | : | |
| | : | |
| Anne M. Madonia, Esquire | : | |
| One Liberty Place | : | |
| 1650 Market Street | : | |
| Philadelphia, Pennsylvania 19103, | : | |
| and | : | |
| The Institutes | : | |
| 720 Province Rd. | : | |
| Malvern, Pennsylvania, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS COZEN O'CONNOR, ANNE BLUME, AND
ANNE M. MADONIA'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendants Cozen O'Connor, Anne Blume, and Anne M. Madonia move to dismiss the

Complaint filed by Plaintiffs Adam Potter and Moxie HC, LLC, because Plaintiffs lack standing

to assert the claims in their Complaint, Plaintiff Moxie may not assert its claims because it does

not exist, and, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs fail to state a claim

upon which relief can be granted in Counts I, II, and III.  For these reasons and as set forth in

Defendants' Memorandum of Law (herein incorporated by reference), the Court should grant

this Motion and dismiss the Complaint in its entirety.

Respectfully submitted,

COZEN O'CONNOR


*/s/ Brian P. Flaherty*
Brian P. Flaherty
Michael J. Melusky
1650 Market Street, Suite 2800
Philadelphia, PA 19103
*Attorneys for Defendants Cozen O'Connor,*
*Anne Blume, and Anne M. Madonia*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Adam Potter<br>57 Willomere Circle<br>Riverside, CT 06878,<br>    and<br>Moxie HC, LLC<br>4343 Old Grand Avenue, Suite 110<br>Gurnee, IL 60031 | :<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 2:20-cv-01825-NIQA |
| Plaintiffs, | :<br>: | |
| v. | : | |
| Cozen O'Connor<br>One Liberty Place<br>1650 Market Street<br>Philadelphia, Pennsylvania 19103, | :<br>:<br>:<br>:<br>: | |
| Anne Blume, Esquire<br>2015 West School<br>Chicago, IL 60618, | :<br>:<br>:<br>: | |
| Anne M. Madonia, Esquire<br>One Liberty Place<br>1650 Market Street<br>Philadelphia, Pennsylvania 19103,<br>    and<br>The Institutes<br>720 Province Rd.<br>Malvern, Pennsylvania, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS COZEN O'CONNOR, ANNE BLUME, AND
## <u>ANNE M. MADONIA'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

COZEN O'CONNOR
Brian P. Flaherty
Michael J. Melusky
1650 Market Street, Suite 2800
Philadelphia, PA 19103

*Attorneys for Defendants Cozen O'Connor,*
*Anne Blume, and Anne M. Madonia*

## TABLE OF CONTENTS

**Page**

I.   FACTUAL BACKGROUND ......................................................................................... 1

   A.   Introduction ......................................................................................................... 1

   B.   The Parties to the Suit ......................................................................................... 5

      1.   Plaintiffs .................................................................................................. 5

      2.   Defendants ............................................................................................... 6

   C.   The Claim that Anne Blume and Cozen Represented Potter ................................. 6

      1.   The CLM Group ...................................................................................... 7

      2.   Anne Blume's Membership on the Advisory Board of Directors for
         the CLM Group ....................................................................................... 8

   D.   The Alleged Business Advice Given by Anne Blume as to the Sale Price .......... 10

   E.   The Engagement of Legal Counsel by Potter, Moxie and the Non-Party
      Sellers to Represent Them in the Negotiation and Creation of the APA ............. 12

   F.   The Timing of Cozen's Involvement as Counsel for The Institutes .................... 13

   G.   The Absence of Any Objection ........................................................................... 14

   H.   The Asset Purchase Agreement .......................................................................... 14

   I.   Events Since the Closing .................................................................................... 16

      1.   Dispute over the Revenue Target Subsequent Payment ............................. 16

      2.   Related Litigation between The Institutes, Adam Potter and His
         Sister, Sydney Posner, after the Sale ........................................................ 18

      3.   Potter discovers that the price negotiated with The Institutes was
         inadequate ............................................................................................... 19

II.   ARGUMENT .......................................................................................................... 20

   A.   Introduction ....................................................................................................... 20

   B.   Plaintiffs Lack Standing to Assert The Claims Asserted in the Complaint. ......... 21

   C.   All Claims Asserted by Plaintiff Moxie Must Be Dismissed Moxie Does
      Not Exist. ........................................................................................................... 23

D.    Plaintiffs Fail to State a Facially Plausible Claim for Relief in Counts I, II, and III.................................................................................................. 23

1.    Plaintiffs' Allegations in Count I Fail to State a Breach of Fiduciary Duty Claim against Anne Blume, Anne Madonia, or Cozen O'Connor................................................................................................. 25

2.    Plaintiffs Allegations' in Count II Fail to State a Tort-Based Legal Malpractice Claim against Anne Blume and Cozen O'Connor. ................... 36

3.    The Gist of the Action Doctrine Bars Count III, Plaintiffs' Contract-Based Legal Malpractice Claim against Anne Blume and Cozen O'Connor.................................................................................................. 37

III.    CONCLUSION............................................................................................................ 42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Airgas, Inc. v. Cravath, Swaine & Moore LLP*,
    No. 10-612, 2010 WL 3046586 (E.D. Pa. Aug. 3, 2020) ......................................................34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................23, 24

*ATG Trust Co. v. Schlichtmann*,
    314 F.Supp.3d 718 (E.D. Pa. 2018) ......................................................................................22

*Atkinson v. Haug*,
    622 A.2d 983 (Pa. Super. 1993)................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................23, 24, 25

*Bruno v. Erie Insurance Company*,
    630 Pa. 79 (2014)........................................................................................................38, 41

*Chainey v. Street*,
    523 F.3d 200 (3d Cir. 2008)....................................................................................................22

*Conley v. Stockey*,
    No. 548 WDA 2015, 2016 WL 1657966 (Pa. Super. Apr. 26, 2016).........................29, 30, 32

*Cost v. Cost*,
    677 A.2d 1250 (Pa. Super. 1996)...........................................................................................27

*Doltz v. Harris & Assocs.*,
    280 F. Supp. 2d 377 (E.D. Pa. 2003) ....................................................................................21

*Dougherty v. Pepper Hamilton LLP*,
    133 A.3d 792 (Pa. Super. 2016)...........................................................................................33

*Duke & Co. v. Anderson*,
    275 Pa. Super. 65, 418 A.2d 613 (1980)..............................................................................39

*Gabriel v. Giant Eagle, Inc.*,
    124 F. Supp. 3d 550 (W.D. Pa. 2015)....................................................................................22

*Home Title Co. of Md. v. LaSalla*,
    257 So.3d 640 (Fla. 2d DCA 2018) .......................................................................................21

*Hoyer v. Frazee,*
      323 Pa. Super. 421, 470 A.2d 990 (1984) ........................................................39, 41

*Juday v. Sadaka,*
      No. 19-1643, 2019 WL 4139089 (E.D. Pa. Aug. 30, 2019) ....................................41

*Kituskie v. Corbman,*
      714 A.2d 1027 (Pa. 1998) ................................................................................22, 36

*Lieberman v. Corporacion Experienca Unica, S.A.,*
      226 F. Supp. 3d 451 (E.D. Pa. 2016) .........................................................................21

*Lincoln Oldsmobile, Inc. v. Branch,*
      547 So.2d 1111 (Fla. 2d DCA 1990) ........................................................................22

*Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz,*
      602 A.2d 1277 (Pa. 1992) ................................................................................33, 36

*Mercy Reg. Health Sys. (formerly Mercy Hosp.) of Altoona v. Dep't of Health,*
      645 A.2d 924 (Pa. Commw. Ct. 1994) ....................................................................16

*Nesselrotte v. Allegheny Energy, Inc.,*
      No. 06-01390, 2007 WL 3147038 (W.D. Pa. Oct. 25, 2007) .................................25

*New York Central Mutual Insurance Company v. Edelstein,*
      2015 U.S. Dist. LEXIS 10817 (U.S.D.C., M.D. Pa. 2015), *aff'd,* 637 Fed.
      Appx. 70, 2016 U.S. App. LEXIS 1661 (3rd Cir. 2016) ..........................................40

*Nkansah v. Kleinbard LLC,*
      No. 19-4472, 2020 WL 920269 (E.D. Pa. Feb. 26, 2020) ...........................32, 33, 41

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,*
      998 f.2d 1192 (3d Cir. 1993) .......................................................................................2

*Reis v. Barley Snyder Senft & Cohen, LLC,*
      667 F.Supp.2d 471 (E.D. Pa. 2009) ...........................................................................34

*Rinker v. Amori,*
      2016 U.S. Dist. LEXIS 36712 (M.D. Pa. 2016) ......................................................40

*Riverside Management Group, LLC v. Finkleman,*
      2018 Pa. Dist. & Cnty. Dec. LEXIS 2573 (Delaware County 2018) .........39, 40, 41

*Seidner v. Finkleman,*
      2018 Pa. Super. Unpub. LEXIS 3249 (August 31, 2018)..........................................40

*Snyder v. Crusader Serv. Corp.,*
      No. 1898 EDA 2019, 2020 WL 1283577 (Pa. Super. Mar. 18, 2020) ....................32

ii

*Storm v. Golden*,
    371 Pa. Super. 368 (1987) .................................................................................39, 41

*Stovall v. Kallenbach*,
    No. 1683 WDA 2018, 2019 WL 2808297 (Pa. Super. July 2, 2019) .....................................22

*Sturgeon v. Pharmerica Corp.*,
    No. 15-6829, 2020 WL 586978 (E.D. Pa. Feb. 5, 2020) .........................................................3

*Vorcheimer v. Philadelphian Owners Ass'n*,
    903 F.3d 100 (3d Cir. 2018).................................................................................6

**Statutes**

Fla. Stat. Ann. § 605.717(1)(b) .................................................................................23

**Rules**

Federal Rule of Civil Procedure 8 .................................................................23, 24, 26

Federal Rule of Civil Procedure 12(b)(6) .................................................................23

**Other Authorities**

*Gist and Legal Malpractice Actions*,
    The Legal Intelligencer, Monday, November 26, 2018.........................................................40

Defendants Cozen O'Connor, Anne Blume and Anne Madonia have moved to dismiss the Complaint against them on the following grounds:

- Plaintiffs lack standing to assert the claims made in this Complaint.

- Plaintiff Moxie, according to the Complaint, has been "discontinued" and therefore lacks the capacity to bring this lawsuit.

- The Complaint fails to state an action against any of the Defendants for the following reasons:

  o Plaintiffs fail to state a breach of fiduciary duty claim against Anne Madonia and Cozen O'Connor in Count I because their allegations with respect to alleged confidential information are insufficient to support their claim;

  o Plaintiffs fail to state a breach of fiduciary duty claim against Anne Blume and Cozen O'Connor in Count I because they fail to allege an attorney-client relationship with Anne Blume and fail to sufficiently allege the elements of a breach of fiduciary duty claim;

  o Plaintiffs fail to state a tort-based legal malpractice claim against Anne Blume and Cozen O'Connor in Count II because they fail to allege an attorney-client relationship with Anne Blume and fail to sufficiently allege the elements of a legal malpractice claim; and

  o Plaintiffs fail to state a contract-based legal malpractice claim against Anne Blume and Cozen O'Connor in Count III because the gist of the action doctrine bars their claim.

This memorandum is filed in support of those motions.[1]

## I.   **FACTUAL BACKGROUND**

### A.   **Introduction**

Plaintiffs' claims all arise out of a transaction documented in an Asset Purchase Agreement ("APA") pursuant to which certain assets were sold to one of the Defendants, The Institutes, by three entities: Claims Pages, LLC; C&E MGMT and Planning, Inc.; and CLM

---

[1] Separately, one of the defendants filing this motion, Anne Blume, is filing a motion to dismiss this matter against her for lack of personal jurisdiction. That motion is being filed separately because only Ms. Blume is making such a motion. If the Court determines that it lacks personal jurisdiction over Ms. Blume, then she will no longer be a party and her positions on the issues addressed in this motion can be disregarded.

Group, Inc.  *See* Compl. at 1-2.[2]  A copy of the APA was appended to the Complaint as an Exhibit and is attached here as Exhibit "B."[3]  Those three entities will be referred to herein as the "Sellers", the term used to describe them in the APA.  Despite the fact that all of the damages allegedly suffered as a consequence of the allegedly improper conduct alleged in this case is that the amount to be paid to the Sellers under the APA was too low, none of the Sellers is a party to this lawsuit.

Plaintiffs are Adam Potter and Moxie HC, LLC.  They are also parties to the APA, but they are not Sellers of the assets.  They assert only that they owned interests in the three corporate entities that are the Sellers.  They and the actual Sellers of assets under the APA are collectively referred to under the APA as the "Selling Parties," to identify them collectively with the Sellers as the entities to whom the restrictive covenants in the APA applied.  *See* Ex. B, APA at 28-29 (APA, sec 6.12).

The Complaint contains four counts.  *See* Compl. at ¶¶ 64-106.  Three of the four counts are asserted against Cozen O'Connor and two of its lawyers, Anne Blume and Anne Madonia. *See* Compl. at ¶¶ 64-98.

Count I asserts a claim for Breach of Fiduciary Duty, in which Plaintiffs assert that Cozen, Blume and Madonia breached a fiduciary duty owed to Potter and Moxie as a result of Blume's and Cozen's alleged prior representation of one or both of them and/or the Sellers identified above; that as a consequence of that breach the purchase price to be paid to the three non-party Sellers by The Institutes for the assets sold under the APA was too low; and that a certain portion of post-closing monetary consideration due to the non-party Sellers under the

---

[2] A copy of the Complaint is attached as Exhibit "A."
[3] Courts may consider "exhibits attached to the complaint" in deciding a motion to dismiss.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 f.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

APA was erroneously miscalculated at too low a figure, in breach of the APA.  *See* Compl. at ¶¶ 64-71.

Count II asserts a legal malpractice claim against Cozen and Blume based upon a tort theory of liability for the same alleged wrongdoing.  *See* Compl. at ¶¶ 72-91.

Count III asserts a legal malpractice claim against Cozen and Blume based upon a contract theory of liability for the same alleged wrongdoing.  *See* Compl. at ¶¶ 92-98.

The fourth count is asserted against The Institutes only.  *See* Compl. at ¶¶ 99-106.  In it, Plaintiffs claim that The Institutes was a "third-party beneficiary" of the wrongdoing allegedly committed by Cozen and its lawyers and that The Institutes is obligated to pay damages to Potter and Moxie consisting of the amounts by which they claim the Sellers under the APA were damaged due to what is alleged to be inadequate consideration paid to them under the APA.  In essence, the claim against The Institutes (and the three other Defendants) is that the amount paid under the APA to the non-party Sellers was insufficient.  *See id.*

This is the third of three currently pending lawsuits that arose out of the transaction documented in the APA.  The first lawsuit was filed by The Institutes in the United States District Court for the District of Delaware on August 28, 2019.  *The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC v. Adam Potter, PBIH, LLC, and Business Insurance holdings Inc.*, No. 1:19-cv-01600-CFC.  A copy of the amended complaint is attached as Exhibit "C."[4]  In it, The Institutes asserted claims that Potter violated the terms of a restrictive covenant in the APA by competing with The Institutes.  *See* Ex. C at ¶¶ 46-52. 104-118, 121-128.  That lawsuit was brought in the District of Delaware because the APA

---

[4] "Courts will [] take judicial notice of certain matters of public record on a motion to dismiss[,]" including "'court-filed documents . . . .'"  *Sturgeon v. Pharmerica Corp.*, No. 15-6829, 2020 WL 586978, *4 (E.D. Pa. Feb. 5, 2020) (citation omitted).

contains a choice of law provision choosing the law of that state as the applicable law and a forum selection clause for disputes arising out of the APA compelling usage of a Delaware forum. *See* Ex. B, APA at 35.

The second lawsuit was brought by The Institutes against Sydney Posner and The Claims Xchange, Inc. on November 14, 2019. Mr. Potter is not a party to that lawsuit, but Ms. Posner is the sister of Mr. Potter. As explained in the complaint in that matter, she was employed by CLM Group, Inc., one of the Sellers that sold assets under the APA, prior to the sale of its assets to The Institutes; became employed by The Institutes following the sale; but was then terminated from her employment with The Institutes upon discovery that she was competing with The Institutes. *See The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC v. Sydney Posner and The Claims Xchange, Inc.*, No. 2:19-cv-05369-NIQA. A copy of the amended complaint is attached as Exhibit "D." In that lawsuit The Institutes asserted a claim against Ms. Posner that she improperly accessed a copy of The Institutes' entire file-share database containing hundreds of files containing proprietary, confidential, and trade-secret information. Despite not being a party to that lawsuit, in it The Institutes alleges that Mr. Potter was involved with his sister's wrongful conduct. *See* Ex. D at ¶¶ 64-86.

Thus, the instant suit is the third action arising out of the APA. Here, Adam Potter and Moxie HC, assert claims that they, as non-party Sellers, should have received more money for the assets the Sellers sold to The Institutes under the APA.

The Complaint attempts to dress that up by presenting a confusing series of allegations designed to create the "impression" that some wrongdoing was done by The Institutes' counsel,

Cozen O'Connor, but a careful review of the Complaint reveals that Plaintiffs do not have a plausible claim.[5]

### B.      The Parties to the Suit

#### 1.      *Plaintiffs*

There are two Plaintiffs: Adam Potter and Moxie HC, LLC.

Potter is a Connecticut resident and the sole member of Plaintiff Moxie.  Compl. at ¶ 1. Potter also alleges he owned 100% of the issued and outstanding stock in C&E MGMT and Planning, Inc., one of the non-party Sellers.  Compl. at ¶ 3.

Plaintiff Moxie was a Florida limited liability company with a registered address in Illinois.  Compl. at ¶ 2.  At the time of the Sale, Plaintiff Moxie owned 100% of the membership interest in Claims Pages, LLC and 100% of the issued and outstanding stock in CLM Group, Inc. Compl. at ¶ 3.  The two entities Moxie claims to have owned were the other two non-party Sellers.

Moxie no longer exists.  The Complaint alleges that Moxie was "discontinued" in December 2019.  Compl. at ¶ 2.  No allegation is made as to the disposition of its assets, including the claims it purports to assert here.

It bears repetition to note that the Sellers of the assets purchased under the APA -- Claims Pages, LLC; C&E MGMT and Planning, Inc.; and CLM Group, Inc. -- are not parties to this lawsuit.  The only damages sought in this suit were suffered, if suffered at all, by them. Plaintiffs' only damages claim, as will be seen in greater detail below, is that that the monetary consideration paid to the Sellers for the assets they sold under the APA would have been higher

---

[5] That is not to suggest that the Plaintiffs do have a plausible claim against The Institutes. They do not.  The Institutes is separately filing its own motion to dismiss this matter.

but for the alleged misconduct of Cozen, Madonia and/or Blume.  *See* infra Section I(I)(1), (3).

Thus, the only entities allegedly harmed by the alleged wrongdoing are not parties to this suit.[6]

        2.     *Defendants*

There are four defendants:

The Institutes is a Pennsylvania limited liability company with a principal place of

business in Pennsylvania.  Compl. at ¶ 4.  It is a subsidiary of the American Institute for

Chartered Property Casualty Underwriters.  *Id.*  The APA identifies the latter as the parent of The

Institutes.  *See* Ex. B, APA at 1.  The Institutes is the sole Buyer under the APA.

Cozen O'Connor is a law firm and Pennsylvania professional corporation with a principal

place of business in Pennsylvania.  Compl. at ¶ 5.

Anne Blume is an individual citizen of the state of Florida.  Prior to the closing of the

sale of assets by the Sellers under the APA she was a member of Cozen O'Connor, in its

Chicago office, and at that time was a citizen of Illinois. She now serves as the Chief Executive

Officer for The Institutes, LLC d/b/a CLM Group, LLC.[7]  Compl. at ¶ 6.

Anne Madonia is an individual citizen of the Commonwealth of Pennsylvania and

presently is a Member of Cozen O'Connor.  Compl. at ¶ 7.

**C.     The Claim that Anne Blume and Cozen Represented Potter**

A fundamental premise of this lawsuit is that Cozen O'Connor, through Anne Blume,

represented Adam Potter and/or one or more of the companies he and/or Moxie owned, and gave

---

[6] At various places in the Complaint, it is erroneously asserted that The Institutes purchased the entities listed above. *See, e.g.*, Compl. at 1; Compl. at ¶¶ 30, 36, 48.  That is not so.  As explained clearly in the APA, the transaction was an asset sale. The Sellers sold substantially all of their assets in return for monetary payments to be made to them. Neither Potter nor Moxie sold anything to The Institutes. *See* Ex. B, APA at 1-2, 6.  "[I]f [a plaintiff's] own exhibits contradict her allegations in the complaint, the exhibits control."  *Vorcheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018).

[7]  The CLM Group, LLC of which Ms. Blume is alleged to be the Chief Executive Officer is not, nor is it alleged to be, the same entity as CLM Group Inc., one of the nonparty Sellers.

advice to one or more of them on a single aspect of the transaction documented in the APA – the price -- at a time when she "presumably" knew that Cozen O'Connor represented The Institutes. *See*, *e.g.*, Compl. at ¶¶ 20-46.  That is, at least, the impression that the convoluted allegations in the Complaint are designed to create, but if one reads them, one can see that they actually do not set out a plausible claim.

                1.     *The CLM Group*

Plaintiffs Potter and Moxie were, per the Complaint, the owners of all of the interests in three entities that were the Sellers under the Asset Purchase Agreement.  *See* Compl. at ¶ 3. Those three Sellers were: Claims Pages, LLC; C&E MGMT and Planning, Inc.; and CLM Group, Inc.  *See id.*

The Complaint alleges that the CLM Group, Inc. is a "business association" that served the "property and casualty insurance claims professions."  Compl. at ¶ 14.  It "provides education, training and information to Insurance Claims Representatives through publications, meetings and conferences" and had "over 45,000 members."  Compl. at ¶ 15.

The second Seller, C&E MGMT and Planning, Inc., is said to have supported CLM Group, Inc. by organizing conferencing events at hotels, resorts and other facilities for the members of CLM group, Inc.  Compl. at ¶ 16.

The business of the third Seller, Claims Pages, Inc., is not specified in the Complaint.  All that is alleged is that "shortly before the sale" Moxie purchased Claims Pages Inc.  Compl. at ¶ 18.

Some of the confusion in the Complaint stems from the inconsistency in the usage of terminology.  As noted immediately above, there was a legal entity -- not a party -- whose full name was "CLM Group, Inc."  But the Complaint also coins the terms "CLM Group" and "CLM," *See* Compl. at ¶ 19, to be used to refer collectively to CLM Group, Inc., C&E MGMT

and Claims Pages, the three non-party Sellers whose assets were sold to The Institutes under the APA, and to whom any monetary consideration was payable under the APA.  *See id.*  The term "CLM Group" does not include Potter or Moxie, according to the Complaint.  *See id.*

        2.     *Anne Blume's Membership on the Advisory Board of Directors for the CLM Group*

The Complaint alleges that Anne Blume was nominated to a body referred to as the "Advisory Board of Directors for CLM Group, Inc." in 2011.  Compl. at ¶ 21.  The Advisory Board of Directors is not alleged to be a Board of Directors in the corporate control sense.  The Complaint refers to it only as an "Advisory Board" and does not explain its legal status, if it had one at all.  *See* Compl. at ¶¶ 20-21, 73.  The Complaint alleges only that Potter created it "to assist him in making various decisions necessary for the operations of CLM Group Inc."  Compl. at ¶ 20.

One might infer from the Complaint that the "Advisory Board" consisted of property and casualty insurance claims professionals, the group that the Complaint asserts was served by the CLM Group, and of whom 45,000 were said to be "members" of CLM Group, Inc.  *See* Compl. at ¶¶ 14-15.  The Complaint does not state the number of Advisory Board members, or describe the content of the "various decisions" on which it allegedly assisted Mr. Potter.  *See* Compl. Presumably, the "various decisions" upon which the Advisory Board of Directors gave advice to Mr. Potter was in the operation of CLM Group Inc.'s education and training business.  But that is not at all clear, and in any event, giving advice on such business matters is not legal advice, nor is it alleged to be.

The Complaint alleges that in 2011 "Anne Blume was nominated to the Board as the ***only outside lawyer member***."  Compl. at ¶ 21 (emphasis added).  We suppose that this assertion is intended to somehow create the impression that Ms. Blume served as "outside counsel."  It really

8

signifies only that there were apparently many insurance company in-house lawyers on the Advisory Board, but that Ms. Blume was the only "outside" lawyer. As noted above, the CLM Group served the "property and casualty insurance claims professions" many of whose members are in-house lawyers employed at insurance companies. *See* Compl. at ¶ 14. It would seem that there were many lawyers on the Advisory Board, but Ms. Blume was the only one in private practice. *See* Compl. at ¶ 21.

The Complaint includes a conclusory allegation that within a relatively brief period after being put on the Advisory Board, Ms. Blume became "outside General Counsel" for CLM Group." Compl. at ¶ 22. It then alleges that Anne Blume "offered her legal skills to Potter, Moxie, and CLM Group, drafting contracts, advising the companies on employment, antitrust, and other business-related matters." *See* Compl. at ¶ 24. The Complaint does not say when during the period of Ms. Blume's alleged involvement with CLM those alleged legal consultations took place. Later, the Complaint alleges that "upon joining the board of the CLM Group defendant Blume became *de facto* and *de jure* counsel for "Plaintiffs as the owners of the businesses." *See* Compl. at ¶ 73.

Plaintiffs allege that "Blume met with, talked to and otherwise interacted with Potter on a daily basis" but there is no allegation that the referenced interactions related to legal services as opposed to the kinds of business matters addressed by all members of the Advisory Board. *See* Compl. at ¶ 25.

The Complaint does not allege that there was any engagement agreement, written or otherwise, between Anne Blume and/or Cozen O'Connor and any of the Plaintiffs, and acknowledges that Ms. Blume never submitted an invoice for any legal services, or, for that matter any non-legal services. *See* Compl. at ¶¶ 26, 73, 94. The Complaint alleges that Anne

Blume opened a "billing file" at Cozen, but there is no explanation as to what it means to open a "billing file" when admittedly no bills were ever sent or paid.  *See* Compl. at ¶ 26.

Plaintiffs allege that Cozen O'Connor and/or Anne Blume provided other legal advice and counsel to Plaintiff Potter in his individual capacity, but Plaintiffs do not allege any specific dates of such services.  *See* Compl. at ¶ 27.

So, it is a mystery as to exactly what the nature of the representations were; when they began and ended; what "legal" as opposed to business relationship was being talked about; and when, assuming they occurred, they took place.  And that is important.  It may be possible, for example, that there was some sort of legal consultation -- in, say, 2015 -- on a discrete matter, and that informal advice, unbilled for, might, in theory, have created a lawyer-client relationship on that one matter for a brief period, but one cannot tell that from the Complaint, which is studiously vague on that point.

### D.    The Alleged Business Advice Given by Anne Blume as to the Sale Price

When it gets to the actual alleged wrongdoing, the Complaint is a model of obfuscation. In its introduction, entitled "Background Summary," the Complaint alleges that both "buyer" and "seller" were represented by Cozen O'Connor in the transaction by which The Institutes acquired certain assets of the three non-party Sellers comprising the CLM Group.  *See* Compl. at 2.   But an examination of the substantive allegations in the actual numbered paragraphs of the Complaint, as opposed to the inflammatory Background Summary, shows that is not so.

Here is what the Complaint actually alleges:

"In or about February 2018, Plaintiff Potter was approached by The Institutes with an offer to purchase the CLM Group."  Compl. at ¶ 30.  The Complaint alleges that Mr. Potter was

"inexperienced in selling a business and immediately turned to Blume for advice and counsel and relied on it."  Compl. at ¶ 37.[8]

The only subject upon which Mr. Potter claims he consulted Ms. Blume, per the Complaint, was the sale price that would be paid by The Institutes for the assets to be sold.  *See* Compl. at ¶¶ 36-40.  The Complaint alleges that The Institutes initially offered $17 million; that, after consulting with Blume, Mr. Potter determined not to accept that offer and asked for more money; that The Institutes made a revised offer of $20 million; that Mr. Potter further discussed that offer with Blume; and that she advised him to accept the higher offer and did not advise him to have the assets in question valued or appraised.  See Compl. at ¶¶ 36-41.  Potter claims that he relied upon Blume for that business advice because he considered her to be his "trusted advisor."  Compl. at ¶ 42.

The Complaint does not allege that Blume gave Potter any other advice in connection with the transaction.  The Complaint is devoid of any allegation that Mr. Potter believed that Ms. Blume possessed or claimed to possess any legal or other type of expertise necessary to advise possible sellers of businesses as to their value for purposes of sale, or that she possessed any expertise at all in the area of business valuations.  *See* Compl.

Nor does the Complaint allege that the advice that Ms. Blume allegedly gave on the matter, limited to the matter of price, was legal advice, as opposed to advice as to the value of his business for sale purposes.  *See* Compl.

There is no allegation that Ms. Blume and/or Cozen O'Connor entered into an engagement to provide the alleged advice as to the price to be paid to the non-party Sellers by

---

[8] The Complaint alleges that Mr. Potter was approached by The Institutes to purchase the "CLM Group."  Compl. at ¶ 30.  As explained above, however, the transaction did not involve the purchase of the "CLM Group," but certain assets owned by three non-party Sellers.

The Institutes under the APA, ever recorded any time, ever rendered a bill or that Potter or the CLM Entities ever received such a bill. *See* Compl.

The Complaint does not allege that Defendant Madonia or Defendant The Institutes had any involvement with any of the alleged advice given by Blume. (Madonia's alleged wrongdoing all took place over a year after the closing on the APA transaction. *See* infra at Section I(I)(1).)

**E.      The Engagement of Legal Counsel by Potter, Moxie and the Non-Party Sellers to Represent Them in the Negotiation and Creation of the APA**

The Complaint alleges that Potter and Moxie actually did retain counsel to "to negotiate and review the transaction documents [i.e., the APA] on his and Moxie's behalf . . . ." and that that counsel was ***not*** Cozen O'Connor. Compl. at ¶ 47. Thus, according to the Complaint, Mr. Potter had counsel other than Cozen to negotiate and review all aspects of the transaction documents. That counsel is actually identified right in the Asset Purchase Agreement: Andreas Papantoniou, Esq., a lawyer with an office in Garden City, New York. *See* Ex. B, APA at 34.

The Complaint does not state the date upon which Mr. Papantoniou was engaged. It says only that Potter engaged him after the purchase price had been negotiated. Compl. at ¶ 47.

Thus, the Complaint actually confirms that, at the time the transaction documents were "negotiated and reviewed," and for the purpose of such negotiation and review, Potter was represented by counsel entirely separate from Cozen O'Connor. *See id.* The Complaint contains no allegation, or even suggestion, that Potter's actual counsel in the transaction was constrained in any manner whatsoever from fully and aggressively representing Potter and Moxie or the Sellers with regard to each and every aspect of the transaction accomplished by the APA, including the price to be paid for the assets being sold and/or whether any appraisal of the assets

being sold should be done.  *See* Compl.  Nor do Plaintiffs allege that the Institutes would have

paid more.  *See id.*

      **F.**      **The Timing of Cozen's Involvement as Counsel for The Institutes**

      The Complaint does not allege that at the time Ms. Blume was allegedly offering

opinions as to the sale price that Ms. Blume in fact knew that Cozen represented The Institutes,

or even, at the time those alleged conversations took place, that other Cozen lawyers knew

anything about the prospective transaction.

      The Complaint alleges only that Ms. Blume "***presumably***" "knew that The Institutes were

long-standing clients of Cozen . . . ."  *See* Compl. at ¶ 33.  As is so of much else in the

Complaint, no dates are provided as to when Ms. Blume "presumably" knew that.  *See id.*

      Thus, the Complaint actually does not allege that Ms. Blume in fact knew about Cozen's

alleged representation of The Institutes on the APA transaction.  *See* Compl.  The most that

Plaintiffs can bring themselves to say is that Ms. Blume "presumably" "knew that The Institutes

were long-standing clients of Cozen[.]" at some unspecified time.  *See* Compl. at ¶ 33.

      At some point, before or after Potter engaged counsel -- the Complaint does not say -- it

became apparent that Cozen lawyers other than Ms. Blume were representing The Institutes on

this transaction.  Indeed, the Complaint alleges Plaintiffs learned "[t]he Asset Purchase

Agreement was drafted by Cozen lawyers."  Compl. at ¶ 47.  That was the APA as to which

Potter engaged counsel -- not Cozen -- to "negotiate and review."  *See* Compl. at ¶ 47.

      After that negotiation and review of the transactional documents by Mr. Papantoniou on

behalf of Potter and Moxie and the non-party Sellers, the transaction closed.  That occurred on

June 1, 2018.  *See* Ex. B, APA.

G.      **The Absence of Any Objection**

The Complaint is silent as to any objection by Plaintiffs or their counsel on the APA transaction to the realization that Cozen was representing The Institutes in the transaction.  *See* Compl.

Despite noting that Cozen O'Connor lawyers were on the other side of the transaction, the Complaint is devoid of any allegation or suggestion that after that became apparent to Mr. Potter and Moxie, which was ***before*** the APA was reviewed and negotiated by Mr. Papantoniou as counsel for Potter, Moxie and the non-party Sellers, that Potter, Moxie or any of the non-party Sellers expressed any objection whatsoever to Cozen's representation of The Institutes.  *See* Compl.

Not only that, the Complaint alleges, following the closing of the transaction, Potter retained such high regard for Blume that he actually recommended to The Institutes that Ms. Blume be appointed as The Institutes' Chief Executive to operate the business utilizing the assets just acquired by The Institutes.  *See* Compl. at ¶¶ 49-50.

Plaintiff Potter also alleges that after the transaction closed, Anne Blume and Cozen O'Connor subsequently provided "certain advice and counsel related to the purchase of his home."  Compl. at ¶ 51.

H.      **The Asset Purchase Agreement**

Some discussion of the APA is necessary to understand the claims made and those that are not made.

The APA provides that The Institutes was acquiring certain assets of the three entities identified above as the Sellers.  *See*, Ex. B, APA at 1.  Potter and Moxie were also parties to the Asset Purchase Agreement.  *See id.*  But they were not Sellers.  *See id.*

The monetary consideration for the sale of the assets by the Sellers was an initial payment to be made at closing of $17,329,098, and certain subsequent post-closing payments. *See id.* at 6.  All those amounts were to be paid to the non-party Sellers, not Moxie or Potter.  *See id.* at 1-2, 6.  Not one penny of the consideration paid for the assets acquired by The Institutes was to be paid to Potter or Moxie.  *See id.*

One type of post-closing payment due to the non-party Sellers was referred to as the "Revenue Target Subsequent Payment."  *Id.* at 7-8.  Whether such a payment would be due and, if so, in what amount, depended upon the financial performance of The Institutes during the twelve month period following the closing.  *See id.*  The payment's maximum amount was to be $2,250,000, but it could be less.  *See id.*

The APA set forth a procedure to determine the financial performance of The Institutes during that twelve month period following closing and the resulting determination of whether or not a Revenue Target Subsequent Payment was due.  *See id.* at 7-9.

The APA also provided that if a dispute arose regarding the Revenue Target Subsequent Payment, the parties would attempt to resolve that dispute in good faith, but, in the event they were not able to resolve it, an "expert" would be engaged to make a decision as to the matters in the dispute in his or her capacity as a "expert," and not as an "arbitrator."  *See id.* at 8-9.  Each party was authorized to prepare submissions to the expert, together with all relevant documents and to provide the expert with all information as the expert might reasonably request.  *See id.*

The APA provided that the decision of the expert would, in the absence of fraud or manifest error, be final and binding on the parties and determine whether a Revenue Target Subsequent Payment was to be made and, if so, in what amount.  *See id.* at 9.  In the event any

15

Revenue Target Subsequent Payment was due, that payment was then to be paid to the Sellers, not to Potter or Moxie. *See id.*

The APA also contained a provision stating that the parties agreed that the APA would be governed and construed in accordance with the law of Delaware and that the parties irrevocably submitted to the exclusive jurisdiction of federal and state courts located in New Castle County, Delaware; provided, however, that in the event of a dispute regarding the Revenue Target Subsequent Payment under section 2.4 C, such agreements were to be finally settled in accordance with the procedure outlined above. *See id.* at 35.

I.     **Events Since the Closing**

1.     *Dispute over the Revenue Target Subsequent Payment*

The Complaint alleges that a dispute in fact developed over whether or not a Revenue Target Subsequent Payment was due. *See* Compl. at ¶¶ 53-57.

The Complaint spells out two separate types of alleged misconduct on the part of Cozen and Anne Madonia with regard to that dispute. First, it alleges, "The Institutes and Madonia failed to adhere to the mandates of section 2.4 [of the APA] and contrary to the mandates . . . of the [APA] twice provided *ex parte*[9] information on December 5 and December 12 to the person tasked with resolving the dispute." Compl. at ¶ 58. According to the Complaint, those "ex parte" communications were "false, misleading and inaccurate, but the person tasked with

---

[9] The Complaint uses the term *ex parte* improperly, we expect. An *ex parte* communication is a communication between a representative of a party and a judicial body or other adjudicator that takes place without the knowledge of the opposing party. *Mercy Reg. Health Sys. (formerly Mercy Hosp.) of Altoona v. Dep't of Health*, 645 A.2d 924, 929 (Pa. Commw. Ct. 1994) ("The common and approved usage of '*ex parte*' is communications between the decision-maker and one party outside of the record and where the other party does not have notice or the opportunity to contest."). It is frequently misused to refer to communications by a party or its representative to a judicial body or adjudicator with which the opposing party disagrees, even where the opposing party is contemporaneously sent a copy of the communication. While we do not know what the plaintiffs truly mean here, there were in fact no *ex parte* communications with the "expert" who served as the adjudicator of the Revenue Target Subsequent Payment dispute.

resolving the dispute had no way to know that." Compl. at ¶ 60. As a result, according to the
Complaint, "Potter and Moxie were not paid the true amount due and owing to them [under the
Revenue Target Subsequent Payment]." Compl. at ¶ 61.

As one can see, this amounts to little more than a claim that the dispute resolution terms
of the APA regarding the Revenue Target Subsequent Payment were breached, and that the
expert engaged to decide the issue decided it incorrectly. The Complaint does not allege that
Potter or Moxie were unable to explain why their views as to the proper calculation of the
Revenue Target Subsequent Payment were correct, and The Institute's incorrect, or why the
expert was unable to discern that in making the "final and binding" decision as to the Revenue
Target Subsequent Payment under the APA.

Second, the Complaint alleges that Cozen and Madonia used "confidential information
gained through the firm's representation of Potter and CLM during the process to deprive Potter
of the benefit of his bargain." Compl. at ¶¶ 59, 69. The Complaint does not, however, provide
even a hint as to what the allegedly "confidential" information was, how Ms. Madonia learned it,
and what it had to do with the dispute resolution process outlined in the APA with regard to the
Revenue Target Subsequent Payment, which concerned the financial performance of The
Institutes over the twelve month period following closing, when neither the Plaintiffs nor the
nonparty Sellers had anything to do with the operations being examined. So it is a mystery as to
how some unspecified "confidential" information in relation to the operations of CLM, Inc. prior
to the sale could have any bearing on an examination of The Institutes revenues.

The consequence of this alleged misconduct, according to the Complaint, is a loss of
$344,951. That is the additional amount which Potter and Moxie assert would have been paid to
the nonparty Sellers under the APA, if defendants had not acted improperly. *See* Compl. at ¶ 62.

2. *Related Litigation between The Institutes, Adam Potter and His Sister, Sydney Posner, after the Sale*

The disputes underlying the two lawsuits mentioned in the introduction also arose after the closing.  Plaintiffs fail to reference those two related lawsuits involving Plaintiff Potter that provide additional context important to understand Plaintiffs' Complaint and shed light on the circumstances surrounding the Complaint.  This court may take judicial notice of those pleadings.

First, The Institutes filed a complaint against Adam Potter, Business Insurance Holdings, Inc. ("BIH"), and PBIH, LLC ("PBIH") in the United States District Court for the District of Delaware on August 28, 2019, which was amended on March 27, 2020.  *See* Ex. C.  There, The Institutes alleged that Potter and the other defendants were violating non-compete provisions included in the APA by building BIH as an alternative and competitor to The Institutes.  *See id.* at ¶ 45.  The Institutes further alleged that Potter and BIH/PBIH were producing claims and litigation management conferences that directly violated the APA's non-compete provisions, that Potter sold BIH to Beacon International Group, Inc. ("Beacon") and remained involved to help Beacon build the business, and that Potter leveraged his relationship with Beacon to assist in the formation of The Claims Xchange, Inc. ("ClaimsX"), a new entity started by Potter's sister, Sydney Posner ("Posner"), to compete with The Institutes.  *Id.* at ¶¶ 46-52. 104-118, 121-128.

The Institutes also filed a complaint against Posner and ClaimsX in the United States District Court for the Eastern District of Pennsylvania on November 14, 2019, which was amended on January 13, 2020.  *See* Ex. D.  There, The Institutes alleged that it offered Posner a job with responsibilities including selling sponsorships for CLM Group events, advertisements for CLM Group publications and/or sponsorships for events of other companies and brands of The Institutes but that it terminated Posner for misconduct on September 20, 2019 when it

learned that Posner was obtaining fees for referring entities to sponsor BIH events.  *See id.* at ¶¶ 25-36, 38, 44-60.  The Institutes demanded that Posner return all company property and reminded Posner that she was not permitted to retain any reproductions of company property, but Posner allegedly copied and exported files and documents containing The Institutes' proprietary, confidential, and trade secret information.  *See id.* at ¶¶ 64-76.  The Institutes alleged that ClaimsX was incorporated on October 1, 2019, hired Posner as its Vice President and appointed her as director as of the same day, and began competing with The Institutes, aided by Posner's retention of The Institute's confidential information.  *See id.* at ¶¶ 77, 80-81, 84-86.

3.    <em>Potter discovers that the price negotiated with The Institutes was inadequate</em>

It was only then, ***after*** the Alternative Dispute Resolution "Expert" process was concluded with a result different from that advocated by Mr. Potter and ***after*** the two referenced lawsuits against Mr. Potter and his sister were begun, Mr. Potter alleges, that he came to the realization that the non-party Sellers had agreed to sell their assets to The Institutes at "an amount substantially below the true value of the company and for a value far lower than what should have been the fair selling price," and that Ms. Blume was responsible for that decision on his part.   Compl. at ¶¶ 48, 82.  He attributes the decision by the non-party Sellers to sell the assets sold to The Institutes under the APA for too low an amount to advice given by Ms. Blume, and claims that at the time Ms. Blume gave that advice she and Cozen had a conflict of interest in that it represented The Institutes.

The Complaint does not explain what prompted this sudden realization.  The Complaint is also devoid of any precision as to the amount by which the consideration to be paid to the non-party Sellers under the APA was deficient.  It is only said to be in the "millions."  *See* Compl. at ¶ 63.

Of course, as with the alleged harm suffered as a consequence of the alleged wrongdoing in connection with the Revenue Target Subsequent Payment process, the alleged harm consisting of the deficiency in purchase price was suffered, if at all, by the non-party Sellers, who were the recipients of all of the consideration paid for the assets under the APA.

## II.   ARGUMENT

### A.   Introduction

By this motion, Defendants Cozen, Madonia and Blume raise a number of different grounds justifying dismissal of this Complaint.  Before addressing those grounds, Defendants note the following:

First, separately Defendant Blume is filing a motion to dismiss this action against her for lack of personal jurisdiction.  We respectfully suggest that the Court address that motion first and, if granted, Ms. Blume will no longer be a party and her positions on the remaining issues in the matter need not be considered.

Second, The Institutes is filing a motion to dismiss or transfer venue in this matter to the United States District Court for the District of Delaware based upon a forum selection clause in the APA and the pendency of other litigation between The Institutes and Mr. Potter in that court. Defendants Cozen and Madonia join in that motion and specifically state that they would not object to the exercise of personal jurisdiction over them in the court in Delaware and consent to venue there. As to Defendant Blume, for the reasons stated separately in her motion to dismiss for lack of personal jurisdiction, she does not believe that either this court or the Delaware court have personal jurisdiction over her.  But, in the event this Court determines that it does possess personal jurisdiction over her, then, and only then, does Ms. Blume state that she also would consent to the exercise of personal jurisdiction and venue in in the court in Delaware.

**B.      Plaintiffs Lack Standing to Assert The Claims Asserted in the Complaint.**

As the above discussion demonstrates, the only damages alleged to have been suffered are (1) the loss of additional monetary consideration that by rights should have been negotiated to be paid by The Institutes to the Sellers under the APA; and (2) a loss of $344,951 that by rights should have been paid by The Institutes to the Seller under the APA via the post-closing payment known as the Revenue Target Subsequent Payment.  Compl. at ¶¶ 62-63.

But here is the key point.  Those additional amounts would have been paid to the Non-Party Sellers under the APA.  *See* supra at Section II(G).  And it is beyond argument that the only two plaintiffs in this lawsuit are not Sellers to whom any money was due.

Plaintiffs apparently think that they can make claims for redress of losses suffered by entities which they allege themselves to have owned.  But they cannot.  "In Pennsylvania, a shareholder lacks standing to institute a direct suit for a harm [that is] peculiar to the corporation and [that is] only [ ] indirectly injurious to [the] shareholder."  *Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 459 (E.D. Pa. 2016) (internal citations and quotations omitted); *see also Home Title Co. of Md. v. LaSalla*, 257 So.3d 640, 643 (Fla. 2d DCA 2018) (explaining that, under Florida law, where an "'injury is primarily against the corporation, or the [share]holders generally, then the cause of action is in the corporation and the individual's right to bring it is derived from the corporation.'") (citations omitted).[10]  "Instead, such a claim belongs to, and is an asset of, the corporation."  *Lieberman*, 226 F. Supp. 3d at 456 (internal citations and quotation omitted); *see also LaSalla*, 257 So.3d at 643 ("Generally, a shareholder of a corporation or a member of an LLC may not maintain an action in his or her

---

[10] "Certain matters that are internal to a corporation are properly adjudicated under the laws of the state of incorporation."  *Doltz v. Harris & Assocs.*, 280 F. Supp. 2d 377, 383 (E.D. Pa. 2003) (applying Florida law in determining whether Plaintiff had standing to bring shareholders' derivative action).

own right if the cause of action is derived from the right of the corporation or the LLC to bring the action.") (citations omitted). (same).  "This type of claim—one belonging to the corporation, rather than the shareholder—is called a derivative claim."  *Id.*; *LaSalla*, 257 So.3d at 644, n.3 ("[W]here the injury is to the corporation, a stockholder must bring the action in the name of the corporation, 'even where the individual is the sole stockholder of the corporation.'") (citing *Lincoln Oldsmobile, Inc. v. Branch*, 547 So.2d 1111, 1114 (Fla. 2d DCA 1990)).

Thus, for that reason, without more, the Complaint must be dismissed as the Plaintiffs lack standing to assert any claim for the only amounts claimed as damages in the lawsuit.[11]

Further, it is well-established that any legal malpractice claim requires as an element that the plaintiff has suffered damages.  *See ATG Trust Co. v. Schlichtmann*, 314 F.Supp.3d 718, 723 (E.D. Pa. 2018) ("A legal malpractice claim also requires 'proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm.'") (citations omitted); *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998) ("An essential element to [a legal malpractice] cause of action is proof of actual loss . . . .") (citation omitted).  As Plaintiffs do not even allege that they personally suffered any actual loss, their claims fail for this reason as well.

---

[11] Plaintiffs also claim to have suffered "non-economic losses, including humiliation, stress and mental anguish."  *See* Compl. at ¶ 70.  But there are at least two problems. First, Moxie is an inanimate company.  It cannot suffer such damages.  As for Mr. Potter, who has not alleged he has suffered any economic damages, clams for non-economic damages are not compensable in these circumstances under Pennsylvania law.  *See, e.g.*, *Chainey v. Street*, 523 F.3d 200, 216 (3d Cir. 2008) ("In order to recover compensatory damages for mental distress, a plaintiff must present evidence of actual injury."); *Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 565 (W.D. Pa. 2015) ("Under Pennsylvania law, mere embarrassment is not compensable in a negligence action, absent physical injury . . . .").  It is possible that damages for emotional distress in connection with a legal malpractice could be appropriate if a plaintiff could establish a claim for tortious infliction of emotional distress, which requires physical injury.  *See Stovall v. Kallenbach*, No. 1683 WDA 2018, 2019 WL 2808297, *2 (Pa. Super. July 2, 2019) (noting that while Pennsylvania courts "have held that tortious infliction of emotional distress may constitute actionable harm in a professional negligence suit" "[a]t a minimum," "a plaintiff must plead some identifiable, physical injury to his person that is verifiable by expert medical testimony").  Mr. Potter, however, fails to plead either a claim for tortious infliction of emotions distress or any physical harm and cannot recover his alleged non-economic losses.

**C.    All Claims Asserted by Plaintiff Moxie Must Be Dismissed Moxie Does Not Exist.**

According to the Complaint Moxie, a Florida limited liability company, was

"discontinued" in December 2019.  It apparently was not dissolved in accordance with Florida

corporation law, and therefore lacks standing to assert any claims.  Florida statute provides that

the "[d]issolution of a limited liability company does not . . . [p]revent commencement of a

proceeding by or against the limited liability company in its name."  Fla. Stat. Ann. §

605.717(1)(b).  Florida statutes, however, do not appear to affirmatively provide such standing

for a "discontinued" limited liability company.  Plaintiffs expressly allege that Moxie was

"discontinued" in December 2019.  *See* Compl. at ¶ 2.  Plaintiffs fail to include any allegation

with respect to whether Moxie was properly dissolved in accordance with Florida statute.  As a

result, as a "discontinued" entity, Moxie lacks standing to assert any claims in this suit, and this

Court should dismiss all of Moxie's claims.

**D.    Plaintiffs Fail to State a Facially Plausible Claim for Relief in Counts I, II, and III.**

Plaintiffs' allegations in Counts I, II, and III fail to state any plausible claim for relief,

and the Court should dismiss these Counts pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain a "'short

and plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  This standard "does not require

'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation."  *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)).  A pleading may not merely offer "'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action'" or "'naked assertion[s]' devoid of 'further factual

enhancement.'" *Id.* (same). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard does not require a probability but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations and citation omitted).

*Twombly* was based upon two general principles: (1) "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" and (2) "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678-79 (citing *Twombly*, 550 U.S. at 555-56). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* Here, Plaintiffs fail to show that they are entitled to relief under Counts I, II, or III, and the Court should grant Defendants' Motion to Dismiss.

1.     *Plaintiffs' Allegations in Count I Fail to State a Breach of Fiduciary Duty Claim against Anne Blume, Anne Madonia, or Cozen O'Connor.*

      a.     <u>Plaintiffs Fail to State a Breach of Fiduciary Duty Claim against Anne Madonia and Cozen O'Connor.</u>

Plaintiffs' breach of fiduciary duty claim against Anne Madonia refers to and relies upon vague and conclusory allegations that Plaintiffs' confidential information was obtained and improperly used to harm Plaintiffs. These allegations are insufficiently pled and do not allege any plausible claims against Anne Madonia. As a result, the Court should disregard these allegations and dismiss Count I as to Anne Madonia.

The District Court for the Western District of Pennsylvania has examined these principles with respect to a defendant's counterclaim for breach of contract and breach of fiduciary duty based on the plaintiff-employee's copying of confidential information prior to the plaintiff's employment termination. *Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2007 WL 3147038, *5 (W.D. Pa. Oct. 25, 2007). The court applied the *Twombly* standard and explained that the defendant

> ple[d] specific factual allegations as to Plaintiff's copying and removal of documents, including approximate dates of Plaintiff's conduct and the contents of said documents. [citing docket] (providing that between October 11, 2004 and October 31, 2004, Plaintiff copied and removed documents, including emails between Plaintiff and Defendant [] discussing 'confidential legal issues, settlement strategies, internal thought processes about pending cases and case preparation as well as information and communications from [employer defendant's] retained outside counsel regarding various legal matters'). Accordingly, even in light of *Twombly*, the Court [found] that the [employer defendant's] proposed counterclaims ple[d] 'enough facts to state a claim to relief that [wa]s plausible on its face.'

*Id.* Here, Plaintiffs fail to sufficiently plead any plausible claim relating to the alleged improper use of confidential information. Plaintiffs assert in a single conclusory sentence that Anne "Madonia and Cozen manipulated the [dispute resolution process of Section 2.4 of the

APA] and took advantage of Potter and his confidential information gained through the firm's representation of Potter and CLM to deprive Potter of the benefit of his bargain."  Compl. at ¶ 59.  That's it.  Plaintiffs fail to disclose what confidential information was obtained, who obtained the confidential information, when the confidential information was obtained, or even how the confidential information was allegedly used.

Moreover, not only do the allegations lack any detail whatsoever, they make no sense, and therefore lack any plausibility whatsoever.  Plaintiffs fail to allege a plausible claim. Plaintiffs allege that "confidential information" was used during the dispute resolution process set forth in Section 2.4 of the APA.  But as explained above, this process dealt with disagreements regarding an evaluation of the revenue The Institutes earned in the twelve-month period ***after*** the assets were sold to The Institutes.  This was an assessment of ***The Institutes'*** performance, not ***Potter's*** or ***Moxie's***.  Plaintiffs were no longer involved at this point in time, and it is mystery how any confidential information obtained from Potter relating to the time when he managed CLM Group, Inc. could have affected Section 2.4's calculations in any way.

Thus, these allegations are insufficient under Rule 8, and the Court should dismiss Count I as to Madonia and Cozen O'Connor to the extent Plaintiffs' claim arises out of Madonia's alleged conduct.

With respect to the other aspect of Anne Madonia's conduct complained of in Count I, which consisted of Ms. Madonia making an "ex parte" communication to the expert, communicating with an expert, even assuming the communication is ex parte, does not constitute any breach of a fiduciary duty.  During that expert process, as everyone knew, Ms. Madonia was adverse to Mr. Potter.  Moreover, at most, assuming this conduct was a breach of the APA, as is alleged, it would constitute a breach of contract, if anything.

> **b.**     <u>Plaintiffs Fail to State a Breach of Fiduciary Duty Claim against Anne Blume and Cozen O'Connor.</u>
>
> **(i)**     <u>Plaintiffs Fail to Sufficiently Allege an Attorney-Client Relationship with Anne Blume.</u>

As an initial point, Plaintiffs do not, and cannot, point to any contract giving rise to an attorney-client relationship with Anne Blume and also fail to sufficiently allege an implied attorney-client relationship. This is fatal to Plaintiffs' breach of fiduciary duty claim against Blume.

Where no express contract exists to create an attorney-client relationship, a court may imply an attorney-client relationship "if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him." *Atkinson v. Haug*, 622 A.2d 983, 986 (Pa. Super. 1993). The sufficiency of factual allegations claiming an implied attorney-client relationship is to be examined "on a case-by-case basis[.]" *Cost v. Cost*, 677 A.2d 1250, 1253 (Pa. Super. 1996).

*Atkinson* dealt with an appeal of a grant of summary judgment, in which the court explained that "the key issue [] was whether there was an attorney/client relationship between [plaintiff] and [defendant attorney] or, in the alternative, the men were merely partners in an unfortunate business enterprise." *Id.* at 986. In finding that no attorney-client relationship existed, the court explained that defendant attorney "dabbled in real estate investments in addition to pursuing his legal career." *Id.* Plaintiff was a college graduate and owner of a cargo transportation business employing approximately ninety persons. *Id.* The men met socially through a mutual friend, and their wives became good friends. *Id.* Between 1982 and 1984, defendant attorney "admittedly handled, pro bono, a few personal legal problems for [plaintiff]."

27

*Id.*  With respect to the apartment complex venture at issue in the case, plaintiff overheard defendant attorney discussing the venture with a mutual friend, plaintiff expressed his interest in the venture, defendant attorney explained the venture, and plaintiff decided to become a one-sixth partner based upon his understanding that he would co-sign a note for the down-payment to purchase the development and that "his loss would be limited to a forfeiture of the real estate should the project fail."  *Id.*  Plaintiff did not review a cash review analysis prior to executing the loan documents and allegedly relied instead on defendant attorney's legal expertise and another partner's accounting experience.  *Id.* at 986-87.  Plaintiff subsequently signed several additional loans, notes, and agreements without reading, or only speed-reading, them.  *Id.* at 987.  Plaintiff testified that "he never asked [defendant attorney] for advice and never was billed nor offered to pay for the legal services allegedly performed by [defendant attorney]."  *Id.*

The court explained that the evidence did not establish an attorney-client relationship and only showed that plaintiff's predicament was a result of his own carelessness.  *Id.*  The court stressed that plaintiff was "an educated man, knowledgeable and seasoned in the business world and owner and president of a successful cargo transportation business" who had previously "borrowed money for his personal investments and, impliedly, had knowledge of the paperwork required and its legal significance."  *Id.*  "A reasonable, sophisticated business person would not sign document after document, imputing financial liability, without reading them.  Nor would he assume so obvious a financial risk relying only on an off-handed, nebulous comment by [defendant attorney] that his risk would be limited to his interest in the partnership."  *Id.*  The fact that defendant attorney was "an attorney by trade [did] not necessarily characterize each of his utterances as 'legal advice,' capable of being upheld as binding in the courts of this Commonwealth."  *Id.*  The court further stressed that "there was no express legal agreement

28

between the parties, no fee arrangement was entered nor retainer paid, no particular legal ramifications of the deal were discussed," there was "no indication [plaintiff] asked [defendant attorney] for legal counsel nor did [defendant attorney] indicate he was [plaintiff's] attorney or attorney for the project[,]" plaintiff had used the services of other law firms prior to the venture, and defendant attorney believed plaintiff continued to seek outside counsel regarding the venture. *Id.* Plaintiff's "subjective belief an attorney/client relationship existed between he and [defendant attorney was] an insufficient basis upon which to find there existed a genuine issue of material fact precluding summary judgment." *Id.* at 987-88.

A recent Superior Court Opinion, while unpublished, is also illustrative here. *See Conley v. Stockey*, No. 548 WDA 2015, 2016 WL 1657966 (Pa. Super. Apr. 26, 2016).[12] In *Conley*, plaintiff was approached by Mr. Butya seeking a loan. *Conley*, 2016 WL 1657966, at *1. Plaintiff and Butya had both been previously represented by defendant attorney,[13] and plaintiff trusted defendant attorney. *Id.* at *1. Butya thus suggested that defendant attorney could facilitate the loan transaction. *Id.* Plaintiff, Butya, and defendant attorney subsequently met to discuss the potential loan, and plaintiff and defendant attorney further discussed the loan in an additional phone conversation, but plaintiff did not recall whether defendant attorney offered any advice regarding the loan. *Id.* As a result of the conversations, plaintiff loaned $150,000 to Butya secured by real property, but, at the closing, plaintiff signed a waiver acknowledging that the property was subject to foreclosure proceedings that could render the loan unsecured. *Id.* Butya defaulted on the loan, and plaintiff was unable to collect on a judgment. *Id.* The documents for the loan were drafted by a separate attorney who attended the closing. *Id.*

---

[12] A copy of the opinion in *Conley* is attached for ease of reference. *See* Ex. "E."
[13] Defendant attorney previously represented plaintiff in various collection efforts and real estate issues. *Id.* at *1 n.2.

Plaintiff presumed defendant attorney reviewed the documents, but defendant attorney was not present at the closing, did not review or discuss the documents with plaintiff prior to the closing, did not bill plaintiff for any legal services, and was not paid any legal fees by plaintiff. *Id.* The lower court granted summary judgment in favor of defendant attorney based upon plaintiff's failure to establish an attorney-client relationship, and plaintiff appealed. *Id.* at *1-2.

On appeal, the court stressed that there was no fee agreement regarding the loan, defendant attorney never reviewed the loan documents with plaintiff prior to closing, defendant attorney did not attend the closing, and plaintiff never paid defendant attorney for legal services. *Id.* at *3. The court found that while plaintiff was able to show that he sought advice from defendant attorney within defendant attorney's professional competence, he failed to establish that defendant attorney expressly or impliedly agreed to render such assistance or that it was reasonable for plaintiff to believe defendant attorney was representing him. *Id.* at *4. At most, plaintiff showed an insufficient subjective belief that defendant attorney represented him. *Id.*

Here, Plaintiffs concede that they did not have an express contract with Anne Blume to create an attorney-client relationship. *See* Compl. at ¶ 94. Thus, Plaintiffs must allege that they 1) sought advice or assistance from Blume, 2) that the advice was within Blume's professional competence, 3) that Blume expressly or impliedly agreed to render such assistance, and 4) that it was reasonable for Plaintiffs to believe Blume was representing them. *Atkinson*, 622 A.2d at 986. Plaintiffs have not done this.

First, Plaintiffs make vague references to Anne Blume allegedly acting as general counsel for the CLM Entities and allegedly "offer[ing] her legal skills to Potter, Moxie, and CLM Group, drafting contracts advising the companies on employment, antitrust, and other business-related matters." Compl. at ¶¶ 22, 24. Plaintiffs do not allege any further detail in connection with these

30

claims.  As such, Plaintiffs do not plead any facts to establish that they sought advice or assistance from Blume, that such advice or assistance was within Blume's professional competence, that Blume expressly or impliedly agreed to render such assistance, and that it was reasonable for Plaintiffs to believe Blume was representing them.  Even if Plaintiffs did allege such detail, they further fail to allege that any such relationship continued and existed during any time relevant to the Complaint.

Plaintiffs also fail to allege an attorney-client relationship with respect to the potential sale of the CLM Entities.  At most, Plaintiffs only allege the first element, when they allege that Potter turned to Blume for advice regarding the potential sale of the CLM Entities.  Plaintiffs do not, and cannot, allege that such advice was within Blume's professional competence.  Plaintiffs' only specific allegations are that Blume recommended accepting a $20 million purchase price for the businesses involved in the Sale and that Blume did not tell Plaintiffs to obtain a valuation of the businesses.  Plaintiffs cannot allege that such advice, which consisted of business advice as opposed to legal advice, fell within Blume's professional competence.

Plaintiffs similarly fail to allege that Blume expressly or impliedly agreed to provide advice regarding the potential sale or that it was reasonable for them to believe Blume represented them with respect to the potential sale.  At most, Plaintiffs allege that Potter and Blume discussed the potential sale on several occasions and Blume thought the asking price was a good offer.  Plaintiffs allege that Potter and Blume had a personal relationship and spoke daily, which demonstrates that Plaintiffs' allegations are analogous to the facts in *Atkinson*.  Plaintiffs' allegations suggest a belief that any utterance Blume made constituted legal advice merely because of her profession, which is contrary to Pennsylvania law.  Just as an off-handed, nebulous comment regarding financial risk in *Atkinson* could not support the existence of an

attorney-client relationship, Plaintiffs' allegations here do not suggest the existence of an attorney-client relationship.

Further, like in *Atkinson*, Plaintiff Potter is a sophisticated business owner, there was no express legal agreement between the parties, no fee arrangement was entered nor retainer paid, there is no indication the legal ramifications of the Sale were discussed, there is no indication that Blume told Plaintiffs she represented them in the Sale, and Plaintiffs in fact obtained separate counsel to represent them in connection with the Sale.  Moreover, just as the attorney in *Conley* discussed a potential loan with the plaintiff, Plaintiffs allege only that Blume discussed a potential sale with Plaintiff Potter.  Like the attorney in *Conley*, Blume did not draft or review any documents associated with the Sale and did not charge or receive any fee for legal services. While *Atkinson* and *Conley* both involved summary judgment, these opinions make clear that Plaintiffs have not sufficiently pled a plausible existence of an attorney-client relationship between themselves and Anne Blume.

Because Plaintiffs' breach of fiduciary duty claim against Anne Blume relies upon the existence of an attorney-client relationship, the Court should dismiss Count I against Blume and Cozen O'Connor to the extent Plaintiffs' claim arises out of Blume's alleged conduct.

> (ii)     Plaintiffs Fail to Sufficiently Allege the Elements of a
> Claim for Breach of Fiduciary Duty against Anne Blume
> and Cozen O'Connor

Even setting aside Plaintiffs failure to allege an attorney-client relationship, for the moment, Plaintiffs fail to allege additional elements necessary to state a claim for breach of fiduciary duty against Anne Blume because they do not, and cannot, allege that Anne Blume negligently or intentionally failed to act in good faith and solely for Plaintiffs' benefit.

To state a claim for breach of a fiduciary duty, a plaintiff must prove: "the existence of a fiduciary relationship between [p]laintiff and [defendant], that [defendant] negligently or

intentionally failed to act in good faith and solely for [plaintiff's] benefit, and that [defendant] suffered an injury caused by [p]laintiff's breach of his fiduciary duty." *Snyder v. Crusader Serv. Corp.*, No. 1898 EDA 2019, 2020 WL 1283577, *9 (Pa. Super. Mar. 18, 2020); *see also Nkansah v. Kleinbard LLC*, No. 19-4472, 2020 WL 920269, *6 (E.D. Pa. Feb. 26, 2020) ("To establish a breach of fiduciary duty, the plaintiff must prove: (1) the defendants negligently or intentionally failed to act in good faith and solely for their benefit; (2) he suffered injury; and (3) the defendants' failure to act solely for his benefit was a real factor in bringing about his injury.").

Pennsylvania courts have explained that "a confidential relationship and the resulting fiduciary duty may attach wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Dougherty v. Pepper Hamilton LLP*, 133 A.3d 792, 797 (Pa. Super. 2016) (internal quotation and citation omitted). In *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277 (Pa. 1992), "[t]he leading case in Pennsylvania discussing breach of a fiduciary duty by an attorney with regard to a conflict of interest," the court highlighted that the defendant law firm "was furnished with substantial confidential commercial information and came to know the complete inner-workings of the company along with Maritrans' longterm objectives, and competitive strategies." *Dougherty*, 133 A.3d at 797 (internal quotations and citations omitted). The court explained that "adherence to a fiduciary duty ensures that clients will feel secure that everything they discuss with counsel will be kept in confidence and that [defendant firm] had a duty to administer properly their responsibilities to respect the confidences of Maritrans." *Id.* (same). The court "further explained that the rationale behind this policy is to prevent an attorney from taking undue advantage of the confidential communications of such client[.]" *Id.*

33

(same).  Thus, the leading Pennsylvania case focused on the attorney's bad faith and self-dealing in assessing a breach of fiduciary duty claim based upon alleged conflicts of interest.

Federal cases applying Pennsylvania law further demonstrate the need for allegations of bad faith to support a breach of fiduciary duty claim based upon an alleged conflict of interest. *See*, *e.g.*, *Reis v. Barley Snyder Senft & Cohen, LLC*, 667 F.Supp.2d 471, 489 (E.D. Pa. 2009) ("Because it appeared from the information provided to [defendant attorney] by [a corporate shareholder] that he was acting in the interest of the Company . . . , there was no negligent or intentional conduct performed by [defendant attorney] in bad faith."); *cf. Airgas, Inc. v. Cravath, Swaine & Moore LLP*, No. 10-612, 2010 WL 3046586, *4 (E.D. Pa. Aug. 3, 2020) (finding that plaintiff sufficiently pled a claim for breach of fiduciary duty where it alleged that "[defendant] disregarded its duty of undivided loyalty to [plaintiff] by accepting, without prior disclosure, a representation of [another entity] designed explicitly to help [that entity] take over [plaintiff]. [Plaintiff] allege[d] that at the same time . . . that [plaintiff] had engaged [defendant] and assumed its undivided loyalty, [defendant] was covertly advising [the other entity] on how to end [plaintiff's] independent corporate existence.").

Again, setting aside the fact that Plaintiffs have not sufficiently pled an attorney-client relationship with Blume, Plaintiffs fail to state a claim for breach of fiduciary duty for two additional reasons.  First, Plaintiffs fail to allege that Anne Blume negligently or intentionally engaged in the alleged conflict of interest underpinning the breach of fiduciary duty claim. Indeed, Plaintiff Potter did not tell Blume who was on the other side of the potential sale at issue here.  Plaintiffs admit as much when they allege that Blume "presumably" "knew that The Institutes were long-standing clients of Cozen . . . ."  *See* Compl. at ¶ 33.  If Potter had told Blume that The Institutes was on the other side of the deal when Potter sought Blume's advice,

34

there would be no need for any such presumptions.  Even setting this aside for the moment, Plaintiffs do not allege that Cozen O'Connor was representing The Institutes with respect to the Sale, as opposed to on other matters, until the drafting of the Asset Purchase Agreement, at which point Plaintiffs obtained other counsel.  *See* Compl. at ¶¶ 43-44, 47.  Thus, Plaintiffs cannot even allege that Blume knew The Institutes were on the other side of the proposed transaction at any time relevant to the Complaint, let alone that she knew Cozen was representing The Institutes with respect to the Sale.  As a result, Plaintiffs fail to allege any facts suggesting that Blume negligently or intentionally engaged in any potential conflict of interest.  The Court should dismiss Count I against Anne Blume for this reason alone.

Second, Plaintiffs cannot allege that Blume "failed to act in good faith and solely for [Plaintiffs'] benefit" as Plaintiffs do not, and cannot, allege any bad faith on Blume's part.  As noted above, Plaintiffs cannot allege that Blume even knew that The Institutes was on the other side of the potential sale when Plaintiff Potter sought her advice.  As a result, Plaintiffs cannot allege any plausible way that Blume was not acting in good faith or for Plaintiffs' benefit. Plaintiffs attempt to claim that Blume had a personal interest in the sale, but the only potential interest Plaintiffs can even suggest is that Blume was appointed Chief Executive Officer of CLM Group, Inc.  *See* Compl. at ¶ 50.  However, Plaintiffs own allegations demonstrate that this occurred *after* the sale and as a result of *Plaintiff Potter's* own recommendation.  *See id.* Plaintiffs did not allege that Blume was aware of this potential appointment at any time relevant to the Complaint.  It is implausible that a potential appointment Blume was not aware of could have somehow motivated her to act in anything other than good faith.  Further, the only specific alleged advice Plaintiffs attribute to Blume relates to a recommendation to accept a $20 million purchase price for the CLM Entities.  Plaintiffs fail to allege, or even suggest, that Blume had

any information relating to the financial affairs of the CLM or believed or knew that this amount was anything other than a fair and reasonable offer. Plaintiffs fall far short of alleging any bad faith that could show Blume was not acting solely for their benefit, and the Court should dismiss Count I against Blume for this reason as well.

Finally, Plaintiffs' claim against Blume also fails to the extent it is based upon an alleged use of confidential information. As an initial point, it is not clear that Plaintiffs even allege that Blume obtained and/or improperly used any confidential information. This uncertainty further demonstrates that these allegations are insufficiently plead, as is explained more fully above in Section IV(B). Thus, any such allegations cannot save Plaintiffs' breach of fiduciary duty claim.

The allegations in Plaintiffs' Complaint fail to state a cause of action for breach of fiduciary duty against Anne Blume, and the Court should dismiss this claim. Because Plaintiffs cannot support their breach of fiduciary duty claim against Anne Blume or Anne Madonia, the Court should also dismiss Plaintiffs' derivative claim against Cozen O'Connor in Count I.

2.   *Plaintiffs Allegations' in Count II Fail to State a Tort-Based Legal Malpractice Claim against Anne Blume and Cozen O'Connor.*

Plaintiffs' allegations cannot state a tort-based legal malpractice claim against Anne Blume or Cozen O'Connor. In order to establish a claim of legal malpractice, a plaintiff must demonstrate three basic elements: "1) employment of the attorney or other basis for a duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) that such negligence was the proximate cause of damage to the plaintiff." *Kituskie v. Corbman*, 714 A.2d 1027, 1029 (Pa. 1998). As noted above, where no express contract exists, a court may imply an attorney-client relationship "if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to

36

believe the attorney was representing him." *Atkinson v. Haug*, 622 A.2d 983, 986 (Pa. Super. 1993). Further, with respect to conflicts of interest, an alleged conflict of interest, standing alone, does not give rise to a cause of action. *See Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1284 (Pa. 1992) ("[S]imply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief.").

As an initial point, Plaintiffs admit there was no written agreement between Plaintiffs and Blume for legal representation. *See* Compl. at ¶ 94. To sustain a legal malpractice claim, then, Plaintiffs must show an implied attorney-client relationship. As is explained more fully above, Plaintiffs fail to sufficiently allege an implied attorney-client relationship with Blume. Thus, Plaintiffs cannot maintain this legal malpractice claim against Blume.

Moreover, to the extent Plaintiffs allege that Blume purposefully failed to act in good faith because of some alleged self-interest in the sale, this claim is a restatement of Plaintiffs' breach of fiduciary duty claim and fails for the same reasons as set forth above with respect to Count I.

Finally, any reference to an alleged use of confidential information cannot support this claim as Plaintiffs failed to sufficiently allege facts regarding confidential information. Again, it is not clear that Plaintiffs even allege that Blume obtained and/or improperly used any confidential information. Because any such allegations are insufficiently pled, they cannot save Plaintiffs' legal malpractice claim against Anne Blume or Cozen O'Connor, and the Court should dismiss Count II.

3.  *The Gist of the Action Doctrine Bars Count III, Plaintiffs' Contract-Based Legal Malpractice Claim against Anne Blume and Cozen O'Connor.*

Based upon the well-pleaded facts set forth in the Complaint, Plaintiffs cannot state a claim for breach of contract against the Defendants, and Count III should be dismissed.

Pennsylvania law is very clear as to whether claims against professionals by their clients may be brought in contract or in tort. A long line of Pennsylvania Supreme Court cases originating in the 19th century explains what has come to be known in Pennsylvania jurisprudence as the "gist of the action" doctrine. Most recently the Supreme Court addressed the issue in *Bruno v. Erie Insurance Company*, 630 Pa. 79 (2014). There, the Court reviewed the long history of the doctrine in Pennsylvania, summing it up as follows:

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim established that the duty breached is one created by the parties by the terms of their contract -- i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract -- then the claim is to be viewed as one for breach of contract. … If, however, the facts established that the claim involves a defendant's violation of a broader social duty owed to all individuals, which is imposed for the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort…Although this duty-based demarcation was first recognized by our Court over a century and a half ago, it remains sound, as evidenced by the fact that it is currently employed by the high Courts of the majority of our sister jurisdictions to differentiate between tort and contract actions. We, therefore, reaffirm its applicability as the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint.

630 Pa. 111-113 (citations omitted). Under this doctrine, it is possible that a client who believes itself to have been poorly served by a lawyer might be able to state a contract claim against its lawyer, but such a claim can only be made where the lawyer allegedly failed to follow specific, articulated instructions. But it is clear that where that kind of allegation cannot be made, and instead the lawyer's alleged malpractice consists not of failing to perform a

specifically identified task, but instead of failing to follow the standard of care expected of all

lawyers in the course of carrying out a representation, the only possible claim sounds in tort.

"The client has a choice: either to sue the attorney in assumpsit, on the theory that the attorney

by failing to follow specific instructions committed a breach of contract; or to sue the attorney in

trespass, on the theory that the attorney failed to exercise the standard of care that he was obliged

to exercise." *Duke & Co. v. Anderson*, 275 Pa. Super. 65, 70-71, 418 A.2d 613, 616 (1980).

Examples of application of this basic rule abound.

In *Storm v. Golden*, 371 Pa. Super. 368 (1987), the Pennsylvania Superior Court held that

where a breach of contract count in a legal malpractice case does not allege a failure to follow

specific instructions nor that a breach of a specific provision occurred it is "not a true contract

cause of action but sounds in negligence." 371 Pa. Super 368, 378, 538 A2d 61 at 65.  In *Hoyer

v. Frazee*, 323 Pa. Super. 421, 470 A.2d 990 (1984), the Superior Court held that where a

malpractice claim is based upon an assertion that an attorney failed to exercise the requisite duty

of care owed to all clients, and there is no allegation of a failure to follow specific instructions,

then no contract cause of action may be brought against the attorney and the claim, however

denominated in the complaint, sounds in negligence. 323 Pa. Super. 421, 426, 470 A.2d 990,

992-93 (1984).

Most recently, in *Riverside Management Group, LLC v. Finkleman*, 2018 Pa. Dist. &

Cnty.  Dec. LEXIS 2573 (Delaware County 2018),[14] the Plaintiffs alleged a number of different

counts by which they sought to recover from their former counsel for malpractice.  The first

count was stated as a breach of contract claim and the second as a negligence claim.  The court

dismissed the contract count, finding, just as is so here, that there was no written agreement of

---

[14] A copy of the opinion in *Riverside* is attached for ease of reference. *See* Ex. "F."

any kind constituting a contract between the clients and the lawyers, and an examination of the Complaint showed that the gravamen of the Complaint made by the former clients against the lawyers was the lawyer's "failure to perform in conformity with the requisite standard of care." 2018 Pa. Dist. Cnty. Dec. LEXIS 2573, at 41.  Just as in this case, the Plaintiffs in *Riverside* did not allege that there was a breach of any specific contractual obligation, only that the quality of services provided was not up to the applicable standard of care.  As a consequence, the claim sounded in tort, and the count purporting to set out a contract claim was dismissed.  The *Riverside* holding was affirmed by the Pennsylvania Superior Court in December of 2018.  *See* 2018 Pa. Super. Unpub. LEXIS 4701 (December 17, 2018).  Because the Superior Court opinion was unpublished, we rely upon the Delaware County Court of Common Pleas opinion, referred to by the Superior Court as "well reasoned."[15]

Other courts have reached the same result.  In *Rinker v. Amori*, 2016 U.S. Dist. LEXIS 36712 (M.D. Pa. 2016), a federal court dismissed a contract action alleging legal malpractice. As in *Riverside*, and as is so here, the plaintiff there did not and could not allege a breach of a specific provision of any contract, but merely that the lawyer failed to provide competent services in accordance with the appropriate standard of care.  In reliance on the gist of the action doctrine the Court dismissed the contract claim.  The same result was reached in *New York Central Mutual Insurance Company v. Edelstein*, 2015 U.S. Dist. LEXIS 10817 (U.S.D.C., M.D. Pa. 2015), *aff'd,* 637 Fed. Appx. 70, 2016 U.S. App. LEXIS 1661 (3rd Cir. 2016).

---

[15] Another recent unpublished opinion of the Pennsylvania Superior Court reached an identical result only three months earlier.  See *Seidner v. Finkleman*, 2018 Pa. Super. Unpub. LEXIS 3249 (August 31, 2018).  The opinions are unpublished, we suspect, precisely because they are based on settled law and break no new ground.  *See also*, *The Gist of the Gist and Legal Malpractice Actions*, The Legal Intelligencer, Monday, November 26, 2018, p. 8, explaining the *Seidner* opinion and summarizing earlier case law to the same effect.  A copy of that article is appended hereto for ease of reference. *See* Ex. "G."

Similarly, this Court recently noted that "Pennsylvania courts have routinely applied the gist of the action doctrine to legal malpractice actions and dismissed claims brought under contract law that actually 'are based on failure of defendants to abide by the relevant professional standard of care'" before holding that plaintiffs' contract-based legal malpractice claim was barred by the gist of the action doctrine where plaintiffs did not allege that "defendants had failed to perform a particular task as required by a contract between the parties." *Juday v. Sadaka*, No. 19-1643, 2019 WL 4139089 (E.D. Pa. Aug. 30, 2019). In an even more recent case, this Court relied upon the gist of the action doctrine to dismiss a contract-based legal malpractice claim where plaintiff "base[d] his breach of contract claim . . . on the same allegations as his negligence claim[,]" did "not allege that the defendants failed to follow his instructions or breached any specific executory promise in their agreement[,]" and based his claim "on the alleged breach of the professional standard of care." *Nkansah v. Kleinbard LLC*, No. 19-4472, 2020 WL 920269, *5 (E.D. Pa. Feb. 26, 2020).

As one can see, a veritable mountain of case law exists at the state and federal level demonstrating conclusively that the claims here sound in tort and not in contract. The cases above arise in a variety of contexts. In some cases it is important to determine whether or not the claim sounds in tort or contract for purposes of application of the statute of limitations, *Riverside*; sometimes it must be determined whether or not expert testimony is required as part of a plaintiff's case, *Storm v. Golden*, and at other times it must be determined to establish the elements of the cause of action, *Hoyer v. Frazee*. But regardless of the context, the results in all the cases are dictated by the basic principle explained above.

Here the question is relevant for purposes of judging whether or not Plaintiffs' Complaint states a claim sounding in contract. As noted in *Bruno v. Erie,* that question must be decided by

41

examining a plaintiff's complaint, where the Supreme Court stated, "the underlying averments supporting the claim in a plaintiff's complaint [are] the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract.  In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance." 630 Pa. 111-113.

Here, examination of Plaintiffs' Complaint reveals that Plaintiffs have not pleaded anything remotely close to the required elements to state a claim for breach of contract in a legal malpractice matter.  Indeed, the Complaint pleads quite the opposite.  It affirmatively pleads that there is *no* engagement letter or other writing of any kind purporting to set forth the terms of any contract describing the representation.  *See* Compl. at ¶ 94.  And it goes even further, affirmatively pleading that the alleged malpractice consisted of an alleged failure to "perform the services in accordance with industry standards as is required by implication in all legal services contracts."  Compl. at ¶ 95.  In so doing Plaintiffs demonstrate that their claim for legal malpractice is a textbook example of a malpractice claim that sounds only in tort.  The language of the Complaint is strikingly similar to the language found in the complaints in the various cases cited above, found by the courts in each case to require the bringing of the claim in tort alone, and not in contract.

For that reason, based upon the well pled allegations of the Complaint, the Court should dismiss Count III of the Complaint.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants Anne Blume, Anne Madonia, and Cozen O'Connor's motion and dismiss the Complaint.

Respectfully submitted,

COZEN O'CONNOR
*/s/ Brian P. Flaherty*
Brian P. Flaherty
Michael J. Melusky
1650 Market Street, Suite 2800
Philadelphia, PA 19103
*Attorneys for Defendants Cozen O'Connor, Anne
Blume, and Anne M. Madonia*

Dated: July 1, 2020

**CERTIFICATE OF SERVICE**

I, <u>Brian P. Flaherty</u>, hereby certify that on this <u>1st</u> day of <u>July</u>, <u>2020</u>, I caused to be served a copy of the following: (1) Defendants Cozen O'Connor, Anne Blume, and Anne M. Madonia's Motion to Dismiss Plaintiffs' Complaint; (2) Memorandum of Law In Support of Defendants Cozen O'Connor, Anne Blume, and Anne M. Madonia's Motion to Dismiss Plaintiffs' Complaint, and (3) a proposed Order on Defendants Cozen O'Connor, Anne Blume, and Anne M. Madonia's Motion to Dismiss Plaintiffs' Complaint, through the Court's electronic filing system on:

Clifford E. Haines, Esq.
Haines & Associates
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107

*Attorneys for Plaintiffs*

/s/ *Brian P. Flaherty*
BRIAN P. FLAHERTY

LEGAL\46707421\2